2014-5143

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

CGI FEDERAL INC.,

Plaintiff-Appellant,

v.

THE UNITED STATES,

Defendant-Appellee.

---

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN NO. 14-355C
JUDGE MARY ELLEN COSTER WILLIAMS

---

NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT
CGI FEDERAL INC.

Scott M. McCaleb
(Attorney of Record)
Daniel P. Graham
Christine Reynolds
Gary S. Ward
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-3193

*Counsel for Plaintiff-Appellant*
*CGI Federal Inc.*

October 20, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CGI Federal Inc. v. United States

No. 2014-5143

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant CGI Federal Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

CGI Federal Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not Applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

CGI Group Inc.; CGI Technologies and Solutions Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Wiley Rein LLP: Scott M. McCaleb, Daniel P. Graham, Christine Reynolds, Gary S. Ward, and W. Barron A. Avery (Mr. Avery is no longer with Wiley Rein)

October 20, 2014

/s/ Scott M. McCaleb

Scott M. McCaleb
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-3139

*Counsel for Plaintiff-Appellant*
*CGI Federal Inc.*

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ......................................................1

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE..............................................................2

STATEMENT OF THE FACTS ............................................................3

I.      The Federal Acquisition Streamlining Act .....................................3

II.     The FAR's Implementation of FASA ...........................................6

III.    The Federal Supply Schedule Program .........................................9

IV.     The Instant Acquisition and Underlying Protests...........................11

V.      The COFC's Issuance of an Injunction Pending Appeal ..............14

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT ....................................................................................20

I.      Standard of Review.....................................................................20

II.     The COFC Erred in Concluding that CMS Did Not Violate FASA and the FAR by Including in the Protested Solicitations Payment Terms that Are Inconsistent With Customary Commercial Practice. ...................................20

        A.      FASA and FAR Part 12 Require Agencies to Use Customary Commercial Terms for All Acquisitions of Commercial Items..........20

        B.      The COFC Mistakenly Failed To Give Effect to FASA's and FAR Part 12's Plain Meaning and Congress's and the FAR Council's Clearly Expressed Intent. ................................................24

III.    The COFC Erred in Concluding that the RFQs' Payment Terms Are Not Unduly Restrictive of Competition. ..........................................30

        A.      The Challenged Payment Terms Restrict Competition.....................31

B.    The Restrictive Payment Terms Are Not Necessary to Satisfy Any Legitimate Agency Need................................................................32

C.    The Record Demonstrates that the Restriction on Competition Extends Beyond CGI...........................................................................................36

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................38

Confidential information has been removed from pages 16 and 32. The information removed is competitively sensitive, proprietary information of CGI Federal Inc, and disclosure of that information would harm its competitive interests. This information is subject to a protective order issued by the Court of Federal Claims. The information removed from page 16 relates to sensitive and irreparable harms that CGI would suffer absent injunctive relief; page 32 relates to proprietary pricing information.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bannum, Inc. v. United States,
  404 F.3d 1346 (Fed. Cir. 2005) ..........................................................31

Charles H. Tompkins Co. v. United States,
  43 Fed. Cl. 716 (1999)........................................................................30

CHE Consulting, Inc. v. United States,
  552 F.3d 1351 (Fed. Cir. 2008) ...................................................30, 33

Kingdomware Technologies, Inc. v. United States,
  754 F.3d 923 (Fed. Cir. 2014) .......................................................9, 10

Lousiana Public Service Commission v. F.E.R.C.,
  522 F.3d 378 (D.C. Cir. 2008)...........................................................33

Laird v. Nelms,
  406 U.S. 797 (1972)......................................................................18, 27

Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile
  Insurance Co.,
  463 U.S. 29 (1983)..............................................................................19

Newman v. Teigeler,
  898 F.2d 1574 (Fed. Cir. 1990) ...................................................22, 24

NTN Bearing Corp. of America v. United States,
  368 F.3d 1369 (Fed. Cir. 2004) .........................................................27

Orion Technology, Inc. v. United States,
  704 F.3d 1344 (Fed. Cir. 2013) .........................................................20

Rockies Express Pipeline LLC v. Salazar,
  730 F.3d 1330 (Fed. Cir. 2013) .........................................................20

Savantage Financial Services, Inc. v. United States,
  595 F.3d 1282 (Fed. Cir. 2010) .........................................................33

Sebelius v. Cloer,
    133 S. Ct. 1886 (2013) ........................................................................22

Sharp Electronics Corp. v. McHugh,
    707 F.3d 1367 (Fed. Cir. 2013) ....................................................9, 10

**Comptroller General Decisions**

Desktop Alert, Inc.,
    B-408196, July 22, 2013, 2013 CPD ¶ 179 .......................................30

NCS Technologies, Inc.,
    B-403435, Nov. 8, 2010, 2010 CPD ¶ 281 ........................................30

Republic Floors, Inc.,
    B-242962, June 18, 1991, 91-1 CPD ¶ 579 ..................................32, 37

Verizon Wireless,
    B-406854, Sept. 17, 2012, 2012 CPD ¶ 260 ........................................9

**Statutes**

41 U.S.C. § 3307 ................................................................................*passim*

Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103–355, 108 Stat.
    3243 ................................................................................................3, 22

**Regulations**

48 C.F.R. § 2.101 .............................................................................*passim*

48 C.F.R. § 8.405-1 ................................................................................10

48 C.F.R. § 8.405-2 ................................................................................10

48 C.F.R. § 10.002 ...................................................................................8

48 C.F.R. § 11.002 .................................................................................30

48 C.F.R. § 12.102 ..........................................................................*passim*

48 C.F.R. § 12.202 ...................................................................................8

48 C.F.R. § 12.301 .............................................................................8, 18

48 C.F.R. § 12.302 ...................................................................9, 18, 23

48 C.F.R. § 38.101 ...................................................................................9

48 C.F.R. § 512.301 ................................................................................7

GSAM 512.203 ...............................................................................7, 11, 27

GSAM 538.271 ...................................................................................11

## Other Authorities

140 Cong. Rec. H9240-01, 1994 WL 513434 (Sept. 20, 1994) ...............................3

140 Cong. Rec. S6489-01, 1994 WL 245996 (June 7, 1994) ..................................3

140 Cong. Rec. S12369-03, 1994 WL 456698 (Aug. 23, 1994).................... 3-4, 24

Final Rule, 60 Fed. Reg. 48231 (Sept. 18, 1995) .............................................*passim*

GSA, For Vendors – Getting on Schedule (May 29, 2014) ....................................10

Hearing on S.1587, Before the Committees on Armed Services & Government
      Affairs, 1994 WL 214456 (Feb. 24, 1994) ....................................................4, 24

Carl L. Vacketta & Susan H. Pope, <u>Commercial Item Contracts: When is a
      Government Contract Term or Condition Consistent with 'Standard' or
      'Customary' Commercial Practice?</u>, 27 Pub. Cont. L.J. 291 (1998)....................5

Marcia Semmes, <u>Recovery Audit Contractor Seeks Stay of Decision on Modified
      Payment Terms</u>, Fed. Cont. Rep. (BNA) (Aug. 29, 2014) ...............................14

Merriam-Webster Online Dictionary.........................................................................8

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Counsel states that he is unaware of any other appeal in or from this action that was previously before this Court or any other appellate court.  Counsel further states that he is unaware of any cases pending in this or any other Court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This appeal is from the Judgment on the Administrative Record entered by the United States Court of Federal Claims (COFC) on August 21, 2014, pursuant to Court of Federal Claims Rule 52.1.  A26.[1]  The COFC had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1491(b).  A12.  Plaintiff-Appellant CGI Federal Inc. timely filed its Notice of Appeal on August 26, 2014, A603, within the 60-day period established by Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3), as an appeal from a final decision of the COFC.

## STATEMENT OF THE ISSUES

1.     Whether the mandate in the Federal Acquisition Streamlining Act (FASA) and the Federal Acquisition Regulation (FAR) requiring agencies to buy commercial items only on commercial terms applies to orders placed under the

---

[1] As required by Fed. Cir. R. 28(a)(12), the court's opinion, judgment, order, and additional findings are reproduced in the addendum to this brief.

Federal Supply Schedule (FSS) Program operated by the General Services

Administration (GSA), the largest government program for buying commercial

items.

2.     Whether the payment terms in the solicitations for this procurement, which

caused potential competitors not to compete and to withdraw from the competition,

are unduly restrictive of competition and therefore cannot stand.

## STATEMENT OF THE CASE

CGI Federal Inc. filed a bid protest in the COFC on April 28, 2014,

challenging the payment terms included in three solicitations (Solicitation Nos.

RFQ-CMS-2014-Region 1, RFQ-CMS-2014-Region 2, and RFQ-CMS-2014-

Region 4) issued by the Department of Health and Human Services, Centers for

Medicare and Medicaid Services (CMS).  Those terms require contractors to wait

an additional 80 to 380 days after performing services to invoice for payment.  CGI

claimed that the terms (1) violated the mandate in FASA and the FAR requiring

agencies to procure commercial items only on commercial terms, and (2) were

unduly restrictive of competition.

After denying the Government's Motion to Dismiss, A13, the court granted

the Government's cross motion for judgment on the administrative record.  A25.

The court agreed with CGI that the solicitations sought commercial items and were

inconsistent with commercial practice, A9-10, but it found FASA's mandate

inapplicable, A21, and the terms not unduly restrictive, A22-23.  Recognizing that these issues were a "very close call," A697:15, the court issued an injunction prohibiting CMS from awarding contracts under the challenged solicitations while this appeal is pending, A707.

## STATEMENT OF THE FACTS

## I.    THE FEDERAL ACQUISITION STREAMLINING ACT

Before the passage of the Federal Acquisition Streamlining Act of 1994 (FASA), Pub. L. No. 103–355, 108 Stat. 3243, the Federal Government had "discourage[ed] commercial companies from bidding on its contracts by including numerous burdensome and unnecessary contract clauses."  140 Cong. Rec. S6489-01, S6490, 1994 WL 245996 (June 7, 1994) (statement of Sen. Levin).  When commercial companies were willing to do business with the Government, it paid exorbitant sums for commercially available items.  See 140 Cong. Rec. H9240-01, H9244, 1994 WL 513434 (Sept. 20, 1994) (statement of Rep. Furse) (noting Government misspending and stating that the Government needs to shop like everyone else: "you go to the store and buy items off the shelf, which are cheaper").

Congress decided that the Government must "jump into the commercial market like any other large customer [because] [t]herein lies the benefits of competition and our national productive capacity."  140 Cong. Rec. S12369-03,

S12370, 1994 WL 456698 (Aug. 23, 1994) (statement of Sen. Glenn).  The

Government recognized that "[t]he only way the Government can take advantage

of the commercial marketplace is to enter into it on commercial terms."[2]  Hearing

on S.1587, Before the Comms. On Armed Servs. & Gov't Affairs, 1994 WL

214456 (Feb. 24, 1994) (statement of John M. Deutch, Under Secretary of

Defense).

     FASA comprehensively reformed Government procurement by mandating

that the Government focus its buying efforts on commercial items acquired only

under commercial terms; for example, FASA required that the Government:

- perform market research to determine if its needs (or modified needs) can be met with commercial items, and "to the maximum extent practicable," state requirements to facilitate commercial item buys;

- acquire commercial items "to the maximum extent practicable"; and

- remove policies that would impede commercial item acquisitions.

41 U.S.C. § 3307(b)-(d).[3]

     Critical to this case, FASA mandated that the FAR contain a list of clauses

for inclusion in "contracts for the acquisition of commercial end items," which to

"the maximum extent practicable . . . shall include only those contract clauses that

---

[2] All emphases are added, and all internal citations and quotations are omitted, unless otherwise noted.  Citations to the FAR are to Title 48 of the C.F.R.

[3] As required by Fed. R. App. P. 28(f) the statutes, regulations, and agency guidance on which Appellant relies are reproduced in the addendum to this Brief."

are . . . determined to be consistent with standard commercial practice." 41 U.S.C.

§ 3307(e)(2)(B); see also id. § 3307(e)(2)(C) (applying requirement to commercial

item subcontracts).  FASA then provided that only clauses that are consistent with

standard commercial practice may be included in any commercial item contract:

> **(D) Clauses that may be used in a contract.**  To the maximum
> extent practicable, only the contract clauses listed pursuant to
> subparagraph (B) may be used in a contract . . . for the acquisition of
> commercial items or commercial components by or for an executive
> agency.

Id. § 3307(e)(2)(D).  FASA required that the FAR provide "standards and

procedures" for waiving the mandate to use only clauses consistent with standard

commercial practice.  Id. § 3307(e)(2)(E).  There is no other exception listed.

A leading government contracts practitioner aptly summarized FASA:

> The passage of [FASA] was heralded as the dawn of a new era by
> commercial companies looking to sell commercial products or
> services to the Federal Government. . . .  Henceforth, the federal
> policy would be to conduct market research in order to determine if a
> commercial or nondevelopmental item would meet the Government's
> needs.  If so, the agency was to acquire a commercial item from its
> prime contractor and . . . subcontractors, to the maximum extent
> practicable.  And, under the dictates of FASA, only two types of
> clauses were to be used in government commercial item contracts: (1)
> those required to implement provisions of law or executive orders
> applicable to acquisitions of commercial items, and (2) those
> determined to be consistent with standard commercial practice."

Carl L. Vacketta & Susan H. Pope, Commercial Item Contracts: When is a

Government Contract Term or Condition Consistent with 'Standard' or

'Customary' Commercial Practice?, 27 Pub. Cont. L.J.  291, 291-92 (1998).

## II.  __THE FAR'S IMPLEMENTATION OF FASA__

The Final Rule implementing FASA created an entirely new FAR Part 12 (Acquisition of Commercial Items), providing that "the policies in the revised Part 12 are applicable to **all acquisitions of commercial items** above the micro-purchase threshold," Final Rule, 60 Fed. Reg. 48231, 48231 (Sept. 18, 1995). Accordingly, the FAR categorically states that Part 12 "shall be used for the acquisition of supplies or services that meet the definition of commercial items at 2.101." FAR 12.102(a).  An "acquisition means the acquiring by contract with appropriated funds of supplies or services . . . by and for the use of the Federal Government through purchase."  FAR 2.101 (defining "Acquisition"). "Acquisition begins at the point when agency needs are established and includes . . . solicitation and selection of sources [and] award of contracts . . . ."  Id.

The FAR identifies just five instances in which Part 12 does not apply to commercial item buys, none of which applies here (they deal largely with simplified acquisitions in Part 13 for very minor purchases, such as those under $3,000).  FAR 12.102(e).  Part 12 nowhere exempts purchases under the FSS program—through which the Government procures roughly $50 billion in commercial items annually, see infra § III—from the terms of Part 12.  To the

contrary, GSA's Acquisition Manual states that, "[f]or [FSS] contracts, the contracting officer shall use the policies in FAR Part 12." GSAM 512.203(a).[4]

The Final Rule is plain that "[t]he requirements of other parts of the FAR apply to commercial items to the extent that they are not inconsistent with Part 12." 60 Fed. Reg. at 48231. Simple rule: Part 12 applies to all commercial item acquisitions, and other parts apply as long as they are not inconsistent with Part 12. In explaining the relationship between new FAR Part 12 and all "Other FAR Parts," the Final Rule emphasized that they coexist, but Part 12 controls:

> 4. Relationship of Part 12 to Other FAR Parts
>
> Several commentators expressed confusion over the relationship of Part 12 to other Parts, especially Part 13, Simplified Acquisition Procedures; Part 14, Sealed Bidding; and Part 15, Contracting By Negotiation. FAR 12.203 was revised to clarify that Part 12 contains unique policies for the acquisition of commercial items. These unique policies are intended to be used in conjunction with the existing procedures contained in Parts 13, 14, and 15 for the solicitation, evaluation, and award of contracts, purchase orders and other instruments. Part 12 will take precedence over other FAR Parts only where the policies in those parts are inconsistent.

Id. at 48233. The FAR thus clarifies that "[c]ontracting officers shall use the policies in this part [12] in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in [Parts 13-15]." FAR 12.102(b). It expressly provides, however, that Part 12 controls over any other FAR section with

---

[4] The GSA Acquisition Regulation also mandates that the "Senior Procurement Executive must approve the use of a [solicitation] provision or [contract] clause" that is not "consistent with customary commercial practice." GSAR 512.301(c).

respect to the acquisition of commercial items: "Contracts for the acquisition of commercial items are subject to the policies in other parts of the FAR.  When a policy in another part of the FAR is inconsistent with a policy in this part, this <u>part 12 shall take precedence</u> for the acquisition of commercial items."  FAR 12.102(c).

Importantly, FAR Part 12 implements FASA's mandate that commercial item contracts only include clauses that are consistent with standard commercial practice.  41 U.S.C. § 3307(e)(2)(B).  FAR 12.301(a) requires that "contracts for the acquisition of commercial items shall, to the maximum extent practicable, <u>include only those clauses</u>" required by law or "<u>[d]etermined to be consistent with customary commercial practice</u>."  The term "customary" in FAR 12.301(a) is synonomous with the term "standard" in FASA.  <u>See</u> Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/ customary.  The determination whether clauses are consistent with customary commercial practice is to be based on "market research," which is the "foundation" for "the solicitation, and resulting contract."  FAR 12.202(a).  Market research is intended to identify whether the Government's needs can be met with commercial items and to determine "[c]ustomary practices . . . under which commercial sales of the products or services are made."  FAR 10.002(b)(1)(iii).

The FAR bans the inclusion in any commercial item <u>solicitation</u> or <u>contract</u> of any clause inconsistent with customary commercial practice, absent a waiver:

> The contracting officer <u>shall not</u> . . . <u>include any additional terms or conditions in a solicitation or contract</u> for commercial items in a manner that is <u>inconsistent with customary commercial practice</u> for the item being acquired unless a waiver is approved in accordance with agency procedures. The request for waiver must describe the customary commercial practice found in the marketplace, support the need to include a term or condition that is inconsistent with that practice and include a determination that use of the customary commercial practice is inconsistent with the needs of the Government.

FAR 12.302(c). Before this case, the law was well-settled that FAR Part 12 and this proscription applied to FSS orders; thus, an agency could not include in any such solicitation or order a term inconsistent with customary commercial practice without a waiver. <u>Verizon Wireless</u>, B-406854, Sept. 17, 2012, 2012 CPD ¶ 260.

## III.   THE FEDERAL SUPPLY SCHEDULE PROGRAM

The FSS program, operated by GSA, provides "Government agencies with a 'simplified process for obtaining <u>commercial supplies and services</u> at prices associated with volume buying.'" <u>Kingdomware Techs., Inc. v. United States</u>, 754 F.3d 923, 925 (Fed. Cir. 2014) (quoting FAR 8.402(a)); <u>accord</u> FAR 38.101(a). Under the FSS program, GSA "'acts as the contracting agent' for the federal government, negotiating base contracts with suppliers of commercial products and services." <u>Sharp Elecs. Corp. v. McHugh</u>, 707 F.3d 1367, 1369 (Fed. Cir. 2013). Once GSA has negotiated these base "schedule contracts," executive agencies can issue orders and benefit from the federal government's volume buying power. <u>See</u>

id.  The terms of the base contract, referred to as the "schedule" contract, are incorporated by reference into the order.  Id.

For orders beneath the "simplified acquisition threshold" (which generally is $150,000, see FAR 2.101), that involve routine supplies and services and do not require a statement of work, agencies simply review the FSS and select a contractor.  FAR 8.405-1(b)-(c).  For larger purchases or more complex services requiring a statement of work, agencies conduct a streamlined competition among FSS contractors by issuing a solicitation or "Request for Quotes" (RFQ) through "e-buy," GSA's online purchasing system.  FAR 8.405-1(d); FAR 8.405-2.

The "FSS program [is] 'the premier acquisition vehicle in government,' accounting for 10% of overall procurement spending.'"  Kingdomware, 754 F.3d at 925.  The Government annually spends roughly $50 billion on commercial items under the FSS program, making it the largest vehicle for government purchases of commercial items.  See GSA, For Vendors – Getting on Schedule, (May 29, 2014), http://www.gsa.gov/portal/content/198473).  As the COFC observed, the instant procurement is an example of the FSS "being used to purchase multi-million dollar, multi-year, complicated services," and "illustrate[s] how FSS buys have expanded into the territory formerly occupied by negotiated procurements."  A25 n.23.

In addition to FAR Part 38 and Subpart 8.4, GSA prescribes policies and procedures for establishing schedule contracts under the FSS program in Part 538 of the GSA Acquisition Manual (GSAM).[5] Among other things, Part 538 requires GSA to award schedule contracts only "for commercial items as defined in FAR 2.101." GSAM 538.271(a). As a result, the GSAM further provides that "the contracting officer shall use the policies in FAR Part 12" when establishing FSS contracts. GSAM 512.203(a). In this case, GAO, the COFC, and the Government all agree that FAR Part 12 governed the formation of CGI's FSS contract; the only regulatory question is whether FAR Part 12 applies to orders placed under that contract. A101415 n.12; A22; A618.

## IV.    THE INSTANT ACQUISITION AND UNDERLYING PROTESTS

Following a pilot program, in 2008 CMS competitively awarded contracts to four RACs—including one to CGI—to identify improper Medicare payments. A2. These RACs have identified nearly $1 billion per year in improper payments, returning huge sums to the Government. A3. CMS pays the RACs a contingency fee calculated as a percentage of the improper payments. Id. The 2008 contracts provided that these fees "shall be paid once the [RAC] collects the Medicare

---

[5] The GSAM consolidates all of GSA's acquisition rules and guidance, including internal agency acquisition policy and the GSA Acquisition Regulation, which is GSA's regulatory supplement to the Federal Acquisition Regulation. GSAM 501.170(a). The GSAM is available online at http://www.acquisition.gov/gsam/gsam.html.

overpayment," A5—which usually occurs within 41 days of the issuance of a

demand letter notifying a provider of the overpayment, A3—but if the RAC's

determination is overturned on appeal, it must "repay Medicare the contingency

payment for that recovery," A5. Thus, RACs typically have invoiced CMS for

their contingency fee 41 days after the demand letter. Id.

In February 2013, CMS issued RFQs under GSA's "Financial and Business

Solutions" FSS contracts for successor RAC contracts, which contained payment

terms identical to the 2008 contracts. Id. Seven companies bid, including CGI.

Id. One filed a GAO protest, prompting CMS to take corrective action to address

how RACs would repay fees for overpayments that are returned after contract

expiration. A5-6.

CMS sought to impose a modification to the existing RAC contracts, which

CMS recognized would be a "drastic change," to preclude a RAC from receiving

its fee until the second of five potential appeals had been exhausted. A7 (quoting

A102001). This would require a RAC to wait at least 120 days and as many as 420

days to be paid for its efforts, which is three to ten times longer than is customary.

A7-8. All four RACs rejected the proposed modification. A7. The solution the

RACs and CMS reached was to require each RAC to "create a reserve fund"

adequate to repay the fee for any overturned overpayment (which would be

updated monthly) and to obtain a letter of guarantee from each RAC's parent company, agreeing to reimburse CMS for any such fees.  A8.

In January 2014, CMS reissued the RFQs, which included the very payment terms the RACs rejected in CMS's proposed contract modifications.  A8.  The COFC found that these terms "[d]eviate [f]rom [s]tandard [c]ommercial [p]ractice."  A9-10.  Whereas seven contractors had responded to the 2013 RFQs, A5, only five contractors (not CGI) submitted quotes in response to the 2014 RFQs, and one of these contractors subsequently withdrew from the competition.  A11.  So, four of the initial seven bidders declined to participate in the 2014 competition.

CGI and another incumbent RAC protested these payment terms to GAO, alleging that (a) the terms violate FAR Part 12's mandate to include in solicitations and contracts only terms consistent with customary commercial practice absent a waiver, as well as Verizon Wireless, and (b) they unduly restricted competition and were unreasonable.  GAO denied the protest, overruling Verizon Wireless and holding that FAR Part 12 does not apply to solicitations and competitions conducted under the FSS program pursuant to FAR 8.4.  A101415-16.

CGI immediately protested to the COFC.  The Court initially committed to issue a decision by June 20, 2014, but it convened a call on June 17, 2014, stating that "[t]his case has presented some thorny issues," that the Court would not issue

a decision by June 20, that it was "concerned about preserving the status quo . . . until the Court [could] issue a ruling," and that the Court was "prepared to issue a temporary injunction, if necessary, until mid-August to enable the Court to act," if CMS would not agree voluntarily not to make an award.  A561:1, 562:5-7, 563:12-14, 564:1-13, 565:1-4.

The Court said it could issue a decision by August 15, 2014, and CMS agreed not to make awards under the protested RFQs until then.  A563:9-16; A568. On August 15, 2014, the COFC denied CGI's protest, holding (in relevant part) that CMS had not violated FASA and the FAR by including the modified payment terms in the RFQ because neither FAR Subpart 8.4 nor FAR Part 12 requires that the terms of RFQs for FSS orders comply with FAR Part 12 procedures.  A18-22. The Court also rejected CGI's claims that the payment terms unduly restricted competition and were otherwise arbitrary and capricious.  A22-25.  The COFC issued the public version of its decision late on August 22, 2014.[6]

## V.     <u>THE COFC'S ISSUANCE OF AN INJUNCTION PENDING APPEAL</u>

CGI filed this appeal within two business days of the release of the public version of the COFC's decision, and it simultaneously moved the COFC for an

---

[6] The response from government contracts experts to this decision has been highly critical of it, noting that "the holding is contrary to the clear intent of FASA" and "basically turns [FASA] on its head" by permitting a "complete end run around the [FASA] prohibition by allowing the agency to introduce non-commercial terms." Marcia Semmes, <u>Recovery Audit Contractor Seeks Stay of Decision on Modified Payment Terms</u>, Fed. Cont. Rep. (BNA) (Aug. 29, 2014).

injunction pending appeal.  A570.  The COFC granted CGI's motion on September

2, 2014, recognizing that its decision on the merits was "a very close call," and

CGI had presented a "substantial case on the merits":

> First, they claim that what the agency has done is contrary to
> the FAR and to FASA, FAR Part 12 and FAR Part [8.4]. This Court
> disagreed with the Plaintiff on that score, but it was a very close call,
> and I think counsel did a very good job this morning of articulating
> why it was such a close call.  Because the notion that these FSS
> contracts, both the schedule itself and the orders issued thereunder,
> should comport with commercial practice is a paramount
> consideration in the statute and in the regulations.
>
> The Court -- this Court did the best it could in trying to
> reconcile the regulations and it did not conclude that FAR Par 12
> applied here.  But, nonetheless, the Plaintiff has made a very good
> case, in this Court's view, for a decision that it does apply and most
> certainly that it should apply. What happened here was contrary to
> commercial practice. These payment terms are clearly contrary to
> commercial practice. Everyone admits that. RAC services are
> commercial items. Everybody admits that.  So, in this Court's view,
> it's a close call on that argument. And although the Plaintiff lost at
> this Court, it could well succeed at the Court of Appeals.

A697:12-698:7.  The court noted further that the reasonableness of the payment

terms was another "area of this case that troubled this Court":

> [T]his Court concluded that the Plaintiff has not demonstrated that the
> agency's inclusion of payment terms inconsistent with customary
> commercial practice was arbitrary, capricious and [an] abuse of
> discretion.  Nonetheless, it pushed right up against it.  This agency
> conduct, in this Court's view, again was a very close call. Plaintiff, as
> the Court noted in its decision, colorfully described it as a belt and
> suspenders approach. This Court held that CGI's argument rings true
> in many respects. The modified payment term here will increase costs,
> reduce competition, and appears to be a bit excessive.  Nonetheless, it

-15-

does not rise to the level of arbitrary and capricious conduct lacking a rational basis.

> . . .
>
> Even if FASA and FAR Part 12 don't apply, there's still a very troubling aspect to this case about why the agency would impose this onerous payment term on these contractors increasing the agency's own costs, causing contractors to drop out of the competition, acting contrary to commercial practice. Very troubling case. This Court called it one way, but another court could well call it another.

A698:9-23, 699:9-16.

The COFC found that CGI would be irreparably harmed absent an injunction, including loss of "the opportunity to compete for these RFQs," loss of "the opportunity for an award that could span three and a half, four and a half years," and "█████████████████████████████" who are "█████ ████████████████████████████████████████" A699:17-700:2. Conversely, the COFC found that an injunction "would not substantially injure the Government," because CMS can continue to receive RAC services from the incumbent contractors. A700:14-17. Finally, the COFC found that the public interest would benefit from having the Federal Circuit "resolve these important issues, [and] to have one procurement with clarity." A701:19-702:1.

## SUMMARY OF THE ARGUMENT

FASA's requirement that agencies use only contract clauses that are "consistent with standard commercial practice" is a statutory mandate that applies to any "acquisition of commercial end items." 41 U.S.C. § 3307(e)(2)(B). Nothing

-16-

Protected Material Removed

in Section 3307 exempts FSS procurements—the Government's largest vehicle for commercial item purchases—from that requirement.  The COFC recognized that Section 3307(e)(2) contains a "mandate that agencies use clauses 'consistent with standard commercial practice'" for acquisitions of commercial items.  A18.  The COFC recognized further that "RAC services qualify as commercial items."  A19; A698:3-4 ("RAC services are commercial items.").  Still further, the Court found that the challenged payment terms were inconsistent with customary commercial practice.  A9-10; A698:1-3.  Rather than apply FASA's mandate, however, the COFC focused on "whether FAR Part 12 applies to Schedule buys under FAR Subpart 8.4."  A19.  That was error.  FASA's plain language, alone, compels reversal of the judgment below.

The COFC also erred in concluding that "FAR Part 12 itself does not expressly state its provisions apply to FSS buys."  A20.  FAR Part 12, like FASA, expressly states that it applies to any "acquisition of supplies or services that meet[s] the definition of commercial items at 2.101."  FAR 12.102(a).  The Final Rule's preamble makes plain that "the policies in the revised Part 12 are applicable to all acquisitions of commercial items above the micro-purchase threshold [which generally is $3,000, see FAR 2.101]."  60 Fed. Reg. at 48321.  FAR 12.102(c) goes even further and establishes an order of precedence under which FAR Part 12 controls over any other Part of the FAR if there is a conflict: "When a policy in

-17-

another part of the FAR is inconsistent with a policy in this part, this part 12 shall take precedence for the acquisition of commercial items." See also 60 Fed. Reg. at 48231 (other provisions in the FAR apply only "to the extent they are not inconsistent with Part 12"). Finally, the two principal regulations on which CGI relies, 12.301(a) and 12.302(c), apply to "contracts for the acquisition of commercial items" and any "solicitation or contract for commercial items," respectively. "Contracts" includes "orders" and "solicitations" include RFQs. See FAR 2.101 (defining those terms).

There is no dispute that "RAC services qualify as commercial items." A19. As with FASA itself, FAR Part 12 makes no exception for FSS contracts, or orders placed under them. Respectfully, the COFC missed this point when it observed: "While Part 12 states that contracts for commercial items are also subject to policies and procedures found in other parts of the FAR, it does not mention Subpart 8.4 or the FSS in this acknowledgement." A20. FAR 12.102(c) does not single out Subpart 8.4 because it broadly applies to all commercial item acquisitions, save for five inapposite exceptions. The FAR Council had no further obligation to enumerate further the many contract vehicles the Federal Government uses to acquire commercial items; thus, no application of the exclusio unius est exclusio alterius canon should have overcome the plain meaning of FAR 12.102(a) and FASA. Laird v. Nelms, 406 U.S. 797, 802 (1972) (stating that a Court cannot

-18-

"judicially admit at the back door that which has been legislatively turned away at the front door").

Even if the challenged payment terms were not unlawful, they are unduly restrictive of competition and cannot stand.  The trial court correctly found that the challenged payment terms "actually forc[ed] this Plaintiff to drop out of the competition," A697:9-10, and that these terms "will increase costs, reduce competition, and appear[] to be a bit excessive," A23; accord A698:18-19.  The only justification offered by the Agency for this restriction on competition was its concern that "there would be no contractual vehicle to demand a contingency fee payment back if an overpayment determination were overturned on appeal after a RAC contract ended."  A23.

That risk, however, was eliminated in 2013 by the requirement in the current contracts for an escrow account containing sufficient funds to cover those amounts and a parental guarantee. A109024 ("[T]he RAC shall provide a letter of assurance from its parent company stating that should the RAC be unable to reimburse CMS monies due on overturned appeals, that it would assume the responsibility to reimburse CMS."). The revised payment terms are a solution in search of a problem, and this procurement is therefore a classic case of an agency "offer[ing] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

-19-

product of agency expertise." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.    STANDARD OF REVIEW

This court "review[s] the grant or denial of a judgment on the administrative record without deference." <u>Orion Tech., Inc. v. United States</u>, 704 F.3d 1344, 1347 (Fed. Cir. 2013). Likewise, the interpretation of a statute or regulation is a question of law, which the Court reviews <u>de novo</u>. <u>E.g.</u>, <u>Rockies Express Pipeline LLC v. Salazar</u>, 730 F.3d 1330, 1335-36 (Fed. Cir. 2013). "Any underlying fact findings are reviewed for clear error." <u>Orion Tech.</u>, 704 F.3d at 1347-48. Because this case centers on an issue of statutory and regulatory interpretation, it is reviewed <u>de novo</u>, except that the Court's finding that the protested payment terms are inconsistent with customary commercial practice is reviewed for clear error.

## II.    THE COFC ERRED IN CONCLUDING THAT CMS DID NOT VIOLATE FASA AND THE FAR BY INCLUDING IN THE PROTESTED SOLICITATIONS PAYMENT TERMS THAT ARE INCONSISTENT WITH CUSTOMARY COMMERCIAL PRACTICE.

### A.    FASA and FAR Part 12 Require Agencies to Use Customary Commercial Terms for All Acquisitions of Commercial Items.

Three core issues are undisputed:

1.    There is no dispute the RAC services at issue are "commercial items" (they are being procured under FSS contracts that are confined only to commercial items, <u>see</u> FAR Part 38). A19; A698:3-4 ("RAC services are commercial items. Everybody admits that.").

2.      There is no dispute that the protested RFQs' payment terms are inconsistent with standard commercial practice in the RAC industry. A9-10; A698:2-3 ("These payment terms are clearly contrary to commercial practice. Everyone admits that.").

3.      There is no dispute that FASA's and FAR Part 12's mandate to include only customary commercial terms in solicitations and contracts for the acquisition of commercial items applies to solicitations and contracts for FSS contracts (as opposed to solicitations and orders placed under FSS contracts). A12 ("FAR Part 12 does apply to GSA's initial award of a vendor's master schedule contract . . . ."); A101415 n.12 (same).

The only question for this Court is whether FASA's prohibition on the inclusion of terms that are inconsistent with standard commercial practice applies to solicitations or orders placed for commercial items under FSS contracts.

GAO had settled that question in the affirmative in Verizon Wireless but abandoned that decision here without a clear or persuasive explanation. A101415-16. For the COFC's part, it viewed the issue as "thorny" and believed that CGI's position "should be" the correct one. A482:2-6 ("I know—and I think that should be the law, okay? I'll be very open with both of you. I think it should apply, but I don't know if it does . . . ."); A697:23-698:1 ("Plaintiff has made a very good case, in this Court's view, for a decision that it does apply and most certainly that it should apply."). Respectfully, however, the COFC did not address the plain language of FASA, which renders this question simple and straightforward.

In order to fulfill Congress's policy desire to attract commercial companies to the Federal Government marketplace, FASA was express that only "standard"

commercial terms were permitted to be included in any "acquisition of commercial end items." 41 U.S.C. § 3307(e)(2)(B)-(D). Congress made no exception in FASA for the $50 billion in commercial item orders placed against FSS contracts each year. The language of the statute is plain and unequivocal. "It is well settled law that the plain and unambiguous meaning of the words used by Congress prevails in the absence of a clearly expressed legislative intent to the contrary." Newman v. Teigeler, 898 F.2d 1574, 1576 (Fed. Cir. 1990).

In addition, Congress knew how to exempt the FSS program from FASA's requirements and did so explicitly where it saw fit. For example, Sections 1004 and 1054 of FASA—which established authority for agencies to enter multiple-award task and delivery order contracts, which are not implicated here—both provide: "Nothing in this section may be construed to limit or expand any authority of . . . the Administrator of General Services to enter into schedule [or] multiple award . . . contracts under any other provision of law." 108 Stat. 3249, 3250 (10 U.S.C. § 2304a(g)), 3262 (41 U.S.C. § 253h(g)). Had Congress included a similar provision in Section 3307, the Government could legitimately argue that FSS procurements (and orders placed under them) need not employ standard commercial practices as required by Section 3307(e)(2)(B). Because Congress did not include such an exemption in Section 3307, however, the only reasonable conclusion is that Congress intended that provision to apply to FSS procurements.

Sebelius v. Cloer, 133 S. Ct. 1886, 1894 (2013) ("We have long held that [w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). FASA's plain language, by itself, compels reversal of the COFC's judgment.

FAR 12.302(c) states just as categorically that the Government "shall not . . . include any additional terms or conditions in a solicitation or contract for commercial items in a manner inconsistent with customary commercial practice," absent a waiver.   An RFQ is a "solicitation," and an order is a "contract."  FAR 2.101(defining those terms).  FAR 12.102(a) provides further that Part 12 "shall be used for the acquisition of supplies or services that meet the definition of commercial items at 2.101," and the preamble to the Final Rule makes plain that "[t]he policies in the revised Part 12 are applicable to all acquisitions of commercial items above the micro-purchase threshold [or $3,000, see FAR 2.101]."  60 Fed. Reg. at 48231.  FAR Part 12 applies to all commercial item buys with five inapposite exceptions.  FAR 12.102(e).  There simply is no exemption for solicitations or orders under the FSS program.

At bottom, there is no express or implied exemption from FASA or FAR Part 12 for FSS solicitations or orders, and the FAR mandates that, in any acquisition of commercial items, if a requirement in FAR Part 12 is inconsistent

with another requirement elsewhere in the FAR [such as Subpart 8.4], "part 12 shall take precedence." FAR 12.102(c). The preamble to the Final Rule confirms that "the requirements of other parts of the FAR [such as Subpart 8.4] apply to commercial items to the extent that they are not inconsistent with Part 12." 60 Fed. Reg. at 48231. These provisions preclude any construction of Subpart 8.4 that departs from FASA or Part 12.

### B. The COFC Mistakenly Failed To Give Effect to FASA's and FAR Part 12's Plain Meaning and Congress's and the FAR Council's Clearly Expressed Intent.

The COFC framed the issue here solely as whether Part 12 applies to FSS purchases. A19. That frame is too pinched, as it ignores FASA's plain language and defeats the statute's very purpose. In enacting FASA, Congress decided the Government must "jump into the commercial market like any other large customer [because] [t]herein lies the benefits of competition and our national productive capacity." 140 Cong. Rec. S12369-03, S12369, 1994 WL 456698. The Government recognized that "[t]he only way the Government can take advantage of the commercial marketplace is to enter into it on commercial terms." Hearing on S.1587, 1994 WL 214456. The "plain and unambiguous meaning of the words used by Congress prevails" here. Newman, 898 F.2d at 1576. Indeed, the plain meaning of FASA and FAR Part 12 and Congress's and the FAR Council's clearly

expressed intent prohibit the use of non-standard terms in commercial item procurements, absent a waiver (which it is undisputed CMS never sought).

The COFC mistakenly focused on whether FAR Subpart 8.4 expressly exempts Part 12 from its application or expressly states Part 12 applies. A20. FASA and Part 12 already provide that their terms apply to all commercial item procurements, and Subpart 8.4 addresses only commercial item acquisitions. As the COFC found, Subpart 8.4 itself neither excludes Part 12 from its terms (as it does for Parts 13-15 and 19), nor does it expressly state that Part 12 applies. Id. The COFC assigned undue weight to that relative silence given the express terms and purpose of FASA and FAR Part 12.

The COFC also found critical that "[w]hile Part 12 states that contracts for commercial items are also subject to policies and procedures found in other parts of the FAR, it does not mention Subpart 8.4 or the FSS in this acknowledgement." Id. Of course not. Section 12.102(c) does not mention any FAR section specifically that applies to commercial item acquisitions, but that does not mean that none apply. That provision broadly provides that commercial item acquisitions—to which FAR 12.102(a) already states that Part 12 applies—are subject to other parts of the FAR, unless the application of those other parts would be inconsistent with Part 12, in which case Part 12 reigns supreme. The better reading of Part 12.102(c), as it applies to Subpart 8.4, is that Subpart 8.4 applies to

the acquisition of commercial items, except to the extent that its terms (or the interpretation of those terms) would be inconsistent with Part 12. That is precisely what has happened here: CMS has construed Subpart 8.4 to permit it to include non-customary terms in an RFQ for commercial items, which is inconsistent with FAR Part 12's contrary mandate and cannot stand.

Likewise, the fact that Subpart 8.4 is only mentioned in Part 12 three times does not support the COFC's decision. FASA and Part 12 apply to all commercial item procurements (with five inapposite exceptions), and the fact that FAR 12.207 thrice expressly addresses how modifications to FSS orders and related "determination and findings" documents are to be made actually evidences that Subpart 8.4 orders and solicitations generally are subject to Part 12. See A21 & n.21.

Similarly, the fact that FAR 12.102(b) and 12.203 state that the Government should use the policies in Part 12 "in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in [Parts 13-15]," but does not expressly mention 8.4, is equally unsupportive. FASA and Part 12 plainly apply to Subpart 8.4, which deals only with procurements of commercial items. As the FAR Council explained in the Final Rule, however, in a section titled "Relationship of Part 12 to Other FAR Parts," Part 12 and all other FAR parts coexist but in the event of a conflict, Part 12 controls. 60 Fed. Reg. at 48233. As

part of that explanation, the FAR Council (and FAR 12.102(b) and 12.203) directly addressed the relationship of Part 12 to Parts 13-15 because that was an area over which "[s]everal commentators expressed confusion." Id.  The absence of any similar confusion whether FAR Part 12 applies to the largest program under which commercial items are procured in no way suggests that Part 12 does not apply to it (namely Subpart 8.4).

The COFC's reliance, therefore, on the expressio unius est exclusio alterius canon is misplaced.  NTN Bearing Corp. of Am. v. United States, 368 F.3d 1369, 1373 (Fed. Cir. 2004) (explaining that "the maxim [expressio unius est exclusio alterius] is not applied where . . . 'its application would thwart the legislative intent made apparent by the entire act").  The entire purpose of FASA and FAR Part 12 is to persuade commercial companies to enter the Government marketplace by dealing with them only on commercial terms.  FASA and Part 12 accomplish that goal in plain terms, and courts cannot "judicially admit at the back door that which has been legislatively turned away at the front door." Laird, 406 at 802.

The COFC's further criticism that CGI "relies only on FAR Subpart 8.4's silence and has failed to identify an actual conflict between the provisions of FAR Subpart 8.4 and the provisions of FAR 12" misses the point.  A21.  CGI does not believe there is an actual conflict; rather, the terms of Part 12 and Subpart 8.4 harmoniously coexist.  Indeed, GSA's acquisition manual expressly states that Part

-27-

12 applies to FSS contracts.  GSAM 512.203(a).  It is only CMS's construction of Subpart 8.4, reluctantly and half-heartedly endorsed by the COFC—that Subpart 8.4 permits the inclusion of terms that are not customary in FSS RFQs and orders—which CGI believes violates the letter and spirit of FASA and FAR Part 12 and thus cannot survive (at a minimum) FAR 12.102(c)'s supremacy provision.

The COFC also ruled that Part 12 "delineates the type of commercial item acquisitions to which it applies and does not include RFQs issued under FSS contracts."  A21-22.  The Court was mistaken.  FAR 12.102(a) states that Part 12 applies broadly to <u>any</u> "acquisition of supplies or services that meet the definition of commercial item," and FAR 12.302(c) expressly prohibits the inclusion of "any additional terms or conditions in a <u>solicitation</u> . . . that is inconsistent with customary commercial practice."  FAR 2.101, in turn, defines "<u>solicitation</u>" to mean "<u>any request</u> to submit offers or <u>quotations</u> to the Government," and nowhere is an RFQ for an FSS order exempted from this broad provision.  Thus, the inclusion of noncustomary terms in an RFQ is expressly prohibited.

Finally, the COFC rejected CGI's argument that permitting agencies to include in FSS RFQs or orders terms that are inconsistent with customary commercial practice would emasculate FASA's purpose and yield an absurd result. The COFC acknowledged that such terms could not be included in the FSS contracts themselves, A12; A1415 n.12, yet it offered no explanation why

-28-

Congress or the FAR Council would have permitted ordering agencies to make an end run around that prohibition in individual orders (which is the only way actually to obtain commercial goods or services under FSS contracts).  Instead, the COFC blamed CGI, stating that it could have "avoided this anomalous result by listing, as part of its Schedule Contract, 'the items offered pursuant to its base contract, as well as the pricing, <u>terms</u>, and conditions applicable to each item' as required by FAR 8.402(b)," instead of stating that "payment terms would be 'negotiated at the order level.'"  A22.  That blame assignment is misplaced.

Neither FASA nor the FAR places the burden on contractors to anticipate an agency's inclusion of countless terms that would be inconsistent with customary commercial practice and then include clauses in their overarching FSS contracts prohibiting the inclusion of such terms in any orders.  The fact that discounts and similar payment terms are to be negotiated does not open the door for CMS to violate FASA and the FAR by including non-customary payment terms.  Instead, the law places the burden on the Government not to include any such terms, absent a waiver.[7]  The COFC's decision would yield an absurd result—a result the court itself recognized <u>should not be the law</u>, A482:2-9; A697:23-700:1—by permitting

---

[7] The Government's principal defense of this protest—which the COFC rejected <u>sub</u> <u>silentio</u>—was that FASA and the FAR prohibited the inclusion of noncustomary terms in "contracts," not "orders" (which do not qualify as "contracts").  Nonsense.  FAR 2.101 defines "contract" to include "orders."

the inclusion in orders placed under FSS contracts (but not in the contracts

themselves) of non-customary terms, defeating FASA's purpose of attracting

commercial companies to the Government marketplace by doing business with

them only on commercial terms.

III.  **THE COFC ERRED IN CONCLUDING THAT THE RFQS'
      PAYMENT TERMS ARE NOT UNDULY RESTRICTIVE OF
      COMPETITION.**

Solicitation provisions that restrict competition may be used only "to the

extent necessary to satisfy the needs of the agency."  FAR 11.002(a)(ii).

Restrictive terms based on an "'unsubstantiated concern about an ill-defined

problem of potentially very limited proportions'" are not permitted.  CHE

Consulting, Inc. v. United States, 552 F.3d 1351, 1355 (Fed. Cir. 2008) (quoting

Nat'l Customer Eng'g, B–251135, 72 Comp. Gen. 132, 138 (1993)); accord

Charles H. Tompkins Co. v. United States, 43 Fed. Cl. 716, 723 (1999) (finding

solicitation restrictive of competition and canceling procurement where agency's

past performance evaluation requirements were "overstated and overly restrictive

of competition to the prejudice of other potential offerors").

This regulatory limitation on the ability of agencies to restrict competition

applies to FSS procurements under FAR Subpart 8.4.  See, e.g., NCS Techs., Inc.,

B-403435, Nov. 8, 2010, 2010 CPD ¶ 281 (sustaining protest where terms in an

FSS RFQ were unduly restrictive of competition); Desktop Alert, Inc., B-408196,

July 22, 2013, 2013 CPD ¶ 179 (same).  This Court reviews the COFC's

determination that the RFQs' payment terms were not unduly restrictive of

competition without deference.  <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346,

1351 (Fed. Cir. 2005).

## A.    **The Challenged Payment Terms Restrict Competition.**

The trial court correctly concluded that "the modified payment term here

will increase costs, reduce competition, and appears to be a bit excessive."  A23;

<u>accord</u> A698:18-19.  As the COFC found, the challenged terms "actually forc[ed]

this Plaintiff to drop out of the competition."  A697:9-10.  "CGI's Vice President's

testimony that CGI could not bid under the modified payment term is unrebutted

and reflects the unremarkable observation that the delay in invoicing dictated by

the modified term would result in a substantially increased accounts receivable

balance, causing cash flow problems."  A14-15.

These findings are supported fully by the record, which demonstrates that

under the current RAC contracts, "RACs typically invoiced CMS at the time of

collection of the overpayment, at least 41 days after the demand letter."  A5;

<u>accord</u> A100473-74.  By contrast, the challenged payment terms require RACs to

wait a minimum of 120 days (three times longer), and a maximum of 420 days

(more than ten times longer) before invoicing based on the possibility that fewer

than three out of every 100 overpayments might be appealed and overturned.  A8-

9; A106804; A101414; A101418 & n.17.  CGI Vice President Robert Rolf

provided unrebutted testimony that these terms "require CGI to quickly absorb

[accounts receivable] balances in excess of $██ million, whereas the current

payment terms have imposed an AR balance that is ████████ of that amount

over the life of the contract."  A101294.

### B.     The Restrictive Payment Terms Are Not Necessary To Satisfy Any Legitimate Agency Need.

The elimination of even one offeror is improper unless the restriction is

reasonably necessary to advance a legitimate agency need.  See, e.g., Republic

Floors, Inc., B-242962, June 18, 1991, 91-1 CPD ¶ 579 (sustaining protest where a

single contractor was excluded from the competition).  Consistent with this

principle, the trial court analyzed whether the payment terms reflected a reasonable

"judgment call" by CMS in light of the costs and benefits.  A23-24.   The court

characterized this as a "[v]ery troubling case," A699:14, stated that the court

"certainly" would have "done it differently" and "disagreed with the agency's

conclusions."  A699:1-3.  It also openly questioned "why the agency would impose

this onerous payment term on these contractors increasing the agency's own costs,

causing contractors to drop out of the competition, [and] acting contrary to

commercial practice."  A699:10-14.  The COFC held that the payment terms were

not unreasonable but candidly admitted that CMS's actions "pushed right up

against" that standard.  A698:13.

Protected Material Removed

Respectfully, the administrative record provides no reasoned explanation of how the challenged payment terms advance any legitimate agency need. The only justification articulated by the Agency is that "there would be no contractual vehicle to demand a contingency fee payment back if an overpayment determination were overturned on appeal after a RAC contract ended." A23. This situation is purely hypothetical in nature, as the Agency admitted before the court below that it has never encountered such a situation in the RAC program's history. A501:19-24. Additionally, the Agency's newly expressed concerns were not cited in any of its reports to Congress, A100531-71, or in the Inspector General's 2013 review of the RAC program, A100600-30. The reason is simple—the concern has no basis in reality.

CGI recognizes that CMS need not "point to past experiences substantiating its concerns in order to survive rational basis review," nor "supply a historical record of failures to substantiate a risk." Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010). Neither may CMS create a "solution in search of a problem," however. La. Pub. Serv. Comm'n v. F.E.R.C., 522 F.3d 378, 391 (D.C. Cir. 2008) (upholding agency action where record demonstrated a real problem to which the agency had responded). As this Court recognized in CHE Consulting, an agency cannot justify restrictive solicitation terms based on an "'unsubstantiated concern about an ill-defined problem of potentially very limited

proportions.'"  552 F.3d at 1355 (quoting <u>Nat'l Customer Eng'g</u>, 72 Comp. Gen. at 138).  That is precisely what the Agency has done here.

The current RAC contracts require the RACs to establish an appeal reserve sufficient to cover amounts potentially owed to the Government, as well as to provide a guarantee that, in the event the contractor is unable to reimburse CMS, reimbursement will be made by the RAC's parent company.  A109025; <u>see also</u> A7-8 (discussing the history of this modification).  These existing contract terms explicitly and fully address the Agency's hypothetical concerns about recouping fees after contract expiration, and the Agency has never suggested otherwise.  Indeed, they sufficiently satisfied CMS's concern for the incumbent contracts.  The existing incumbent contract terms, moreover, do not introduce onerous, non-commercial terms that "increase cost, reduce competition, and appear[] to be a bit excessive."  A23.  The RFQs' payment terms are an "unnecessary 'solution in search of a problem' and a 'belt and suspenders' approach for ensuring the Government can recoup contingency fees"—a point that the trial court acknowledged "rings true in many respects."  <u>Id.</u>

At oral argument, the COFC expressed great frustration with the lack of a rational record explanation why the challenged payment terms were necessary:

> [THE COURT:]  But I want you to help me here, because the decision of the agency has to have a rational basis, and in administrative law -- forget the protest for a minute, but let's go back to basic administrative law.

-34-

> The proposed solution that an agency is implementing has to do something to fix a problem, okay? So, there is no problem given the history of this program. There's never been one fee that you've not been able to recover, and yet we're turning this program on its head. It's a drastic change – I don't think anyone disagrees with that -- and you're losing competition. And you have a way to recoup the fee, and there's this amorphous notion that you're going to -- bankruptcy is somehow on the horizon for these people.    So, I'm having trouble really getting the rationality here. I'm having trouble doing that.

A507:7-21.  In finding that the Agency did not cross the line of arbitrariness, however, the COFC failed to address these critical, unanswered questions.  The court did not identify any Agency need that was not fully addressed by the existing requirements for an appeal reserve and parental guarantee, let alone a need that could conceivably outweigh the adverse impacts the court associated with the RFQs' payment terms.  Moreover, the court credited the Agency with making a "financial judgment call" "knowing its cost and benefit."  A24-25.  The Government conceded at oral argument, however, that CMS did not perform any cost-benefit analysis to determine whether the perceived additional security from the challenged terms outweighs their adverse impact on competition.  A510:4-15; accord A512:20-25 ("There is nothing reflecting a cost-benefit analysis . . . .").

Labeling the challenged payment terms a "solution in search of a problem" rings true because it is true.  Because these terms reduce competition without advancing any legitimate Agency need, the judgment below should be reversed.

## C.    The Record Demonstrates that the Restriction on Competition Extends Beyond CGI.

Although CGI submits that the record does not justify <u>any</u> restriction of competition, the COFC's analysis was skewed by its failure to recognize the full extent of the restriction in this procurement.  The record shows that <u>nearly half</u> of the original competitors dropped out after the challenged payment terms were added to the 2014 RFQs:  "the Government received seven quotes in response to the 2013 RFQ that did not contain restrictive payment terms, but only four quotes in response to the January 2014 RFQ containing the restrictive terms."  A22.  One contractor, PRGX, withdrew its quote due to the RFQs "challenging business terms" that resulted in an "unacceptable level of financial risk."  <u>Id</u>. (quoting A101337).

The trial court disagreed that the restriction of competition extended beyond CGI, however, asserting that "the record does not establish that the payment terms were the cause of any other RACs failing to bid."  A22.  But, the numbers speak for themselves, and neither the trial court nor the Agency can identify any significant change to the RFQs other than the challenged payment terms.  With respect to PRGX, the trial court observed that "'challenging business terms' are only one of several reasons PRGX withdrew."  A23.  Respectfully, whether the terms were the sole reason or one of several reasons does not change the fact that the terms are restrictive of competition.

The trial court's understatement of the competitive impact of the RFQ's payment terms colored its analysis of CMS's rationale.  The court concluded that the "curtailment of competition" was not "significant."  A24.  Even then, however, the court struggled to find the challenged terms reasonable:  "This agency conduct, in this Court's view, again was a very close call."  A698:14-15.  As discussed above, the elimination of even a single responsible competitor is improper unless the restriction is reasonably necessary to advance a legitimate agency need, and the record of this procurement fails to identify any agency need that is not already addressed by the payment terms in the existing contracts.  See, e.g., Republic Floors, Inc., 91-1 CPD ¶ 579.  Had the court properly weighed the full extent of the restriction on competition, the balance would have tilted decisively in CGI's favor.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the COFC's judgment should be reversed because the inclusion of non-standard payment terms in the instant solicitations for commercial RAC services violates FASA and the FAR. The COFC's judgment should be reversed for the additional reason that the payment terms are unduly restrictive of competition. CGI therefore respectfully requests that this case be remanded to the COFC for with instructions to enter a permanent injunction in accordance with the COFC's findings that the other factors for injunctive relief favor CGI. A699-702.

/s/ Scott M. McCaleb
Scott M. McCaleb
(Attorney of Record)
Daniel P. Graham
Christine Reynolds
Gary S. Ward
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-3193

*Counsel for Plaintiff-Appellant
CGI Federal Inc.*

October 20, 2014

# PROOF OF SERVICE

I certify that I served a copy on counsel of record on October 20, 2014 by:

       US mail Fax
       Hand
X   Electronic Means
       (by email or CM/ECF)

 

/s/ Scott M. McCaleb
Scott M. McCaleb
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-3139

*Counsel for Plaintiff-Appellant*
*CGI Federal Inc.*

October 20, 2014

# CERTIFICATE OF COMPLIANCE

Counsel for Appellant CGI Federal Inc. certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 9,066  words, based on the "Word Count" feature of Microsoft Word, including footnotes. Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Certificate of Filing and Service, Table of Contents, and Table of Authorities.

/s/ Scott M. McCaleb
Scott M. McCaleb
(Attorney of Record)
Daniel P. Graham
Christine Reynolds
Gary S. Ward
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-3193

*Counsel for Plaintiff-Appellant CGI Federal Inc.*

October 20, 2014

2014-5143

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

CGI FEDERAL INC.,

Plaintiff-Appellant,

v.

THE UNITED STATES,

Defendant-Appellee.

---

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN NO. 14-355C
JUDGE MARY ELLEN COSTER WILLIAMS

---

NON-CONFIDENTIAL ADDENDUM TO BRIEF OF PLAINTIFF-APPELLANT
CGI FEDERAL INC.

October 20, 2014

## NON-CONFIDENTIAL INDEX TO ADDENDUM

| Document No. | Description |
|---|---|
| 1 | Opinion and Order, No. 14-355 (Fed. Cl. Aug. 15, 2014) (Public Version) |
| 2 | Judgment, No. 14-355 (Fed. Cl. Aug. 21, 2014) |
| 3 | Transcript of Oral Argument on Motion for Stay, No. 14-355 (Fed. Cl. Sept. 2, 2014) (Public Version) |
| 4 | Order Granting Stay and Injunction Pending Appeal, No. 14-355 (Fed. Cl. Sept. 2, 2014) |
| 5 | 41 U.S.C. § 3307 |
| 6 | 48 C.F.R. § 2.101 (Excerpt) |
| 7 | 48 C.F.R. Part 8.4 |
| 8 | 48 C.F.R. § 10.002 |
| 9 | 48 C.F.R. § 11.002 |
| 10 | 48 C.F.R. Part 12 |
| 11 | 48 C.F.R. § 38.101 |
| 12 | GSAM 512.203 |
| 13 | GSAM 538.271 |

Confidential material has been removed from pages 6, 7, 10, 11, 14, 24, 41, 63, 64, and 67 of this Addendum. This material is competitively sensitive confidential of CGI Federal Inc. or attorney-client privileged information of the United States. This material is subject to a protective order issued by the Court of Federal Claims.

# CGI ADDENDUM DOCUMENT NO. 1

# In the United States Court of Federal Claims

**No. 14-355C**
**(Bid Protest)**
**(Filed: August 22, 2014)[1]**

* * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| **CGI FEDERAL INC.,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| Defendant. | * |
| | * |

**Pre-award Bid Protest; 28 U.S.C. § 1491(b)(1); Jurisdiction; Standing; Prospective Bidder; Direct Economic Interest In Award; Centers for Medicare and Medicaid Services ("CMS"); Federal Acquisition Regulation ("FAR") Part 12; FAR Subpart 8.4; Federal Acquisition Streamlining Act ("FASA"); Customary Commercial Practice; Payment Term; Unduly Restrictive of Competition.**

* * * * * * * * * * * * * * * * * * * * * * * *

Scott M. McCaleb, Wiley Rein LLP, 1776 K Street, NW, Washington, D.C. 20006, for Plaintiff. Daniel P. Graham, W. Barron A. Avery, Christine Reynolds, Gary S. Ward, Wiley Rein LLP, 1776 K Street, NW, Washington, D.C. 20006, Of Counsel.

Stuart F. Delery, Robert F. Kirschman, Jr., Kirk Manhardt, and William P. Rayel, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Jeffri Pierre, Department of Health and Human Services, Office of General Counsel, Of Counsel. Jennifer L. Howard, General Services Administration, Office of General Counsel, Of Counsel.

_____

**OPINION AND ORDER**
_____

**WILLIAMS**, Judge.

This pre-award bid protest comes before the Court on Defendant's motion to dismiss for lack of standing, Plaintiff's motion for injunctive relief, and the parties' cross-motions for judgment on the Administrative Record ("AR"). Plaintiff, CGI Federal Inc. ("CGI"), challenges the payment terms of three Requests for Quotation ("RFQ") issued by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services

---

[1] The Court issued this opinion under seal on August 15, 2014, and directed the parties to file proposed redactions by August 22, 2014. The Court publishes this Opinion indicating redactions by brackets "[  ]."

("CMS") for services of Recovery Audit Contractors ("RACs") under the General Services Administration's ("GSA") Federal Supply Schedule ("FSS").[2]

Plaintiff argues that CMS violated the Federal Acquisition Streamlining Act ("FASA") and Part 12 of the Federal Acquisition Regulation ("FAR") by including payment terms in the RFQs that are inconsistent with customary commercial practice. Plaintiff further claims that the payment terms are unduly restrictive of competition. Accordingly, CGI asks this Court to enjoin award of the contracts under these RFQs, order CMS to revise the existing payment terms, and provide all prospective bidders an opportunity to submit bids under the revised RFQs.

Defendant argues that the requirements of FASA and FAR Part 12 do not apply to FAR Subpart 8.4 FSS procurements, and that the payment terms do not unduly restrict competition, pointing to other RACs that bid on the contested RFQs. Finally, Defendant submits that CMS reasonably exercised its discretion even if the payment terms restrict competition.

For the reasons that follow, the Court finds that Plaintiff has standing, but denies the protest.

### Findings of Fact[3]

### The Medicare Fee-for-Service Recovery Audit Program

CMS administers the Medicare Fee-for-Services ("FFS") program and, through a network of contractors, processes more than one billion claims each year submitted by more than one million providers. AR Tab 20f at 533.[4] To insure that paid claims accord with Medicare guidelines, CMS uses Recovery Audit Contractors to identify improper payments and highlight any common billing errors, trends, or other Medicare payment issues. Id. After a pilot program, CMS competitively awarded contracts in 2008 to four RACs—one for each geographical region of the country—including CGI, but performance was delayed due to a bid protest. AR Tab 20f at 533; AR Tab 95 at 8608-10.[5]

---

[2] Specifically, CGI challenges RFQs Numbers: RFQ-CMS-2014-Region 1, RFQ-CMS-2014-Region 2, and RFQ-CMS-2014-Region 4.

[3] These findings of fact are derived from the AR as supplemented. Additional findings of fact are in the Discussion.

[4] Providers that submit claims include hospitals, physicians, skilled nursing facilities, labs, ambulance companies, and suppliers of durable medical equipment, prosthetics, orthotics, and medical supplies. AR Tab 20f at 533.

[5] The four geographic regions and respective awardees were as follows: Region A: Performant Recovery (formerly Diversified Collection Services, Inc.); Region B: CGI; Region C: Connolly; Region D: Health Data Insights ("HDI"). AR Tab 95 at 8609; AR Tab 111 at 9085; AR Tab 128 at 9547; AR Tab 147 at 9967. The AR contains a map of the country by region. AR Tab 20f at 537.

CGI Addendum - 002

The RAC program has successfully assisted CMS in recouping improper Medicare payments. In the 2011 fiscal year alone, RACs identified 887,291 improper payments, resulting in corrections totaling $939.3 million. AR Tab 20f at 533. "After taking into consideration all fees, costs, and appeals, the Medicare FFS Recovery Audit Program returned $488.2 million to the Medicare Trust Fund" in 2011. Id. That same year, providers appealed 6.7% of identified overpayments, but less than half of that 6.7% were successful at some level of the appeal process. Id. at 567.

Each RAC reviews the Medicare FFS claim payments processed in its region to identify improper payments.[6] CMS pays the RACs on a contingency fee basis calculated as a percentage of the improper payment. AR Tab 20f at 537. When a RAC identifies an improper payment, CMS, through a contractor, sends the provider a demand letter that in the case of an overpayment requests repayment in a specific amount. Id. at 538. The demand letter also contains the rationale provided by the RAC "includ[ing] references utilized in reviewing the medical documents, and . . . educat[ing] providers about how to avoid similar payment errors in future Medicare billing practices." Id.[7] CMS' recoupment of an overpayment typically commences within 41 days of the demand letter. Id. at 539.

**The Appeal Process**

If a provider disagrees with the RAC's determination that CMS overpaid the provider, the provider can appeal. There are five levels of appeal. See id. at 539.

The First Level of Appeal: "Redetermination"

After receiving a demand letter that identified an overpayment, regardless of the amount in controversy, a provider can appeal by seeking a redetermination as to the propriety of the identified payment. Id. at 539-40; see also 42 C.F.R §§ 405.940-42. This "first level appeal" must be requested, in writing, within 120 days of receiving the demand letter. 42 C.F.R §§ 405.942(a), 405.944(b). The provider must explain the basis for its disagreement with the determination and may submit any relevant evidence. Id. at § 405.946(a). A written decision will be rendered within 60 days of receipt of the provider's request for a redetermination and must inform the provider of its right to appeal and the procedures for seeking a redetermination. Id. at §§ 405.950(a), 405.956(b)(5).

---

[6] Improper payments include overpayments by CMS to a provider. An overpayment can occur when the review of the medical records shows that an item or service is not covered under Medicare or Medicaid, was not medically necessary, was improperly coded, or lacks proper supporting documentation. Id. at 535-36. Because of the great volume of claims, CMS must pay the claims before reviewing the medical records. Id. at 536.

[7] While CMS transitioned this responsibility to Medicare Administrative Contractors ("MACs") in the 2011 fiscal year, RACs are responsible for providing an explanation for their identified overpayments. Id. at 538-40.

The Second Level of Appeal: "Reconsideration at the QIC Level"

If a provider disagrees with the redetermination, it can appeal to a qualified independent contractor ("QIC") within 180 days of its receipt of the redetermination letter. AR Tab 20f at 539; 42 C.F.R § 405.962(a). In CMS parlance, this level of appeal is referred to as "reconsideration," "the QIC level," and "the second level" interchangeably. The QIC reviews the evidence and findings upon which the initial determination and the redetermination were based, as well as any additional evidence a provider submits or that the QIC obtains independently. 42 C.F.R. § 405.968(a)(1). QICs must process the provider's appeal within 60 days. Id. at § 405.970(a).

The Third Level of Appeal: A Hearing Before An Administrative Law Judge ("ALJ")

If the provider is dissatisfied with the QIC's reconsideration, or if the QIC did not timely process the provider's request, the provider may request a hearing with an Administrative Law Judge ("ALJ") if the claim meets the amount-in-controversy threshold.[8] Id. at §§ 405.1000(a), 405.1006. The provider must file within 60 calendar days of receipt of the notice of the QIC's reconsideration. Id. at § 405.1002(a)(1). "The ALJ conducts a *de novo* review and issues a decision based on the hearing record." Id. at § 405.1000(d). The ALJ must issue a decision, dismissal order, or remand to the QIC, within 90 days if the provider appealed the QIC's decision or within 180 days if the provider requested an ALJ hearing because the QIC failed to issue a decision within the prescribed time period. Id. at § 405.1016.

The Fourth Level of Appeal: Medicare Appeals Council ("MAC") Review

The provider may appeal the ALJ's decision to the Medicare Appeals Council. Id. at § 405.1102(a)(1). The MAC conducts a *de novo* review and must issue a final decision, dismissal order, or remand, within 90 calendar days of receipt of the provider's request. Id. at § 405.1100(c)-(d).

The Fifth Level of Appeal: United States District Court Review

If the provider remains dissatisfied and the amount in controversy is at least $1,300[9] it may file an appeal of the MAC's decision within 60 days to a United States District Court. Id. at §§ 405.1006(c)(1), 405.1130. The District Court is not subject to a time limit to make this final, binding, decision.

**The Original RAC Contracts**

The original RAC contracts, signed in late 2008, contained the following payment terms:

---

[8] This amount was $130 in 2011, according to CMS' Report to Congress. AR Tab 20f at 539.

[9] This amount was $1,300 in 2011, according to CMS' Report to Congress. Id.

CGI Addendum - 004

> All payments shall be paid only on a contingency fee basis.    The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayment.  The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments.  If, during the period of performance of this contract, the RAC determination is overturned at any level of appeal the recovery audit contractor shall repay Medicare the contingency payment for that recovery.

AR Tab 95 at 8608-10.[10]   Under these terms, RACs typically invoiced CMS at the time of collection of the overpayment, at least 41 days after the demand later.  AR Tab 20c at 473-74.

### The February 2013 RFQs

On February 28, 2013, CMS issued an RFQ pursuant to GSA's Financial and Business Solutions ("FABS") Schedule seeking to award five task orders to Recovery Audit Contractors— four for Medicare/Medicaid in different regions and one relating to durable medical equipment ("DME") and Home Health/Hospice Recovery.  AR Tab 47 at 1542-1735.  This RFQ contained identical payment terms to the original RAC contracts.  Id. at 1645-46; AR Tab 95 at 8610.

This payment clause provided:

> If an incumbent Recovery Auditor . . . is awarded a new contract in any region, all outstanding receivables, claim adjustments, discussion periods, and appeals will transition and continue to be the responsibility of the Recovery Auditor who identified the improper payment.  If a new Recovery Auditor . . . is awarded a contract all outstanding receivables in the region without an incumbent Recovery Auditor will transition to the new Recovery Auditor.  The new Recovery Auditor will then be responsible to complete any remaining appeal workload but will not lose the contingency fee for overturned appeals that they did not identify.

AR Tab 47 at 1609.  Seven bidders, CGI, HealthDataInsights, Inc., Connolly, Inc. ("Connelly"), Performant Financial Corporation ("Performant"), PRGX Global, Inc. ("PRGX"), Catapult Consulting, LLC ("Catapult"), and AdvancedPharmacyConcepts ("APC"), submitted quotes in response to this RFQ.  AR Tab 57 at 1991-98.

### Health Data Insights' Pre-Award GAO Protest and CMS' Corrective Action

On April 3, 2013, HealthDataInsights ("HDI"), an incumbent RAC, filed a pre-award bid protest at the GAO alleging that the February 2013 RFQ imposed a different scope of work and lacked sufficient information for bidders to submit an informed price.  AR Tab 56 at 1976-88.  CMS took corrective action and cancelled the RFQ.  AR Tab 22c at 631; AR Tab 58-59 at 1999-2001.  As a rationale for this cancellation, the Government stated that the February 2013 "RFQ did not address how the RACs would repay [the] contingency fees if collected overpayments

---

[10] The Court cites the RFQ for Region 4.  The RFQs for Regions 1 and 2 are essentially the same.

were returned on appeal after the expiration of the contract." AR Tab 47 at 1646; AR Tab 95 at 8610; AR Tab 111 at 9089; AR Tab 128 at 9551; AR Tab 147 at 9971.

In an undated internal memo that the Government did not produce at the GAO, an unidentified author at CMS discussed a perceived problem with the original payment terms, stating:

> The problem is provided in the contract itself stating that CMS will collect during the period of performance of the contract. Appeals can take up to two years on recoveries made by the RAC causing the concern that CMS will not receive reimbursement due to the language in the contract. In discovery of this issue, CMS, OFM, OGC and [RACs] have thoroughly reviewed this issue and came up with a plan to move forward. (Please see attached draft mod language). Below are options that came up during discussions with all parties aforementioned:

> - Surety Bond
> - Withhold
> - Trust fund
> - Escrow
> - Progress Payments
> - Letter of Credit
> - Financial rewards
> - Letter of Assurance from Parent Company
> - Reserve

> Decision: After extensive review, CMS' plan is to extend the current contracts for an additional 2 years for administrative purposes and have each RAC record/set aside an appeal reserve sufficient for potential contractual liabilities in the event that overpayment decisions are overturned on appeal. The appeal reserve shall be based on the RACs historical contract-to-date appeal and loss rates for invoiced overpayment claims. The appeal reserve shall be reviewed and updated monthly to ensure that it remains adequate to cover any potential liability and shall remain through the contract ending date of December 31, 2015 or later if further extended through contract modification. The RAC is responsible to reimburse CMS for all monies due to CMS on appeals that are adjudicated in the providers favor even if such amounts exceed the reserve set aside. In addition, the RAC shall provide a letter of assurance from its parent company stating that should the RAC be unable to reimburse CMS monies due on overturned appeals, that it would assume the responsibility to reimburse CMS.

AR Tab 59 at 2000. The memo continued:

> During the protest, [

CGI Addendum - 006

Protected Material Removed

]. With this drastic change on how the [RAC] gets paid[,] Offeror's would have proposed differently. With the highlighted issues above, CMS plans to do the following:

- Cancel procurement
- Pay after the second level of appeals (QIC)
- Change evaluation criteria from LPRA to Tradeoff.

Id. at 2001.

In light of HDI's pre-award protest, CMS extended the original RAC contracts to continue services while it planned the next RFQ. AR Tab 22c at 631; AR Tab 58 at 1999; AR Tab 110 at 8673; AR Tab 110 at 9021; AR Tab 111 at 9094; AR Tab 127 at 9483; AR Tab 128 at 9556; AR Tab 146 at 9903; AR Tab 147 at 9976; AR Tab 160 at 10376; Def.'s Mot. App. 12-19.

On June 25, 2013, CMS provided RACs with a draft modification of incumbent contracts that contained terms requiring the RACs to wait to invoice until the improperly paid claims had exited the second level of appeals process, i.e. the QIC level. AR Tab 161 at 10462, 10511. Specifically these payment terms stated:

> Effective the date of this contract modification, Recovery Auditors shall not receive any contingency fee until the improperly paid claims have exited the second level of the appeals process (QIC level). If no appeal has been filed within the initial 120 days that a provider has to appeal, Recovery Auditors may then invoice for their contingency fee payment. There are specific statutory timeframes for filing an appeal after a decision at each level. If no additional appeal is submitted within that timeframe, the claim may be invoiced for payment.

Id. (emphasis added). All four incumbent RACs rejected these proposed modifications, and negotiations ensued. E.g., id. at 10547-50, 10770-73, 10934-36, 10942-43. Each RAC complained that this was a dramatic change and they could not agree without increasing their fees. Id. Ultimately, all RACS ended up refusing to sign the modification as proposed by CMS. See id.

After negotiations, the incumbent RACs entered into contract modifications. CGI signed its contract modification on July 31, 2013. AR Tab 110 at 9021. The payment terms of CGI's modification stated:

> **Section B.3 CONTINGENCY FEE,** is hereby modified to revise the payment methodology scale percentages, Section B.3 is replaced in its entirety and reads as follows:

> a. All payments shall be paid only on a contingency fee basis. The contingency fees shall be paid once the recovery audit contractor collects

Protected Material Removed

the Medicare overpayment. The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments. If the RAC determination is overturned at any level of appeal[,] the recovery audit contractor shall repay Medicare the contingency payment for that recovery.

Id. at 9022.

In addition to changing the contingency fee payment terms, the modification extended the contract term, required RACs to create a reserve fund so that RACs could repay CMS their contingency fees if an overpayment was overturned on appeal, required RACs to provide a letter of guarantee from their parent companies agreeing to reimburse contingency fees for overpayments reversed on appeal, and increased the contingency fee CMS would pay to the RACs. AR Tab 110 at 9021-25; AR Tab 127 at 9483-87; AR Tab 146 at 9903-07; AR Tab 160 at 10376-80.

In an undated memo[11] CMS cancelled the February 2013 RFQ. AR Tab 22c at 631; AR Tab 58 at 1999-2001. CMS explained that "[i]n the course of undertaking corrective action" responsive to HDI's pre-award protest, "CMS made several significant changes to the RFQ[;] the most significant change is when the RAC contractor will receive payment." AR Tab 22c at 631. The memo further acknowledged that these "major revisions" are "so substantial that they exceed what prospective Offerors reasonably could have anticipated." Id. As such, the contracting officer determined that it would be in the best interest of the Government to cancel the February 2013 RFQ and release new RFQs for RAC services. Id.

### The January 2014 RFQs

In January 2014, CMS issued four RFQs for RAC services in four regions for Medicare Parts A and B pursuant to GSA's Financial and Business Solutions Schedule. AR Tab 62 at 2083; AR Tab 74 at 4393; AR Tab 84 at 6666. These RFQs contained virtually the same terms as CMS' proposed contract modification in June 25, 2013, namely that the RACs were required to wait to invoice until the alleged improper claims cleared the second level of appeal—QIC level—i.e., 80 days longer than RACs had to wait under the original contracts. AR Tab 62 at 2086; AR Tab 74 at 4396; AR Tab 84 at 6669. Specifically, the payment terms in the January 2014 RFQs state:

Recovery Auditors shall not receive any payments from the mere identification of improper overpayments. Recovery Auditors may invoice for the applicable contingency fees when all required claim elements are input into the Data Warehouse and the improperly paid claims have exited the second level of the appeals process (QIC level). There are specific statutory timeframes for filing appeals at each level. If no appeal has been filed within the initial 120 days that a provider has to appeal, Recovery Auditors may then invoice for their contingency

---

[11] The memo cancelling the procurement is not dated, though the digital signature of the contracting officer contains the date of the e-signature, which was December 6, 2013.

fee payment. If no additional appeal is submitted within the required timeframe, the claim may be invoiced for payment.

Id. (emphasis in original).  Per these terms, if an appeal were granted by QIC, then the RAC must wait even longer to invoice—up to 420 days.  AR Tab 21d at 580-81; AR Tab 22b at 614; AR Tab 94 at 8603.  CMS articulated the following rationale for this change in payment terms:

> The bottom line concern is the RACs really should not be paid until it is determined that the recoupment is deemed legitimate and appropriate (after the appeals process).  We felt that after the 2nd level, CMS could be substantially confident that the overpayment would be upheld.  Meaning, [if] the provider lost the first and 2nd appeal, it would likely [be] that the provider would still lose at the [Administrative Law Judge level].  But, since the [Administrative Law Judge level] takes so long (could be up to 2 years or longer), it seemed unreasonable to have the RAC wait for payment.   However, if the provider wins at [Administrative Law Judge level], the RAC must still pay CMS back. Timeframes for appeals are as follows:
>
> > 1st Level:  providers have up to 120 days to file an appeal - decided [within] 60 days
> > 2nd Level:  providers have up to 180 days after the 1st level decision - decided [within] 60 days

AR Tab 94 at 8603 (internal CMS email dated January 31, 2014 that CMS did not produce during the GAO proceeding).[12]

## The Modified Payment Terms Deviate from Standard Commercial Practice

Under standard commercial practice in the recovery audit industry, a RAC invoices its commission payment immediately after the payer recoups the improperly paid claim.  AR Tab 32 at 1292, 1295.  As CGI's Vice-President of Health Compliance, Robert Rolf, explained:

> It is standard practice in the recovery audit industry for audit vendors to invoice immediately after the payer recoups an improper payment.   Recoupment occurs when the overpayment is identified, the payer adjusts the  improperly paid claim in its system, and debits the overpayment against future  payments to the provider. Typically, recoupment will occur between 30-60  days after the overpayment is identified, depending on the payers' internal  processes.   If the provider disagrees that the claim was improperly paid, that  process may take up to 30 days longer.

*  *  *

---

[12]  This email was first produced as part of the AR before this Court and was not part of the record before the GAO.

CGI Addendum - 009

> [W]hen and if an overpayment is successfully challenged by a provider after recoupment, the payer simply returns the recouped funds to the provider and automatically deducts the RAC's commission from the RAC's next invoice.

Id. at 1292 ¶ 5, 1293 ¶ 9.[13]   In keeping with industry practice, all of CGI's recovery audit contracts permit CGI to invoice immediately after the payer recoups payment.  Id. at 1293 ¶ 9.

Highmark Inc. ("Highmark"), the fourth-largest Blue Cross and Blue Shield affiliate and a Pittsburgh-based company providing 33.5 million people with health insurance, dental insurance, vision care, and information technology, utilizes RACs to recoup approximately $[ ] million annually from health care service providers.  Id. at 1295 ¶¶ 2, 3.  In keeping with industry practice, a recovery audit vendor is entitled to immediately invoice Highmark for its commission payment once the improperly paid claim is adjusted downward and the overpayment deducted from Highmark's next payment to the provider.  Id. at 1295 ¶ 4.  The vendor immediately invoices Highmark after the claim is adjusted regardless of whether the provider agrees that the claim was paid properly.  Id. at 1296 ¶ 6.  "Adjustment is usually delayed no more than 30-40 days by a provider's disagreement that a claim was improperly paid."  Id.  Vince Garofalo, a fraud consultant for Highmark who supervises Highmark's four recovery audit vendors, testified in a declaration:

> I am not aware of any commercial recovery audit programs that require a vendor to wait 120 days or more following adjustment of a claim.  I am not aware of [a] business purpose that could be served by requiring a vendor to withhold an invoice after an adjustment has been made and Highmark has taken the steps necessary to recoup the overpayment.

Id. at 1296 ¶ 7.[14]

### CGI and HDI's Pre-Award GAO Protests Challenging the January 2014 RFQs

Before the close of bidding, CGI and HDI filed pre-award bid protests at the GAO, claiming that, contrary to FAR Part 12, the payment terms were inconsistent with customary

---

[13] Mr. Rolf is responsible for CGI's recovery audit programs, data analysis services, fraud and abuse detection, and management services, including CGI's recovery audit work for commercial health payers, e.g., [

], CMS and state Medicaid recovery programs, e.g., Medicaid recovery audit contracts for Ohio, Massachusetts, Washington, and Colorado.  AR Tab 32 at 1292 ¶¶ 2, 3, 4.  Mr. Rolf has 18 years experience in public and private recovery audit programs, eight of which were in managing RAC programs, and has briefed executive agency personnel and members of Congress and testified before legislative committees on recovery audits and improper payment issues.  Id. at 1292 ¶ 1.

[14] Mr. Garofalo has worked as a fraud consultant for Highmark since 1997, overseeing the recovery of Highmark overpayments to health care providers.  Id. at 1295 ¶ 3.

Protected Material Removed

commercial practice, unduly restrictive of competition, and violated the recovery audit program's enabling statute as well as prompt payment requirements. AR Tab 44 at 1414-15. In an internal email discussing these bid protests, CMS again examined the effects of changing the payment terms:

> So far we have 3 pre-award protests from the RACs (2 from HDI and now one from CGI). All three are protesting the payment process. If you recall, [
>
> ]. In working with OFM, we determined that it would be in the Gov't best interest to [make] payment after 2nd level appeal (QIC Level). The original RAC program allowed the RACs to get paid after recoupment – which could be prior [to] any appeal process. The RACs are not happy because it will increase the time period in which they will get paid. However, keep in mind that [
>
> ].

AR Tab 94 at 8607.3.[15]

While HDI's and CGI's protests were pending at the GAO, Connolly, Performant, HDI, PRGX, and Sagebrush Solutions submitted timely quotes in response to the January 2014 RFQs. AR Tab 65 at 2262-64; AR Tab 77 at 4528-31; AR Tab 87 at 6845-48. PRGX later withdrew its quote. AR Tab 41 at 1337; AR Tab 71 at 4314; AR Tab 82 at 6588; AR Tab 93 at 8584. CGI did not submit a quote for the January 2014 RFQs, but awaited the decision of its pre-award protest then pending at the GAO. AR Tab 44 at 1410; AR Tab 65 at 4528-31; AR Tab 87 at 6845-47, see AR Tab 65 at 2262-64.

On April 23, 2014, the GAO denied CGI's and HDI's bid protests. AR Tab 44 at 1410. Though the GAO recognized that "the RFQs require the RACs to wait a minimum of 120 days and no more than 420 days before they could invoice for their contingency fee," it noted that this 120-day period—representing the expiration of the time a provider may appeal—is only 80 days longer than the RACs must wait under their existing contracts. The GAO also pointed out that historical data shows that providers only appeal 5.8% of the overpayment determinations and, from there, only appeal the first level redetermination in 0.84% of total cases, hence the RACs would wait longer than 120 days in only approximately 6% of cases.[16] Addressing the protesters' contention that the payment terms are unduly restrictive of competition, the GAO

---

[15] This email was not part of the record before the GAO.

[16] In a footnote, the GAO stated: "Providers sought a redetermination in 52,422 cases and requested a reconsideration in 7,561 cases in fiscal year 2011. Of those, 741 overpayment determinations were appealed to an administrative law judge (third-level appeal)." AR Tab 44 at 1418 n.18 (internal citations omitted) (citing the fiscal year 2011 report to Congress in the GAO).

                    Protected Material Removed

held that the terms are "necessary to address situations where a RAC has to reimburse CMS for an overpayment determination that is overturned on appeal after the contract period of performance has ended." Id. at 1414. The GAO further held that "FAR Part 12 procedures do not apply to orders being placed against the FSS," but acknowledged that FAR Part 12 does apply to GSA's initial award of a vendor's master schedule contract and to orders where an agency adds open market items not listed on the master schedule contract. AR Tab 44 at 1415.

On April 28, 2014, five days after GAO's denial, CGI filed the instant protest.[17]

## Discussion

### Jurisdiction

The Tucker Act authorizes this Court to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract, or to a proposed award . . . or any alleged violation of statute or regulation in connection with a Federal procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). Jurisdiction is a threshold issue that the Court must address before examining the merits. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). In "reviewing a motion to dismiss for lack of subject matter jurisdiction, a court accepts only uncontroverted factual allegations as true for purposes of the motion." Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (citing Gibbs v. Buck, 307 U.S. 66, 72 (1939)); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). If the motion to dismiss challenges the underlying jurisdictional facts as alleged, then the court "may consider relevant evidence in order to resolve the factual dispute." Banks, 741 F.3d at 1277 (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988)). "Standing is a question of subject matter jurisdiction . . . ." Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013) (citing S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 n.3 (Fed. Cir. 2005)).

### CGI Has Standing

The Government contends that CGI lacks standing because it is not an interested party as it was not prevented from bidding and cannot demonstrate a direct economic impact affected by award. Plaintiff "bears the burden of establishing [the] elements [of standing]" because it invokes this Court's jurisdiction. Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (alterations in original) (quoting Lujan, 504 U.S. at 561). To have standing in a bid protest, a protestor must be an "interested party." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing Rex Serv. Corp. v. United States, 448 F.3d

---

[17] At the Court of Federal Claims, CGI added an assertion that FASA requires payment terms consistent with standard commercial practice and dropped a claim made before the GAO that the modified terms violated prompt payment terms in 5 C.F.R. §1315.4(e) (2014) which prohibits extended acceptance periods. See id.

HDI did not protest in this Court.

1305, 1307 (Fed. Cir. 2006)). To be an "interested party," a protestor must show: (1) that it is an "actual or prospective bidder" (2) "whose direct economic interest would be affected by the award of the contract." Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing Rex, 448 F.3d at 1307). As the term denotes, an actual bidder is one who submitted a bid for the challenged procurement. Rex, 448 F.3d at 1307. A prospective bidder "must be expecting to submit an offer prior to the closing date of the solicitation." Id. at 1308 (Fed. Cir. 2006) (citing MCI Telecommunications Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989)).

## CGI Is A Prospective Bidder

Invoking Rex Services Corporation v. United States, the Government argues that CGI cannot be a prospective bidder because "the opportunity to qualify as either an actual or prospective bidder ends when the proposal period ends" and CGI "could have bid, but chose not to, [and therefore] cannot be considered a prospective [bidder]." 448 F.3d at 1308 (quoting MCI, 878 F.2d at 365). Although Rex was a post-award protest, it addressed generally the requirements to be a prospective bidder, and the Federal Circuit has applied Rex to the pre-award context. Orion, 704 F.3d at 1348-49.

The plaintiff in Rex was an incumbent and the only approved source for the items being solicited by the Defense Supply Center ("DSC")—thumbwheel switches. One day before the close of bidding, Rex filed an agency protest asserting violations of the Procurement Integrity Act ("PIA"), namely that the RFP disclosed some of its proprietary information, but did not allege that such violations prevented it from bidding. Rex, 448 F.3d at 1306-07. Rex did not submit a bid before the close of bidding. After losing the agency protest, Rex did not file a pre-award protest in any other forum. Three months after losing the protest and almost a month after the agency made award, Rex filed a protest in the Court of Federal Claims contending that the agency "deviated from the process specified in the 2004 RFP." Id. at 1307. Hence, Rex attempted to protest the agency's evaluation in a procurement where it did not bid. Rex's pre-award protest against disclosure of its proprietary information in the RFP had nothing to do with its post-award challenge to the evaluation in a competition it never entered.

The Federal Circuit in Rex found that the plaintiff lacked standing because it neither bid nor "file[d] a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid prior to the close of the solicitation period but was prevented from doing so on the basis of improper agency action." Id. at 1308 (citing MCI, 878 F.2d at 365). The plaintiff in Rex clearly lacked standing as it was neither an actual nor a prospective bidder. As the Federal Circuit explained: "It is not relevant to Rex's status that it filed a pre-award agency protest, or that it alleges department 'illegalities' prejudiced its ability to bid. It 'could have [bid] for the contract award . . . and could have utilized the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process.'" Id. at 1308 (alterations in original) (quoting Fed. Data Corp. v. United States, 911 F.2d 699, 705 (Fed. Cir. 1990)).

In Rex the Federal Circuit expressly declined to reach a similar scenario to that presented here, explaining that it did "not decide, whether an agency protest, filed before the end of the solicitation period, that establishes the party expected to bid, but was prevented from doing so by

improper agency action, may meet the requirements of <u>MCI</u> and secure prospective party status for a subsequent bid protest action." <u>Id.</u> at 1308 n.\*\*.  As such, this Court is confronted with an issue the <u>Rex</u> court did not reach—whether CGI, in filing a GAO protest before the end of the bidding period, established that it "expected to bid but was prevented from doing so by improper agency action" and achieved "prospective bidder status." <u>Id.</u>

CGI has consistently maintained that the alleged improper agency action—inclusion of the modified payment terms—prevented it from bidding by delaying its ability to invoice, thereby so restricting its cash flow as to make any resultant contract commercially impracticable. Absent this restriction, CGI, a successful incumbent, expected to bid and would have bid.  As CGI's Vice President of Health Compliance, Robert Rolf, testified:

> [T]he new RFQ payment terms will require CGI to quickly absorb [accounts receivable] balances in excess of $[ ] million, whereas the current payment terms have imposed an AR balance that is [        ] of that amount over the life of the contract.

AR Tab 32 at 1294 (Rolf Decl. ¶ 14, Mar. 13, 2014).  Mr. Rolf continued:

> CGI is an established RAC and is well-positioned to perform on recovery audit contracts containing customary commercial payment terms.  The RFQs' payment terms add an additional, significant cost burden to CGI that unfairly and unnecessarily restricts CGI's overall cash flow.  As a publicly traded company, such terms are simply unacceptable and render the RAC business commercially impracticable.  In that case, CGI will have no choice but to not participate in these procurements.

<u>Id.</u> at ¶ 15.

Mr. Rolf's testimony establishes that, but for the modified payment terms, CGI expected to submit a bid prior to the closing date of the RFQs.  In arguing that CGI does not qualify as a prospective bidder because it could not but chose not to, Defendant would have this Court discredit Mr. Rolf's unrebutted testimony and substitute its speculation on what CGI "could have" bid.  Defendant argues that Plaintiff had a reasonable opportunity to bid under the modified payment term because, even with the required delay in invoicing, Plaintiff could still have submitted a profitable bid.  However, CGI's Vice President's testimony that CGI could not bid under the modified payment term is unrebutted and reflects the unremarkable observation that the delay in invoicing dictated by the modified term would result in a substantially increased accounts receivable balance, causing cash flow problems.

Defendant argues that because CGI's present contingency fee percentage is approximately [ ]% and the FSS contract permits this percentage to be as high as 19.55, CGI could have raised its rate and submitted a quote.  Def.'s Mot. 20.  Similarly, in addressing the difficulty with cash flow, the Government concedes that there is a "cost" to borrowing money, but argues that financing would not have been difficult for CGI to obtain, given its available credit and its parent companies' financial statements.  There is, however, no basis for this Court

Protected Material Removed

to cast aside Mr. Rolf's testimony and substitute the Government's speculation as to what a successful and sophisticated contractor could have bid.

The Government also argues that filing a timely pre-award protest in another forum does not "preserve[] a plaintiff's prospective bidder status, where the deadline for submitting quotes passes prior to the Plaintiff filing a protest in this Court." Def.'s Opp'n 5. CGI established that it was a prospective bidder before the close of bidding by filing a GAO protest which fully put the agency on notice of what it claimed was improper agency action in the RFQs. Then CGI pursued its protest by filing in this Court immediately upon the GAO's denial of its protest. Unlike the plaintiff in Rex who waited until after award to protest on grounds different than it had raised pre-award at the agency, CGI continued to "utilize[] the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process." Rex, 448 F.3d at 1308 (alteration in original) (quoting Fed. Data Corp., 911 F.2d at 705).

Defendant appears to be saying that CGI's protest at the GAO did not count toward preserving its prospective bidder status for a protest in this forum. This Court disagrees. Pre-award protests in any forum serve the salutary purpose of permitting an agency to correct errors in a solicitation and proceed with its procurement. It matters not what forum a plaintiff chooses to notify the agency that its solicitation is infirm—an agency protest provides just as effective a remedial vehicle as a protest brought at the GAO, or this Court.

As this Court ruled in Bannum Inc. v. United States, 115 Fed. Cl. 257, 274 (2014), even a letter that does not constitute a formal agency protest can suffice to adequately notify the agency of a pre-award objection to a solicitation. This Court in Bannum reasoned:

> Defendant and Intervenor interpret the Blue & Gold waiver rule to require a protestor to pursue a formal pre-award protest with the agency, GAO or this Court. Neither Blue & Gold nor COMINT however stands for the proposition that a protestor must file a formal protest to preserve its right to challenge a solicitation. In articulating the waiver rule and confirming its broad application in bid protests, the Federal Circuit only required that a protestor "object to" or "challenge" a solicitation containing a patent ambiguity or error before award. Blue & Gold, 492 F.3d at 1315; COMINT, 700 F.3d at 1382. The Federal Circuit did not articulate any specific procedural requirements for such a challenge or objection or suggest that a protestor would have to pursue a formal protest remedy pre-award. The point of the waiver rule is to provide notice to the agency so that it can remedy a defective solicitation before award. Allowing informal notice in raising pre-award issues permits the expeditious amendment of problematic solicitations or, if the agency is satisfied its solicitation is adequate, an expeditious continuation with the award process at hand. At present, the law does not require that Bannum do anything more than it did here. All that is required is that a protestor must have "done something" to challenge a solicitation prior to award to preserve its right to protest the solicitation in this Court. DGR Assocs., Inc. v. United States, 94 Fed. Cl. 189, 202-04 (2010) ("All [Blue & Gold] says is that a party must have done something prior to the closing date to protest the solicitation

error, before raising 'the same objection . . . subsequently in the Court of Federal Claims.'" (quoting Blue & Gold, 492 F.3d at 1313)).

115 Fed. Cl. at 274; see U.S. Foodservice, Inc. v. United States, 100 Fed. Cl. 659, 673 (2011).

In sum, this Court finds that because CGI was a qualified bidder, expected to bid, would have bid but for the unacceptable payment term and timely challenged this term prior to the close of bidding, CGI has demonstrated that it is a prospective bidder.

## CGI Has a Direct Economic Interest That Would Be Affected By Award

To establish standing, CGI must also demonstrate that it has a "direct economic interest [that] would be affected by the award of the contract." Digitalis, 664 F.3d at 1384 (citing Rex, 448 F.3d at 1307). The Federal Circuit has stated that "[g]enerally, to prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract." Orion, 704 F.3d at 1348 (citing Rex, 448 F.3d at 1308). There is, however, "an exception to that standard [] when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid." Id. (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1361 (Fed. Cir. 2009)). In the pre-award context, the protestor can establish a direct economic interest "by demonstrating that it suffered a 'non-trivial competitive injury which can be redressed by judicial relief.'" Id. (citing Weeks Marine, 575 F.3d at 1361-62).

In fashioning this less exacting standard for establishing a direct economic interest in a pre-award protest, the Federal Circuit explained:

> We have not had occasion to discuss what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder / offeror is challenging a solicitation in the pre-award context. In such a case, it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. See, e.g., Statistica, 102 F.3d at 1582 (holding that a contractor lacked standing because it failed to show a "substantial chance it would have received the contract award but for" agency error). The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a "but for" prejudice analysis. However, Article III considerations require a party such as Weeks to make a showing of some prejudice. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("First, the plaintiff must have suffered an 'injury in fact'. . . "); Myers Investigative & Sec. Servs., 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").

* * *

Upon consideration of the matter, we conclude that the standard applied by the Court of Federal Claims ["a non-trivial competitive injury which can be redressed by judicial relief -- ] "strikes the appropriate balance between the language of §

1491(b)(1), which contemplates" an action by an interested party objecting to a solicitation for bids or proposals . . . or any alleged violation of statue or regulation in connection with . . . a proposed procurement," and Article III standing requirements.

Weeks Marine, 575 F.3d at 1361-63.

The Government contends that CGI has not demonstrated a non-trivial competitive injury, because it lacked the requisite financial resources to be a qualified bidder. Specifically, the Government states that if CGI has concerns about waiting an additional 80 days for payments, then it would not be able to demonstrate adequate financial resources to satisfy the RFQ requirement that RACs be capable of sustaining operations without payment for a year. In making this argument, the Government is jumping the gun—evaluating CGI's hypothetical compliance with the RFQs and attempting to make a nonresponsibility determination for the purposes of litigation without a contracting officer doing the analysis. The Government's attack on CGI's financial capability is predicated on speculation, not on a sufficiently developed record. CGI was a qualified bidder that had successfully performed the services being procured, but the prompt payment clause that CGI claims is illegal prevented it from submitting a viable bid. Here, as in Weeks Marine, Inv. v. United States, CGI had "a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations." 575 F.3d at 1362. As such, CGI has demonstrated a nontrivial competitive injury which can be redressed by this Court.

## CGI Did Not Waive its Standing Argument

Defendant contends that CGI has waived any argument on standing because it failed to address the issue in its opening brief for judgment on the AR. Defendant cites Novosteel SA v. United States, 284 F.3d 1261, 1273 (Fed. Cir. 2002) and Brooks Range Contract Services v. United States, 101 Fed. Cl. 699, 708 (2011) for the principle that a plaintiff must raise standing in its opening brief to avoid waiver and that pleading standing in a complaint is not sufficient. Tr. Oral Arg. 32, June 6, 2014. Novosteel is inapposite as it involves waiver of a retroactivity argument in an anti-dumping case and does not suggest that a jurisdictional argument like standing can be waived.

Brooks Range is not binding, and to the extent Brooks Range could be applied here, this Court declines to follow it. Standing is not the type of argument that can be waived because Plaintiff failed to mention it in an opening brief. Rather, because standing is jurisdictional, argument on that issue may be made at any time, especially since standing may be raised on appeal or by the Court sua sponte. Weeks Marine 575 F.3d at 1358-59; Myers, 275 F.3d at 1369; Fuji Photo Film Co. v. Int'l Trade Comm'n, 474 F.3d 1281, 1289 (Fed. Cir. 2007); Bannum, 115 Fed. Cl. at 153; Archura, 112 Fed. Cl. at 497.

## Standard of Review for Bid Protests

The Court evaluates bid protests pursuant to the Administrative Procedure Act's standard of review for an agency action. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir.

2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Therefore, this Court will not disturb an agency's procurement decision unless the Court finds that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014).  Under Rule 52.1, the parties are limited to the AR and the Court makes findings of fact as if it were conducting a trial on a paper record.  See Bannum, 404 F.3d at 1356.  Looking to the AR, the Court must determine whether a party has met its burden of proof based on the evidence in the record.  Id.

**Plaintiff Failed to Establish that CMS Violated FASA and the FAR By Including the Modified Payment Term in the RFQs**

CGI argues that CMS violated the Federal Acquisition Streamlining Act and FAR 12.301, 12.302, and 10.002 by including payment terms in the RFQs that are inconsistent with customary commercial practice without first conducting market research or obtaining a waiver.[18]  CGI points to FASA's mandate that agencies use clauses "consistent with standard commercial practice," 41 U.S.C. §§ 3307(b), (e)(2)(B)(ii), which the FAR Council implemented "in FAR Part 12 (among other places)."  Pl.'s Mot. 15.  FAR 12.301(a)(2) provides that "contracts for the acquisition of commercial items shall, to the maximum extent practicable, include only those clauses [d]etermined to be consistent with customary commercial practice."  FAR 12.302(c) directs that the Government "shall not tailor any clause or otherwise include any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice . . . unless a waiver is approved . . . ."  In order to request a waiver, an agency must draft a waiver request that "describe[s] the customary commercial practice."  To ascertain the customary commercial practice, the agency must first conduct market research in accordance with FAR 12.302(c) and 10.002(b).  See FAR 12.302(c)[19] and FAR 10.002(b).[20]

CGI's argument is contingent on the assumption that FAR Part 12 applies to Federal Supply Schedule purchases addressed in FAR Subpart 8.4.  FAR Part 12 governs the acquisition

---

[18] At oral argument, Plaintiff's counsel explained that though FASA's language is directed to the FAR Council—not CMS—FAR Part 12 incorporates FASA and makes FASA applicable.  Tr. Oral Arg. 54-55, June 6, 2014.

[19] FAR 12.302(c) states, in pertinent part: "The request for waiver must describe the customary commercial practice found in the marketplace, support the need to include a term or condition that is inconsistent with that practice and include a determination that use of the customary commercial practice is inconsistent with the needs of the Government."

[20] FAR 10.002(b) states in pertinent part: "(1) . . . Market research involves obtaining information specific to the item being acquired and should include— . . . (iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made."

of commercial items generally, and the parties agree that RAC services qualify as commercial items.  As such, the Court must determine whether FAR Part 12 applies to Schedule buys under FAR Subpart 8.4.

## Neither FAR Subpart 8.4 Nor FAR Part 12 Requires That Terms of RFQs for FSS Buys Comply with FAR Part 12 Procedures

CGI contends that because RAC services meet the FAR's definition of commercial items and the FAR states that Part 12 <u>shall</u> apply to acquisitions of commercial items, the agency was required to adhere to Part 12 in fashioning the RFQs.  The application of Part 12 would have required CMS to include in the RFQs only terms consistent with customary commercial practice or obtain a waiver, which CMS concedes it did not do here.  <u>See</u> FAR 12.302(c).

FAR Subpart 8.4 governs the Federal Supply Schedule which provides federal agencies with a simplified process for obtaining commercial supplies and services at prices associated with volume buying.  <u>See</u> FAR 8.402.  In <u>Sharp Electronics Corporation v. McHugh</u>, the Federal Circuit explained how the Federal Supply Schedule operates:

> Under the current version of the GSA Schedules Program, also called the Federal Supply Schedule Program or Multiple Award Schedule Program, [], GSA "acts as the contracting agent" for the federal government, negotiating base contracts with suppliers of commercial products and services. Each supplier publishes an Authorized Federal Supply Schedule Pricelist listing the items offered pursuant to its base contract, as well as the pricing, terms, and conditions applicable to each item. <u>See</u> FAR 8.402(b). Individual agencies issue purchase orders under the base contract as needed.  The terms of the base contract, referred to as the "schedule" contract, are incorporated by reference into the order. ... Schedule contracts are intended to simplify the acquisition process.

707 F.3d 1367, 1369-70 (Fed. Cir. 2013) (internal citations omitted); <u>see also</u> <u>Tektel, Inc. v. United States</u>, 116 Fed. Cl. 612, 614 (2013).

FAR Subpart 8.4 expressly lists FAR provisions that do and do not apply to the FSS, but does not list Part 12 in either category.  FAR Subpart 8.4 explicitly mentions Part 12 in three places.  First, Subpart 8.402 instructs agencies that they may add items not on the FSS—"open market items"—to Blanket Purchase Agreements ("BPA") or FSS orders, but "only if" the agency complies with "all applicable acquisition regulations pertaining to the purchase of the items not on the Federal Supply Schedule . . . (e.g., publicizing (Part 5), competition requirements (Part 6), *acquisition of commercial items (Part 12)*, contracting methods (Parts 13, 14, and 15), and small business programs (Part 19))."  FAR 8.402(f) (emphasis added).  Second, under Subpart 8.406-4, a termination for cause must comply with FAR 12.403."  Third, under Subpart 8.406-5 "[t]erminations for the Government's convenience must comply with FAR 12.403."  Thus, FAR Subpart 8.4 only provides that FAR Part 12 applies in three instances—termination for cause, termination for convenience, and adding open market items to FSS orders.  These instances in which FAR Part 12 applies are different species than a payment clause.

FAR 8.404 lists FAR sections that generally do not apply to FSS orders—FAR Parts 13, 14, 15, and 19—but does not include Part 12. CGI contends that where Subpart 8.4 explicitly excludes and includes other provisions of the FAR, those mentioned provisions are "process oriented," e.g. negotiated procurements, sealed bidding, whereas Part 12 is policy, and is therefore generally applicable, whether expressly mentioned or not. Tr. Oral Arg. 61, June 6, 2014. This distinction between process-oriented provisions and policy is not persuasive in this context—all of these provisions have elements of policy and process—solicitation, evaluation, and award using sealed bidding, negotiations, or simplified acquisitions delineate processes that embody policy, as do the provisions of FAR Subpart 8.4 describing procedures to implement what is supposed to be a simplified acquisition process for Schedule buys. More fundamentally, the notion that a court should apply regulations where they do not say they apply because they contain "policy" invites unwarranted judicial intrusion into the realm of regulation writing. Whether FAR Part 12's requirements for customary commercial practices ought to be injected into a given procurement process is a matter for the FAR Council to determine, and the Council has not seen fit to add that requirement to FSS buys.

In a similar vein, FAR Part 12 itself does not expressly state its provisions apply to FSS buys. In general, FAR Part 12 prescribes policies and procedures for the acquisition of commercial items. It "implements the Federal Government's preference for the acquisition of commercial items . . . by establishing acquisition policies more closely resembling those of the commercial marketplace and encouraging the acquisition of commercial items and components." FAR 12.000. While Part 12 states that contracts for commercial items are also subject to policies and procedures found in other parts of the FAR, it does not mention Subpart 8.4 or the FSS in this acknowledgement. FAR 12.102(c) ("Contracts for the acquisition of commercial items are subject to the policies in other parts of the FAR.").

FAR Part 12 only expressly mentions Subpart 8.4 or the Federal Supply schedule in three instances, which are of no help here. These three references simply direct a contracting officer to follow procedures in subpart 8.4 when using the Federal Supply Schedule.[21] Concomitantly FAR Part 12 lists five situations where Part 12 does not apply, but does not mention Schedule buys: "(1) At or below the micro-purchase threshold; (2) Using the Standard Form 44 (see 13.306); (3) Using the imprest fund (see 13.305); (4) Using the Government[-]wide commercial purchase card . . . ; or (5) Directly from another Federal agency." FAR 12.102(e).

Other provisions of Part 12 indicate that its provisions have some applicability to different FAR sections, but fail to mention Subpart 8.4 or the FSS. For example, FAR 12.203

---

[21] These references are in FAR 12.207, entitled "contract type." The first reference to Subpart 8.4 is in "paragraph (b)" where it states "(3) When making a change that modifies the general scope of. . . (ii) An order issued under the Federal Supply Schedules, [the contracting officer must] follow the procedures at 8.405-6." FAR 12.207(b) The second reference, also in paragraph (b), cites FAR 8.404(h) "for the requirement for determination and findings when using Federal Supply Schedules." Id. Finally, the third reference in paragraph (c) explains when indefinite-delivery contracts may be used, and states that "[p]lacement of orders shall be in accordance with Subpart 8.4 or 16.5, as applicable." FAR 12.207(c)(2).

CGI Addendum - 020

directs contracting officers to use the policies in Part 12 "in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in [P]art 13, Simplified Acquisition Procedures; [P]art 14, Sealed Bidding; or [P]art 15, Contracting by Negotiation, as appropriate for the particular acquisition." FAR 12.203.

In interpreting these regulations, the Court follows the long-established principle of *expressio unius est exclusio alterius*—the express mention of one thing excludes all others. See e.g., Slattery v. United States, 635 F.3d 1298, 1323 (Fed. Cir. 2011) ("As a textual matter, the amendment applies only to the enumerated entities in light of the canon *expressio unius est exclusio alterius*") (citing Tenn. Valley Auth. v. Hill, 437 U.S. 153, 188 (1978)). Both FAR Subpart 8.4 and FAR Part 12 expressly list other instances or types of acquisitions where FAR Part 12 applies, but neither mentions the scenario at issue here—payment terms in an FSS purchase. Under maxim *expressio unius est exclusio alterius*, this Court finds that FAR Part 12 does not apply to the payment term in the RFQs issued under CGI's FSS contract. There is no basis to refrain from applying this maxim here because there is no intent expressed in either FAR Subpart 8.4 or FAR Part 12 suggesting that customary commercial payment terms ought to apply to FSS orders. Cf. Andrus v. Glover Constr., 446 U.S. 608, 619 (1980) (quoting DeCoteau v. District County Court, 420 U.S. 425, 447 (1985) ("[a] canon of construction is not a license to disregard clear expressions of . . . congressional intent.").

CGI also invokes FAR 12.102(c) which provides that "[w]hen a policy in another part of the FAR is inconsistent with a policy in this part, this [P]art 12 shall take precedence for the acquisition of commercial items." FAR 12.102(c). CGI contends that because Part 12 applies to the acquisition of commercial items and requires contracts to contain terms consistent with customary commercial practice absent a waiver, then Part 12 conflicts with Subpart 8.4 and, consequently, Part 12 prevails. Pl.'s Mot. 15. Plaintiff, however, relies only on FAR Subpart 8.4's silence and has failed to identify an actual conflict between the provisions of FAR Subpart 8.4 and the provisions of FAR 12. As explained above, Part 12 delineates the type of commercial item acquisitions to which it applies and does not include RFQs issued under FSS contracts.

Plaintiff also suggests that failing to apply FAR Part 12 at the FSS order level would lead to an anomalous result where the terms of the FSS contract would meet FAR Part 12 but the order placed under that contract would not. That is not the situation before this Court, however. CGI could have avoided this anomalous result by listing, as part of its Schedule Contract, "the items offered pursuant to its base contract, as well as the pricing, terms, and conditions applicable to each item" as required by FAR 8.402(b) (emphasis added). See also, Sharp Elec. Corp., 707 F.3d at 1369-70. Orders made through the FSS, FAR Subpart 8.4, must be consistent with the schedule contract. FAR 8.406-1(c). CGI's "pricelist," or price terms on its schedule contract listed a contingency fee of up to 19.55%, but stated that payment terms would be "negotiated at the order level." Def.'s Mot. App. 25.[22] CGI's Schedule itself said nothing about payment terms including when invoicing could be done, leaving room for the agency to insert a payment term in its RFQ that was not inconsistent with CGI's FSS contract, but problematic for CGI nonetheless. Id.

---

[22] The record does not indicate why this language appeared in CGI's Pricelist.

### The RFQ's Payment Terms Do Not Unduly Restrict Competition

CGI contends that RFQs' payment terms unduly restrict competition by requiring RACs to wait 120 days to 420 days to invoice, thereby causing them to absorb high accounts receivable and ultimately forcing incumbent RACs to refrain from bidding on the instant RFQs.  Pl.'s Mot. 28 (citing AR Tab 32 at 1293-94 ¶ 12-14).  CGI points out that the Government received seven quotes in response to the 2013 RFQ that did not contain restrictive payment terms, but only four quotes in response to the January 2014 RFQ containing the restrictive terms.  Pl.'s Opp'n 21; Tr. Oral. Arg. 53-54, June 6, 2014.

CGI has not demonstrated that the payment terms "actually 'restricted competition'" as all incumbent RACs, except CGI, submitted quotes for the RFQ and the record does not establish that the payment terms were the cause of any other RACs failing to bid.  Def.'s Mot. 35-36. PRGX, a RAC, made the following public statement on withdrawing its quote:

> 2013 was especially difficult due to changes in audit scope in the Medicare RAC program and significant delays in the rebid process, resulting in disappointing financial results for the year. As previously disclosed, we expect a difficult 2014 in this business due to continued delays in the CMS rebid process and unprofitable changes in the scope of the current subcontracts.  Given the uncertain audit scope and challenging business terms as defined in the Medicare RAC rebid RFP and the ongoing pressure from the provider community to limit scope in the future, we simply believe that entering into a new Medicare RAC contract presents unacceptable level of financial risk for PRGX.  Thus we have decided to dropout of the CMS rebid process and focus our future growth efforts in other areas.

AR Tab 41 at 1337.

CGI contends that the "challenging business terms" referenced in the above quote are the restrictive payment terms.   However, as the Government emphasizes, the unexplained "challenging business terms" are only one of several reasons PRGX withdrew as delineated in its public statement.  Based on its own words, a primary source of PRGX's withdrawal was a more limited audit scope.  As Plaintiff's counsel acknowledged, "there's a Congressional moratorium on about 90% of the work that's being done under the RAC contracts until March of 2015."  Tr. Oral Arg. 74, June 6, 2014.

While CGI's withdrawal indicates the payment terms caused some restriction in competition, CGI has not demonstrated this term "unduly" restricted competition.  As the  GAO found in Impact Resource Technologies, competition was not unduly restricted where a protestor challenged terms of an RFQ as unduly restrictive, but the agency received four other responsive quotations.  See Impact Res. Techs., B-407259.2, 2012 CPD ¶ 335, 2012 WL 6035676, at *2 (Comp. Gen. Dec. 4, 2012).

22
A22

**Plaintiff Has Not Demonstrated that the Agency's Inclusion of Payment Terms Inconsistent with Customary Commercial Practice was Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law**

CGI also alleges that the modified payment term is arbitrary and capricious and lacks a rational basis because it is an unnecessary "solution in search of a problem" and a "belt and suspenders" approach for ensuring the Government can recoup contingency fees on overpayments that were misidentified. While CGI's argument rings true in many respects and the modified payment term here will increase cost, reduce competition, and appears to be a bit excessive, it does not rise to the level of arbitrary and capricious conduct lacking a rational basis.

This Court may set aside an agency's procurement decision if "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332. The Federal Circuit has explained that "[w]hen a challenge is brought on the first ground ... contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Id. at 1332-33 (citing Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." In re Sang-Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43). Here, the agency examined relevant data, considered several options, articulated a basis for its decision, did not violate statute or regulation or unfairly disadvantage any bidder or class of bidders.

The modification of the payment term was in essence a judgment call by agency officials from CMS' procurement, financial, and legal departments. What concerned the agency was that there would be no contractual vehicle to demand a contingency fee payment back if an overpayment determination were overturned on appeal after a RAC contract ended. Previously CMS had simply deducted from future payments any contingency fees the RAC owed CMS for misidentifying the overpayment. As the agency recognized, when the RAC contract ends, CMS will no longer be regularly paying the RAC and will be unable to deduct the contingency fees owed by RACs. The agency decided that it was preferable to wait to pay the contingency fees and thus keep money in the Government's possession, rather than turning it over to the RACs, until it appeared more likely that the contingency fee had been properly earned and an overpayment correctly identified. The agency determined that there would be sufficient benefit in structuring its program this way because of its "concern that the RACs really should not be paid until it is determined that the recoupment is deemed legitimate and appropriate." AR Tab 94 at 8603. The agency considered various options it characterized as surety bond, withholding, trust fund, escrow, progress payments, letter of credit, financial rewards, letter of assurance from parent company, and reserve. Ultimately, CMS exercised its discretion to modify the payment term as well as to require a reserve and letter of assurance, knowing full well the RACs' concerns with the term and the costs and benefits involved. AR Tab 59 at 2000.

The record demonstrates that CMS knew that the RACs were not "happy [with the terms] because it will increase the time period in which they will get paid." AR Tab 94 at 8607.3. Before CMS issued the RFQs at issue, it attempted to include the contested payment terms in a

contract modification with the RACs, but none of the performing RACs agreed to that modification *in toto*, and most expressed concern about their ability to financially tolerate the delayed invoicing requirements. One contractor, HDI, related to CMS that it anticipated the new delayed invoicing terms would cost it more than $[        ] per/year. AR Tab 161 at 10530. Similarly, Performant objected to the "unilateral changes to material contract terms" and contended that it would have a "negative impact on the RAC's financial capacity." Id. at 10900. HDI sent CMS a list of concerns including that the terms would bring the RAC's "cash flow and revenue recognition []to a halt," then CMS attached this list of concerns to an email CMS sent to all RACs and some CMS employees. Id. at 10529-30, 10539-40.

Although, before issuing the RFQs, CMS was aware that the RACs objected to these delayed invoicing payment terms and contended that their services would cost more, the agency determined that a countervailing consideration won the day—that the agency was unwilling to take on the risk of not being able to recoup contingency fees once the contract ended. This was not arbitrary, capricious, or irrational. The decision did not violate statute or regulation or result in an uneven playing field—all prospective bidders were equally disadvantaged. Nor was the curtailment of competition significant. The Court would thus be overstepping its bounds to substitute its judgment for that of the agency in determining its needs, particularly in the financial realm.

As this Court recognized in Communication Construction Services, Inc. v. United States, procurement officials possess substantial discretion in financial judgments regarding agency needs because the agency will live with the consequences of its determination. 116 Fed. Cl. 233, 268, 272 (2014). Here, the agency devised the modified payment term knowing its cost and benefit to the Government and adverse impact on bidders and was willing to impose this requirement as a solution to its needs. This was in essence a financial judgment call that this Court should not second guess.[23]

## Conclusion

The Court **DENIES** the Government's motion to dismiss for lack of standing.

The Court **DENIES** Plaintiff's motion for judgment on the Administrative Record and **GRANTS** the Government's motion for judgment on the Administrative Record. Plaintiff's

---

[23] This case does provide, however, a troubling example of what are supposed to be FSS simplified acquisitions being used to purchase multi-million dollar, multi-year, complicated services, such as for Recovery Audit Contractors. Procurements such as these illustrate how FSS buys have expanded into the territory formerly occupied by negotiated procurements. See John Cibinic & Ralph C. Nash, Contracting Methods: Square Pegs and Round Holes, 15 Nash and Cibinic Rep. 9 ¶ 48 (2001) (citation omitted) ("Use of the FSS to acquire services [such as $344 million in services over 60 months] . . . hardly seems to be what Congress expected when it granted statutory status to multiple award schedules.").

Protected Material Removed

motion for injunctive relief is **DENIED**.    The Court directs the Clerk to enter judgment accordingly.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

# CGI ADDENDUM DOCUMENT NO. 2

Case 1:14-cv-00355-MCW   Document 43   Filed 08/21/14   Page 1 of 1

# In the United States Court of Federal Claims

No. 14-355 C

**CGI FEDERAL, INC.,**

**JUDGMENT**

v.

**THE UNITED STATES**

Pursuant to the court's Opinion and Order, filed August 15, 2014, granting the Government's motion for judgment on the Administrative Record and denying Plaintiff's motion for judgment on the Administrative Record and motion for injunctive relief, and the Government's motion to dismiss for lack of standing,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is in favor of the Government.

Hazel C. Keahey
Clerk of Court

**August 21, 2014**              By:     s/Lisa L. Reyes

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

CGI Addendum - 026

# CGI ADDENDUM DOCUMENT NO. 3

Redacted Version

```
1                UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    CGI FEDERAL, INC.,                    )

5            Plaintiff,                    ) Case No.

6              vs.                         ) 14-355C

7    THE UNITED STATES OF AMERICA,         )

8            Defendant.                    )

9

10                 ****TRANSCRIPT ███████****

11

12                        Suite 612

13           Howard T. Markey National Courts Building

14              717 Madison Place, N.W.

15                   Washington, D.C.

16              Tuesday, September 2, 2014

17                    10:54 a.m.

18                  Oral Argument

19

20

21       BEFORE:  THE HONORABLE MARY ELLEN COSTER WILLIAMS

22

23

24

25   Elizabeth M. Farrell, CERT, Digital Transcriber
```

Under Seal Designation Removed
From Each Page

2

Transcript ████████

CGI Federal, Inc. v. USA                                              9/2/2014

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFF:
 3            SCOTT M. McCALEB, ESQ.
 4            DANIEL P. GRAHAM, ESQ.
 5            Wiley Rein, LLP (DC)
 6            1776 K Street, NW
 7            Washington, DC  20006
 8            (202) 719-7049
 9            smccaleb@wileyrein.com
10
11    ON BEHALF OF THE DEFENDANT:
12            WILLIAM P. RAYEL, ESQ.
13            U.S. Department of Justice
14            Commercial Litigation Branch, Civil Division
15            Post Office Box 480
16            Ben Franklin Station
17            Washington, DC  20044
18            (202) 616-0302
19             william.rayel@usdoj.gov
20
21    ALSO PRESENT:
22            Jeffri Pierre, DHHS
23            Steven O'Neil, GSA
24
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 028

3

Transcript ███████

CGI Federal, Inc. v. USA                                          9/2/2014

```
 1                    P R O C E E D I N G S
 2                    -    -    -    -    -
 3          (Proceedings called to order, 10:54 a.m.)
 4          THE COURT:  Good morning, Counsel.  This is oral
 5    argument in the motion to stay pending appeal in CGI Federal,
 6    Inc. v. United States, Number 14-355.  I'm Judge Williams.
 7    Let me ask counsel to please identify themselves for the
 8    record.  For the Plaintiff?
 9          MR. MCCALEB:  Scott McCaleb, and with me is Dan
10    Graham and Gary Ward, both from Wiley Rein.
11          THE COURT:  Good morning.
12          MR. MCCALEB:  Good morning.
13          THE COURT:  And for the Government?
14          MR. RAYEL:  This is William Rayel from the
15    Department of Justice, and on other lines are Jeffri Pierre
16    from the Department of Health and Human Services, and Steven
17    O'Neil (phonetic) from the General Services Administration.
18          THE COURT:  Welcome to all of you as well.
19          MR. RAYEL:  Thank you.
20          THE COURT:  All right, Mr. McCaleb, it's your
21    motion.
22          MR. MCCALEB:  Thank you, Your Honor.  On behalf of
23    CGI, we think that the motion is -- that we are likely to
24    succeed on the merits of our appeal.  At a minimum, we think
25    we've raised serious novel issues that we think the Court,
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 029

4

Transcript ████

CGI Federal, Inc. v. USA                                        9/2/2014

1    itself, has found to be difficult to deal with.  It is

2    undisputed that the RAC services at issue here are, in fact,

3    commercial items.  The Court here also expressly found that

4    the RFQ, the payment terms, are not consistent with customary

5    commercial practice.

6           So, the only question for the Circuit is does FASA

7    and FARS mandate that the Government cannot include non-

8    customary commercial terms in contracts for commercial items,

9    whether that mandate applied to Subpart 8.4 RFQs or orders.

10   We --

11          THE COURT:  Now, let me stop you there, Mr.

12   McCaleb, and have you clarify for us FASA's role in this.

13   You say FASA and FARS mandate.

14          MR. MCCALEB:  Absolutely.

15          THE COURT:  Where does FASA come in?

16          MR. MCCALEB:  FASA comes in at the very beginning.

17   I mean, the entire point of FASA was to attract commercial

18   companies to the U.S. Government marketplace by doing

19   business with them only on commercial terms.  That was the

20   entire point of FASA.  We think that FASA plainly says that.

21   We think that when you look at E2B and E2D, coupled with

22   E2 -- 3307 E2E, Echo, the waiver of contract claims --

23          THE COURT:  This is like alphabet soup.

24          MR. MCCALEB:  I know it is.  I apologize for going

25   so quickly.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 030

5

Transcript ██████████

CGI Federal, Inc. v. USA                                      9/2/2014

1          THE COURT:  That's all right.  Wait, let me pull it
2    out.  Okay, I had it out, now here let me just grab it again.
3    So, it's 41 USC -- what is it, 3307?
4          MR. MCCALEB:  3307.
5          THE COURT:  Gotcha, okay, I'm with you now.  E2 --
6    so, this is in terms of what the regulations are supposed to
7    tell us, right?
8          THE COURT:  The title, of course, is the
9    regulation, and as the Court is well aware, a heading in a
10   statute of regulation cannot limit what the text makes plain.
11   And, so, you have three --
12         THE COURT:  Really?
13         MR. MCCALEB:  Yeah.  We think that that canon --
14   that interpretative canon is well established.  We'd be happy
15   to brief that further if it would help --
16         THE COURT:  No, no, no, we're going to rule today.
17         MR. MCCALEB:  Okay.
18         THE COURT:  So, just go right ahead and you tell me
19   -- give me your best shot right now.
20         MR. MCCALEB:  Sure.  When you look just basically
21   at E2D, delta, clauses that may be used in a contract, it
22   says, to the maximum extent practicable, only the contract
23   clauses listed in subparagraph B.  So, you go to B and B
24   says, you can only -- you only include, to the maximum extent
25   practicable, clauses that are either required by law, which

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 031

6

Transcript ████████

CGI Federal, Inc. v. USA                                                9/2/2014

```
 1   is not what's at issue here, or those that are determined to

 2   be consistent with standard commercial practice.

 3            So, you look at the statute and, so, to the maximum

 4   extent practicable, only contract clauses listed pursuant to

 5   B may be used in a contract.  And then you fast forward, you

 6   skip the next clause, for the acquisition of commercial items

 7   or commercial components by or for an executive agency.  That

 8   statutory provision prohibits the inclusion in contracts for

 9   commercial items of terms that are not consistent with

10   customary commercial practice.  The Government emphasizes

11   that that's only to the maximum extent practicable.  The

12   Government has never argued that this is a practicability

13   issue that has required them to include these terms.

14            But even if that were the case, that language --

15   it's plain when you read that together with Echo, the waiver

16   of contract clauses, that when you are -- when you are going

17   to use a non-customary term, you need a waiver under Echo,

18   waiver of contractor clauses.  So, we think that FASA itself

19   makes a plain statement that you cannot include, without a

20   waiver, terms that are inconsistent with standard commercial

21   practice.  The FAR, we think, plainly implements that and

22   implements it clearly.

23            THE COURT:  Okay.  Before you get to that, I

24   obviously didn't think so or I wouldn't have ruled the way I

25   did.  But let me go back to your prior point.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 032

7

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1          MR. MCCALEB:  Sure.

2          THE COURT:  In terms of compliance with FASA, this

3    is about fashioning regulations, right?  And the agency here

4    didn't write these regulations.  They're just doing the best

5    they can to work with what's in the FAR already.  So, who's

6    the culprit?

7          MR. MCCALEB:  I don't think there's any culprit

8    because I think that when you read the statute, when you

9    understand the statute's purpose and read the regulations,

10   and specifically 12.102A, that says that Part 12 applies to

11   the acquisition of commercial items, that there's no room for

12   ambiguity.  So, I find no culprit because I find no error in

13   the regulations, the statute or the statute's purpose.

14         THE COURT:  I know you don't, but I did.  So, my

15   question to you, is who drafted the regulation?  The FAR

16   council [2 1:08] not the agency here.

17         MR. MCCALEB:  Well, I don't deny that the agency,

18   in a vacuum, did not write the regulations.  Obviously, GSA

19   has a role in that and GSA is part of the team -- the

20   Government team here.

21         THE COURT:  Okay.  I understand your position.

22         MR. MCCALEB:  Very good.  We think -- with respect,

23   and hopefully the Court recognizes that we have nothing but

24   the utmost respect for the Court, the Court's decision, we

25   believe, would gut FASA and that mandate and carve out $50

8

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1    billion in annual commercial item procurements from that

2    mandate and then permit, in orders, precisely what the Court

3    agrees GSA cannot include in an FFS contract.

4           THE COURT:  Well, you know what, I think I said

5    this.  Maybe I didn't say it clearly enough.  I agree with

6    you and I'm very troubled by it.  Look at that footnote.

7           MR. MCCALEB:  I recognize the footnote on the last

8    page.

9           THE COURT:  But, you know, Mr. McCaleb, and all of

10   you, this is a business about the role of the Court and

11   what's the role of judicial review in these cases.  That's

12   what I was so stymied by here.

13          MR. MCCALEB:  Yeah, I understand that.  Obviously,

14   we don't think that there is the room for ambiguity in the

15   implementing regs, especially when viewed in the light of the

16   purpose of the statute and the statutory terms that the Court

17   found, and we're obviously hopeful that the Circuit agrees

18   with us.  The fact that FAR Part 12 does not say expressly

19   that it applies to Subpart 8.4 we view as of no moment.

20   12.102A already says that, as does FASA.  And there are five,

21   and only five, exceptions that are listed in Part 12, none of

22   which applies here.

23          The same applies with the fact that 8.4 does not

24   say expressly that Part 12 applies.  8.4 is necessarily for

25   only commercial items and nothing in FASA or Subpart 8.4 or

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 034

9

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1    Part 12 says otherwise.  12.102A already says that it applies

2    to the acquisition of commercial items.

3              And then, finally, Your Honor, on the likelihood of

4    success prong, we respectfully think that the Court's

5    assignment of blame to CGI of the anomalous result is

6    mistaken.  There's nothing in FASA or FAR that charges the

7    contractor with anticipating countless terms and conditions

8    that might be inconsistent with customary commercial practice

9    and then prohibiting them from being included in orders under

10   the FFS contract.  That burden is placed squarely on the

11   Government not to include those sorts of terms and

12   conditions.

13             THE COURT:  Well, should CGI have raised that as a

14   protestable issue?

15             MR. MCCALEB:  I'm sorry, the -- we -- I think we

16   did argue that it leads to an anomalous result and that it

17   would yield basically an absurd result that's inconsistent

18   with the statute and the regulation.

19             THE COURT:  No, but your client's sitting there

20   looking at his price list and your client's the one that

21   said, okay, here's my price list and we're going to save

22   these terms -- these pricing terms for a later day to be

23   negotiated by order, which led to the mischief that happened

24   here.

25             MR. MCCALEB:  Well, that -- with great respect, we

10

Transcript █████████

CGI Federal, Inc. v. USA                                    9/2/2014

1    don't think that that opens up the door for the Government to
2    introduce non-customary terms that are outlawed by the
3    regulation and, we believe, by the statute.
4              THE COURT:  Now, I know this isn't in the record
5    before me, but it may -- and maybe I shouldn't even ask it,
6    I'm just curious though.  So, how did -- the terms got in
7    there by the Government with no input at all by CGI, I take
8    it?
9              MR. MCCALEB:  No, CGI had input.  CGI basically
10   said we will not agree to the terms.  They rejected the terms
11   when they were introduced as a contract modification, and
12   then when they put them in the RFQ, we rejected them again.
13             THE COURT:  Now, is that a common practice for the
14   Government to sit down with the contractor and negotiate the
15   terms that are left for a later day?
16             MR. MCCALEB:  I'm not -- I'm not sure that I
17   understand the question, Your Honor.  I'm trying to think
18   through it.
19             THE COURT:  Well, this is -- I mean, yeah, I
20   understand.  I'm struggling with this.  And, obviously, so
21   let's just go back to square one.  Before any award is made,
22   your client submits its price list, right?  That's part of
23   its schedule contract.  It doesn't submit the payment terms
24   on the price list, although it could have.
25             MR. MCCALEB:  No, no --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 036

11

Transcript ███████

CGI Federal, Inc. v. USA                                    9/2/2014

1          THE COURT:  Its own, couldn't it?

2          MR. MCCALEB:  -- the -- the schedule contract is --

3     it's readily available to all Government agencies and it

4     simply just says that whatever the specific terms of payment

5     are going to be, the percentages, for example, that those

6     percentages are going to be negotiated.  It depends -- you

7     know, depending on, you know, whatever the desire of the

8     company is or is not, in order to obtain an individual order

9     under the -- a competed order under the schedule contracts,

10    they're going to negotiate with the Government over what that

11    percentage of contingency fee is going to be.

12         THE COURT:  Right.

13         MR. MCCALEB:  That does not, however, introduce an

14    opportunity for the Government to impose non-standard terms.

15         THE COURT:  Okay.  But my question is different.  I

16    understand.  There's no problem here with the percentages.

17    That's fine.  The problem here is the terms.  Didn't your

18    client have an opportunity to insert its own terms, prompt

19    payment terms, into its price list?

20         MR. MCCALEB:  Did they have an opportunity?  I

21    can't answer whether, at the time they were negotiating the

22    Federal Supply Schedule contract, that was an issue that

23    surfaced and was negotiated with GSA.  I -- but I don't think

24    that that answer -- I don't think that the answer to that

25    question changes our position on the merits.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 037

12

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1         THE COURT:  No, no, I don't think it does either.

2    I'm just curious.  And that's why I'm saying, I don't know

3    how this works as a practical matter.  Do you always sit down

4    later and negotiate a bunch of terms or are you just putting

5    the percentages?  I understand they were [3 2:27] copasetic

6    or what else is left for the second -- for a later day?

7         MR. MCCALEB:  Yes.

8         THE COURT:  This seems to be a problem here.

9         MR. MCCALEB:  So, in the ordinary course of FFS

10   contracts, obviously, you know, the -- there is a -- anybody

11   gets on them, you know, they can all get their contract, you

12   can get your schedule contract.  And, generally, you know,

13   you can -- generally, the terms are for each schedule

14   whatever they are.  And then you can -- you know, you can

15   have some level of negotiation.

16        But what -- when we looked at what the Court's

17   ruling was, it seemed to us that what you were expecting of

18   contractors is that contractors need to anticipate the sorts

19   of non-commercial terms that were imposed here in an RFQ,

20   anticipate those, and then put in a prohibition in their

21   schedule contract that you can't include those sorts of

22   terms.

23        THE COURT:  Right.

24        MR. MCCALEB:  That's not a -- our point on that,

25   Your Honor, is that that's not -- that is not something --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

13

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1   that's not something that the statute or the regulation

2   charges the contractor with doing.  The charge is for the

3   Government not to include, you know, non-customary terms.

4          THE COURT:  I think the Court's coming from the

5   perspective that when a contractor does a price list, it's at

6   least free to include terms and it was free to include a term

7   about prompt payment, but it didn't.

8          MR. MCCALEB:  Well, I'm -- I would -- I can't --

9   I'll try and verify this, but I would assume that the Prompt

10  Payment Act terms are in the contract.  But that's not what

11  we're -- that's not what we're challenging here.  I mean,

12  this --

13         THE COURT:  Well, not Prompt Payment Act, but a

14  payment scheme that it was used to, you know, the 30 days or

15  whatever it used to have before the 120 to 420-day debacle

16  that you are complaining about.

17         MR. MCCALEB:  Right.  Now, this is -- well, I guess

18  the point that I would make is when you -- when you have --

19  certainly, if you were looking at CGI sitting, you know, in

20  the position they are sitting in at the time, they're

21  negotiating that schedule contract -- I can't remember the

22  date of it, but you're sitting in there at a time when you

23  know that FASA prohibits the inclusion of non-customary

24  terms.  You're sitting in there at a time that you know that

25  FAR Part 12 requires the same thing, and you're sitting in

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

14

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1    that negotiation seat at a time when -- when -- and I think

2    this is right, but we could verify it, that either Verizon --

3    the Verizon case held in terms -- held that Part 12 applies

4    or you can't include these or there had been no holding, you

5    know, in other words, it predated Verizon.

6            THE COURT:  Mm-hmm.

7            MR. MCCALEB:  In that context, the suggestion from

8    the Court that contractors, in creating their Federal Supply

9    Schedule contracts with GSA, have to somehow, beyond just

10   saying, yeah, we'll end up negotiating the contingency fee

11   with you, have to somehow, beyond that, anticipate what the

12   Government is going to want to include that would not be

13   customary and include a prohibition on it, is asking too much

14   and it is not consistent with the burden as -- the burden

15   that the statute and the regulation places, in our view,

16   squarely on the Government not to include.

17           THE COURT:  Okay.  So, even though the price list

18   permitted contractors to include "terms," as well as the

19   contingency fees in the price list, your position is, well,

20   they didn't have to anticipate every little nit.

21           MR. MCCALEB:  Well, they don't have to anticipate

22   terms that the Government -- that are not customary.  They

23   don't have to anticipate those and then put in a prohibition

24   against them being included in orders.  That's not a burden

25   that FASA or the FAR places on contractors; that's a burden

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

15

Transcript ████

CGI Federal, Inc. v. USA                                          9/2/2014

1    that's placed on the Government.

2              THE COURT:  Okay, I understand your position.

3              MR. MCCALEB:  Okay.  On the harms, Your Honor, we

4    think the balance swings in CGI's direction.  This is not a

5    1491(B)(3) national defense situation.  The harms that we

6    have pled we think are well established in the law, the

7    inability to compete fairly for a contract, the likelihood of

8    having to ████████████████████████, no lost profits,

9    lost experience with the Government, and without an

10   injunction, CMS would award contracts and, likely, ████████

11   ████████████████████████████████, which would

12   mean that we would not be able to compete effectively if we

13   were to ultimately prevail and get the relief we want.

14             THE COURT:  What's the duration of the RFQ at issue

15   and how many options?  In other words, how much business is

16   your client out by not being able to compete in this?

17             MR. MCCALEB:  I think it's five years total.

18             THE COURT:  Whoa.

19             MR. RAYEL:  Your Honor, if I could clarify.

20             THE COURT:  Yes, of course.

21             MR. RAYEL:  I believe it's one -- each of the RFQs

22   has a one-year base period, and then they vary in terms of

23   the options.  I believe it's two and a half -- two and a half

24   years of options to three and a half years of options for the

25   three RFQs.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Protected Material Removed

16

Transcript ███████

CGI Federal, Inc. v. USA                                    9/2/2014

```
 1            MR. MCCALEB:  Yeah, that sounds right to me, Will.
 2    So, at any rate, maybe it's four and a half years that you're
 3    looking at.
 4            THE COURT:  Mm-hmm.
 5            MR. MCCALEB:  What the Government has said is,
 6    well, gee, there aren't going to be any awards until October
 7    22nd, and by that time, the Federal Circuit can decide a
 8    motion that we haven't filed.  We haven't filed a motion
 9    there and this Court, you know -- not consistent with the
10    Government's position, this Court has an obligation to decide
11    our motion and [4 3:34] and Rule 62 says, you know, go to the
12    Court of Federal Claims first.  Don't go straight to the
13    Circuit.
14            The DOJ expressly assumed, on page 10 of its brief,
15    that you're going to deny our motion today and, so, their
16    pleading on harm is, well, we're not going to be harmed
17    because we won't ultimately -- because we'll be able to get
18    to the Circuit and let the Circuit deal with this.  That's
19    not the law.  The law is that this Court has to deal with it
20    in the first instance, and we're asking this Court to issue
21    an injunction.
22            As far as --
23            THE COURT:  Well, what -- so, then what happens?
24    Suppose I do issue an injunction, then what happens upstairs?
25    They have to issue an injunction, too, right?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

17

Transcript ████████

CGI Federal, Inc. v. USA                                          9/2/2014

1           MR. MCCALEB:  No, no, your injunction applies.

2           THE COURT:  But that --

3           MR. MCCALEB:  There's an injunction.

4           THE COURT:  Could that be the subject of an appeal,

5      also?

6           MR. MCCALEB:  I think the issuance of an injunction

7      as opposed to the denial of an injunction, my recollection is

8      that they would not be able to appeal that, but I'm not

9      positive no that.

10          THE COURT:  All right.  Did you want to talk about

11     the third parties and the public interest?

12          MR. MCCALEB:  Yeah, sure.  First of all, any

13     competing harm to the Government, you know, we think would be

14     minimal at best.  There certainly would be no additional cost

15     to the United States.  The Government included in its

16     exhibits to its opposition brief the justification and

17     approval document which expressly says two or three different

18     places, there will be no additional cost to the Government.

19     Our contracts are in place.  They have been extended, they

20     can be extended.  The notion that you could have a pause to

21     reform the program, but then claim that pauses would cause

22     significant harm, we think are not consistent.  And 90

23     percent of the work has, at some level, already been stayed,

24     so we don't think there's any harm to letting the other 10

25     percent be performed by incumbents.

18

Transcript ▮▮▮▮▮▮

CGI Federal, Inc. v. USA                                    9/2/2014

```
 1          The notion that the claims -- that the harms would
 2   be more -- that the harms to offerors who have submitted
 3   quotes would be greater than the harms to CGI, we think, is
 4   very misplaced.  Three of the four offerors are incumbent
 5   contractors who have already rejected CMS's payment terms of
 6   the modification.  So, they're in no rush to perform under
 7   these terms.  They've already rejected them.
 8          And the claim that if the pause goes on too long
 9   that the Medicare trust fund will somehow be diminished, we
10   view that as misleading at best.  At most, we believe it
11   would, at most, cause a short delay in identifying the
12   overpayments.  But they will be identified and collected and,
13   indeed, that work can continue under existing contracts as
14   the United States admits.
15          On the public interest, Your Honor, we think that
16   the interest in the procurement process and remedying
17   violations of law is paramount.  The claim that -- the claim
18   that the public interest lies in permitting competitively
19   awarded contracts to go forward rather than to perform --
20   allow performance under sole source contract extension we,
21   again, think is misplaced because the existing contracts were
22   all competitively awarded.
23          So, this is not an instance where you're extending
24   contracts that were initially awarded sole source.  The
25   benefits of competition were reaped during the initial
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

19

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1    competition and the extension on those same terms, we don't

2    think, is in the public -- is something that the public

3    interest favors when, in balance to the integrity of the

4    procurement process, remedying violations of law.

5           THE COURT:  Mr. McCaleb, when you say 90 percent of

6    these are stayed already and it's not as much harm to just

7    stay the other 10 percent, what did you mean by that?

8           MR. MCCALEB:  What I meant by that is the -- and

9    the Government doesn't disagree.  We disagree about the

10   impact.  But roughly 90 percent of the work has been stayed

11   because there is a -- there is the law that has stayed until

12   March of 2015 review of short inpatient visits.  And, so,

13   that leaves -- that's been about 90 percent of the work.  So,

14   all we're saying is it's not irreparable harm to the

15   Government to allow the remaining 10 percent to be performed

16   by the incumbent contractors.

17          Now, what the Government says in their opposition

18   brief is, well, that 90 -- they agree with all of that, but

19   what they say is, yeah, but the 90 percent is because that --

20   you know, the RACs have chosen to focus on the short

21   inpatient stays.  Well, there's a reason for that.  That's

22   where a lot of the overpayments have been.  And, so, the

23   Government will say, well, they can actually do some other

24   things and look at other issues and maybe it's not 10 percent

25   of the work, maybe it could go up to, you know, 15 or 20

20

Transcript ███████

CGI Federal, Inc. v. USA                                    9/2/2014

1    percent.  But, right now, where things stand is that about 90

2    percent of the work is not being performed because of a law

3    that has been passed by Congress prohibiting it.  And, so,

4    all we're saying is allowing the other 10 percent to be

5    performed by the incumbents we don't view as irreparable harm

6    to the Government.

7              THE COURT:  I understand your position.  Thank you.

8              MR. MCCALEB:  You're welcome.  If there are no

9    further questions, that concludes my argument.

10             THE COURT:  I have another question, though, and

11   that's just with the timing on the appeal.  If the Government

12   keeps talking about this being an indefinite stay, which

13   sounds so ominous, but how long typically do you think one of

14   these things would take upstairs?

15             MR. MCCALEB:  We would certainly look to expedite.

16   I mean, we think this is a very simple one -- a very simple

17   issue, a legal issue for the Court that could be briefed

18   fast.  On average, you know, my experience and what I will

19   share with you is that from start to finish, you know, these

20   things can take, you know, 9, 10, 11 months.  I think we

21   would be able to expedite it and do it faster and I think one

22   of the things that -- so, I don't think it's going to take 9,

23   10 or 11 months.  I think it will be faster.  But that is --

24   if you were to look at statistics, that would be about what

25   you would find.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 046

21

Transcript ███████

CGI Federal, Inc. v. USA                                    9/2/2014

1          THE COURT:  And you will file a motion to expedite?

2          MR. MCCALEB:  We will ask for briefing to be

3    expedited.  We wanted to talk to Will about his ability to

4    expedite, and if he can't, then we will -- we plan to self

5    expedite, which means just filing your briefs earlier than --

6    filing your briefs earlier than are required.

7          THE COURT:  And when you self expedite, does then

8    the Court of Appeals give you an earlier hearing and an

9    earlier resolution typically?

10         MR. MCCALEB:  What the Circuit -- the Circuit

11   basically -- once the briefing is done, so as fast as we can

12   do the briefing, once the briefing is done, you know, the

13   joint appendix is submitted within seven days.  And then the

14   Court just -- then you fall in line with the Court's argument

15   calendar if they don't give you an expedited hearing.  Right

16   now, my -- when last I checked, argument was basically -- I

17   think it was about two months after the filing of the joint

18   appendix.  So, it would be relatively quickly even if we

19   didn't get an expedited hearing.  Maybe it would be three

20   months after filing the JA.

21         THE COURT:  Thank you.

22         MR. MCCALEB:  You're welcome.

23         THE COURT:  Mr. Rayel?

24         MR. RAYEL:  Yes.  I don't have a whole lot in terms

25   -- I think we stated our position in our response brief.  If

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

22

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1    there's any particular area the Court wants to explore
2    further, I'm happy to do that now.
3             THE COURT:  Well, I'm concerned with mostly the
4    other three factors, not so much the likelihood of success.
5             MR. RAYEL:  Yes, Your Honor.  I mean, the
6    likelihood of success is the --
7             THE COURT:  No, I am not concerned with that.
8             MR. RAYEL:  Right, right, I know, I know.  That's
9    what I'm saying, that is the big one.
10             THE COURT:  I know what I said, I know what Mr.
11    McCaleb just said, I know what the standards are.
12             MR. RAYEL:  Okay.
13             THE COURT:  But, you know, it is what it is.  But I
14    am concerned about the things that, you know, we're really
15    here to talk about, which is, okay, what's the harm?  We know
16    the harm to CGI.  What's the harm to the Government and third
17    parties?
18             MR. RAYEL:  Well, first, there isn't really harm to
19    CGI of the Court denying their motion for an injunction
20    pending review because the Federal Circuit should have plenty
21    of time to decide that before any awards are made in this
22    case.  That's very simple.  I mean, the Court should be
23    deciding is there irreparable harm from the denial of the
24    particular motion before the Court.  And if the answer is no,
25    the Court should deny the motion.  So, because CMS doesn't

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 048

23

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1    intend to award these contracts until October 22nd, that

2    should be plenty of time for the Federal Circuit to have a

3    full hearing on the motion to stay -- a full briefing on the

4    motion for injunction pending review.

5            THE COURT:  So, what are you doing between now and

6    October 22nd?

7            MR. RAYEL:  Well, presumably, CGI will file its --

8            THE COURT:  No, I don't mean in the litigation; I

9    mean the agency in terms of award.

10           MR. RAYEL:  Evaluating offerors and preparing --

11   you know, preparing its internal documents to get ready for

12   award.

13           THE COURT:  Well, wouldn't that prejudice CGI?  If

14   they ultimately win, they'd be behind the eight ball and have

15   to -- you'd be wasting your effort, you'd have to do it over.

16           MR. RAYEL:  It would be -- I mean, it would be

17   wasted effort to the Government to some degree.  But, I mean,

18   two -- both the GAO and this Court have already ruled against

19   CGI.  So, at this point, I think CMS should be fairly

20   confident in moving forward.

21           THE COURT:  Well, I wouldn't take that to the bank

22   yet.

23           MR. RAYEL:  I wouldn't take it to the bank fully,

24   but, I mean, it is -- two tribunals have looked at the

25   question CGI has raised and -- including yourself, Your

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 049

24

Transcript ██████

CGI Federal, Inc. v. USA                                    9/2/2014

1    Honor.

2            THE COURT:  Well, I know, that's why I'm saying

3    don't take it to the bank.

4            MR. RAYEL:  No, I understand.  But, I mean, I

5    suppose internally to CMS, yes, there would be some wasted

6    effort if they ended up having to redo it.  But, you know,

7    that's not harm to CGI.  CGI is not harmed by that.  That

8    doesn't --

9            THE COURT:  Well, sure they are, because your

10   evaluators would get longer to think about these other

11   bidders and the pluses and minuses of their proposals and CGI

12   comes in late in the game.  There's a little subtle, I think,

13   possible prejudice there.

14           MR. RAYEL:  I think that's assuming bad faith, Your

15   Honor.  That's --

16           THE COURT:  No, no, no, no, they're human.  Come

17   on, it's nothing to do with bad faith.  And I don't think

18   there's an iota of bad faith in this case.  I think everybody

19   tried to do the right thing.

20           MR. RAYEL:  Yes, Your Honor.  But there's a case

21   called Boston Harbor from Judge Allegra where it talks about

22   kind of a similar issue where the -- there was an award of a

23   lease and the agency decided not to -- the agency decided it

24   was going to take corrective action on the award, but not

25   terminate the awardee's lease and just do the corrective

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

25

Transcript ███████

CGI Federal, Inc. v. USA                                    9/2/2014

1    action while the protested lease continued.

2              And then that decision was protested in the Court,

3    and I believe the holding was a lack of standing because

4    there was no harm to the protestor.  The agency -- even

5    though the agency was continuing on with the lease -- that

6    was the claim, that because the agency was continuing on,

7    they were going to be prejudiced in favor of the current

8    awardee because it would be easier, you know, not to

9    terminate the lease and not to have to face all those

10   termination costs, because I believe -- I don't believe

11   there's termination for convenience clauses in leases.  And

12   the Court held, no, that would be assuming bad faith on the

13   part of the Government.

14             So, no, the fact --

15             THE COURT:  Yeah, I agree with that.  I think this

16   is a different -- this is a little bit of a different

17   scenario.  And I -- look, this is not a big point.  This is a

18   very minor point in my own thinking.  But, yeah, so you'd

19   waste your effort.

20             MR. RAYEL:  Right.  But there's not harm to --

21             THE COURT:  That's the main thing.

22             MR. RAYEL:  -- there's not harm to CGI in any way.

23   So, on the irreparable harm question, there's simply no harm

24   of the Court denying -- denying this particular motion.

25             Now, in terms of the balance of harms, that's one

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 051

26

Transcript ▮▮▮▮▮▮

CGI Federal, Inc. v. USA                                        9/2/2014

1    thing that CGI didn't really address in its brief is the
2    harms to third parties of an injunction in this case.  I
3    mean, you know, CGI's claim is that, oh, these other RACs,
4    they're not interested in moving forward with the award
5    because they didn't like the payment terms from the
6    beginning.  But they did submit bids, they did commit
7    substantial resources to this -- heck, HDI's counsel showed
8    up to oral argument, it was so interested in the case.  None
9    of the other --
10           THE COURT:  But they didn't intervene.
11           MR. RAYEL:  That's true, that's true, they didn't
12   intervene.  I'm not sure whether they could have or not.
13   But, I mean, they did --
14           THE COURT:  I guess that's probably an issue, yeah.
15           MR. RAYEL:  But they -- but, I mean, none of these
16   other offerors, you know, moved -- challenged this in this
17   Court.  I believe Connelly actually attempted to intervene on
18   the Government's side at the GAO.  I believe that's in the
19   administrative record.
20           And I would also point out in CGI's own exhibit,
21   Exhibit 1, which is an article from the -- from Inside Health
22   Policy, there's a statement from Christian Walker,
23   spokesperson for the American Coalition of Health Care Claims
24   Integrity, which represents RACs, in which he says, our
25   coalition is pleased that the litigation has been decided

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 052

27

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

1   clearing the way to move ahead with procurement.  CMS is now

2   in a position to swiftly issue the new RAC contract awards.

3              So, the idea that the RACs -- all the other RACs

4   are just hoping CGI wins here and they want this to be

5   delayed, that's not supported by the record in any way.

6   Instead, they've submitted their bids.  I'm sure they

7   would --

8              THE COURT:  Well, that's not --

9              MR. RAYEL:  -- like for CMS to move forward with

10  the procurement.

11             THE COURT:  But that's not the --

12             MR. RAYEL:  Especially after two tribunals have

13  already rejected CGI's protest.

14             THE COURT:  That's not the traditional type of

15  third-party harm anyway, is it?

16             MR. RAYEL:  It is.  It is third-party harm in that

17  these contractors don't -- they're not receiving new awards

18  that they're due.  I wouldn't say due as if it's a matter of

19  right, but new awards that, you know, should be provided in

20  the ordinary course here.  Instead, we're now going to a

21  third forum with a possible indefinite length of time.  That

22  9 to 11 months sounds about right.  I'm not going to argue

23  with that number.

24             So, I mean, there's now --

25             THE COURT:  Well, if it's 9 to 11 months, then

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

28

Transcript ████████

CGI Federal, Inc. v. USA                                    9/2/2014

1   there is harm to CGI because you'll award October 22nd.

2          MR. RAYEL:  But CGI has -- but there's not harm

3   from this Court denying the stay.  CGI has the opportunity to

4   go to the Federal Circuit and still seek a stay at -- or seek

5   an injunction pending review at that level.  So, this Court

6   denying the -- their request for an injunction doesn't harm

7   CGI.

8          There's also the fact that the -- that CMS is

9   making improvements in the new task orders, improvements that

10  have been announced to the public and have been, according

11  to, again, the article that CGI submitted, well received by

12  the health care industry.  So, that's going to be delayed if

13  these tasks orders are delayed as well.

14         In terms of the idea that because a pause would

15  help CMS in some way, that certainly doesn't mean that an

16  indefinite pause helps CMS, and Mr. Elza (phonetic), the

17  director of the Division of RAC Operations, I believe it's

18  called, he clarified that as if a declaration was really

19  needed to clarify that, that, you know, if this pause goes on

20  indefinitely that there could very well be harm to the

21  Medicare Trust Fund of not being able to review these --

22  review these older payments.

23         Now, the agency does have the agency of doing sole

24  source extensions to the current incumbent contracts, and if

25  there were an injunction that could last another 9 to 11

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

29

Transcript ████

CGI Federal, Inc. v. USA                                    9/2/2014

```
 1   months or longer, that is likely what the agency would do and
 2   it's likely they'll not guarantee that the RACs would agree
 3   to those -- to modifications.  But, you know, that -- that's
 4   basically saying that the -- I mean, there's simply no logic
 5   to the idea that sole source extensions to incumbent
 6   contracts are better more -- you know, give more to the
 7   integrity of the procurement process than simply awarding
 8   competitive task orders that have now been vetted by two
 9   tribunals, and those tribunals have found no error.
10             At this point, there's simply no benefit to the
11   public interest by another -- by another injunction at this
12   point or by an injunction at this point pending review.
13   Rather, the benefit to the integrity of the procurement
14   process is to move forward with the competitive awards that
15   have been found by two tribunals to be -- to not be in error.
16             Unless the Court has any further questions --
17             THE COURT:  Well, Mr. Rayel, I have the same
18   question for you that I had for Mr. McCaleb.  Do you agree
19   with his assessment of the duration of this litigation
20   upstairs?
21             MR. RAYEL:  Nine to 11 months, that sounds about
22   right.
23             THE COURT:  Now, if the Plaintiff here decides to
24   do expedited briefing, will the Government go along with it?
25             MR. RAYEL:  I don't know.  We'll have to make that
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 055

30

Transcript ███████

CGI Federal, Inc. v. USA                                    9/2/2014

1   decision once they've proposed what they're -- I mean, we

2   haven't discussed that at all yet.

3           THE COURT:  All right.  Will you be handling the

4   appeal?

5           MR. RAYEL:  I would imagine so, yes.

6           THE COURT:  Aside from that, would the Government

7   have an independent intent to seek expedited consideration of

8   the appeal assuming this Court enters an injunction?

9           MR. RAYEL:  I don't know.

10          THE COURT:  That's a --

11          MR. RAYEL:  We may.

12          THE COURT:  That's a fair answer.  I've been there.

13  Okay, anything else you want to tell me about timing up

14  there?

15          MR. RAYEL:  No, Your Honor.

16          THE COURT:  Okay.  Anything further from the

17  Plaintiff?

18          MR. MCCALEB:  Just two things quickly, Your Honor.

19  One, my far brighter colleague tells me that if you were to

20  enter an injunction, that would be appealable under 1292, or

21  he thinks it would be appealable under 1292.

22          THE COURT:  Without my certifying it?

23          MR. MCCALEB:  Yes.

24          THE COURT:  Okay.

25          MR. MCCALEB:  And in that vein, we just

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

31

Transcript ███████

CGI Federal, Inc. v. USA                              9/2/2014

1    respectfully think that the Government is taking far too
2    pinched a view of what we're requesting.  We're asking this
3    Court to enter an injunction that would last through the
4    duration of the appeal, because during the course of the
5    appeal, we believe we would suffer irreparable harm that
6    outweighs any harm to the Government or other parties and
7    would be in the public interest.
8              This notion that this Court should -- this Court
9    should be focused only on whether we would be harmed if it
10   denied a temporary stay now while we get up to the Circuit
11   and let the Circuit review it, that's not what we're asking
12   for.  We're asking for the Court to issue an injunction that
13   would extend through the duration of the appeal.
14             The second point that was a little bit troubling,
15   there was a lot of introduction of what I think are things
16   not in the record about what the expectations are of the
17   other offerors who are participating.  We are completely
18   unfamiliar with any effort by Connelly to have intervened on
19   the Government's side at GAO.  That is nothing that has ever
20   surfaced ever.  It's not in the record.  The only thing in
21   the record is that the incumbent contractors all rejected
22   these very payment terms when they were introduced as
23   contract modification terms to their incumbent contracts and
24   that's it.
25             If we are going to get into extra record, you know,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 057

32

Transcript ███████

CGI Federal, Inc. v. USA                                        9/2/2014

1    musings, I can certainly tell you that the RACs are all very,

2    very interested in this decision and they are not fond of the

3    payment terms that have been introduced.  So, I don't think

4    that's something that the Court needs to hear about, but if

5    we're going to start introducing extra record material, the

6    Court should at least have the benefit of both sides of this.

7               With those two points, I have nothing further, Your

8    Honor.

9               MR. RAYEL:  Your Honor, just to clarify, Tab 9 of

10   the record is the GAO's rejection of Connelly's request to

11   intervene.

12              THE COURT:  Okay.

13              MR. RAYEL:  So, that is in the record.  It's AR-

14   421, Tab 9.

15              THE COURT:  Okay, thank you for that, both of you.

16   The Court is going to take a five-minute recess and we'll be

17   back to rule.

18              MR. MCCALEB:  Thank you.

19              MR. RAYEL:  Thank you, Your Honor.

20              (A brief recess was taken.)

21              THE COURT:  We're back on the record.  In deciding

22   whether to grant the Plaintiff's motion for a stay and

23   injunction pending appeal, the Court must apply the four

24   factors to guide its discretion.  The first factor is whether

25   the stay applicant has made a strong showing that he is

33

Transcript ███████

CGI Federal, Inc. v. USA                                     9/2/2014

```
 1   likely to succeed on the merits; secondly, whether the
 2   applicant will be irreparably injured absent a stay; third,
 3   whether the issuance of the stay will substantially injure
 4   the other parties interested in the proceeding; and four,
 5   where does the public interest lie.
 6           Hilton v. Braunskill, 481 U.S. 770 (1987), each
 7   factor, however, need not be given equal weight.  Also,
 8   likelihood of success in the appeal is not a rigid concept.
 9   Standard Havens Products, Inc. vs. Gencor Industries, Inc.,
10   897 F.2d 511 (Fed. Circ. 1990).
11           And the Fed Circuit, in that case, is quoting the
12   D.C. Circuit in Washington Metropolitan Area Transit
13   Commission vs. Holiday Tours.  In ruling on a motion to
14   vacate a stay where there is a substantial equity and need
15   for judicial protection, whether or not the movant has shown
16   a mathematical probability of success, then an order
17   maintaining the status quo is appropriate.  559 F.2d 841-844
18   (D.C. Cir. 1977).
19           When the harm to a plaintiff is great enough, a
20   Court will not require a "strong showing that the applicant
21   is likely to succeed on the merits."  Standard Havens at 512.
22           As the Supreme Court acknowledged -- and this is
23   also from Standard Havens, the traditional stay factors
24   contemplate individualized judgments in each case.  The
25   formula cannot be reduced to a set of rigid rules.  There,
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 059

34

Transcript ████

CGI Federal, Inc. v. USA                                        9/2/2014

1   the Court talked about the strong likelihood of success

2   factor and indicated a stay was appropriate if the movant

3   establishes that it has a strong likelihood of success on

4   appeal or where failing that, it can nonetheless demonstrate

5   a substantial case on the merits provided the other factors

6   militate in the movant's favor.  Hilton 107 Supreme Court at

7   2120.

8            And as the Second Circuit said, it is not necessary

9   that a plaintiff's right to a final decision after trial be

10  absolutely certain, wholly without doubt.  If the other

11  elements are present, it will ordinarily be enough that the

12  plaintiff has raised questions going to the merits so

13  serious, substantial, difficult and doubtful as to make them

14  a fair ground for litigation.  Hamilton Watch Co. vs. Benrus

15  Watch Co., 206 F.2d 738-740 (Sec. Cir. 1953) cited in

16  Standard Havens Products vs. Gencor 897 F.2d at 512.

17           The Federal Circuit continued in that case to say,

18  "Thus the four stay factors can effectively merge, as that

19  Court earlier recognized in Dupont."  And they quoted a

20  Seventh Circuit case saying that "The discussion of

21  injunctions applies a sliding scale approach.  The more

22  likely the plaintiff is to win, the less heavily need the

23  balance of harms weigh in his favor.  The less likely he is

24  to win, the more need it weigh in his favor."

25           "If harm to the injunction applicant is

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 060

35

Transcript ███████

CGI Federal, Inc. v. USA                                    9/2/2014

1    sufficiently serious, it is only necessary that there be a

2    fair chance of success on the merits."  Standard Havens

3    quoting C. Tennant and Sons vs. New York Terminal Conference

4    299 F. Supp 796-799 (Southern District of New York 1969).

5          So, then, turning to the first prong in this case,

6    the Plaintiff's allegation here is that the RFQ's payment

7    terms require RACs to wait 120 days to 420 days to invoice,

8    thereby causing them to absorb high accounts receivable and

9    actually forcing this Plaintiff to drop out of the

10   competition.  The Plaintiff has raised three arguments

11   against what the agency has done here.

12         First, they claim that what the agency has done is

13   contrary to the FAR and to FASA, FAR Part 12 and FAR Part

14   804.  This Court disagreed with the Plaintiff on that score,

15   but it was a very close call, and I think counsel did a very

16   good job this morning of articulating why it was such a close

17   call.  Because the notion that these FFS contracts, both the

18   schedule itself and the orders issues thereunder, should

19   comport with commercial practice is a paramount consideration

20   in the statute and in the regulations.

21         The Court -- this Court did the best it could in

22   trying to reconcile the regulations and it did not conclude

23   that FAR Par 12 applied here.  But, nonetheless, the

24   Plaintiff has made a very good case, in this Court's view,

25   for a decision that it does apply and most certainly that it

36

Transcript ████

CGI Federal, Inc. v. USA                                            9/2/2014

 1   should apply.  What happened here was contrary to commercial

 2   practice.  These payment terms are clearly contrary to

 3   commercial practice.  Everyone admits that.  RAC services are

 4   commercial items.  Everybody admits that.  So, in this

 5   Court's view, it's a close call on that argument.  And

 6   although the Plaintiff lost at this Court, it could well

 7   succeed at the Court of Appeals.

 8           The other area of this case that troubled this

 9   Court was, under our standard of review, I know this Court

10   concluded that the Plaintiff has not demonstrated that the

11   agency's inclusion of payment terms inconsistent with

12   customary commercial practice was arbitrary, capricious and

13   abuse of discretion.  Nonetheless, it pushed right up against

14   it.  This agency conduct, in this Court's view, again was a

15   very close call.  Plaintiff, as the Court noted in its

16   decision, colorfully described it as a belt and suspenders

17   approach.  This Court held that CGI's argument rings true in

18   many respects.  The modified payment term here will increase

19   costs, reduce competition, and appears to be a bit excessive.

20   Nonetheless, it does not rise to the level of arbitrary and

21   capricious conduct lacking a rational basis.

22           This conclusion is all about the standard of

23   review.  How far can a court go in second guessing an

24   agency's judgment, substituting its judgment for that of the

25   agency?  Obviously, this Court and other Courts have found

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CGI Addendum - 062

37

Transcript ████████

CGI Federal, Inc. v. USA                                            9/2/2014

1   themselves in situations where they may not -- they may have

2   done it differently.  They may have disagreed with the

3   agency's conclusions.  That's certainly what happened here.

4   But, nonetheless, this Court applied that standard of review

5   in a very highly deferential way.  And I think it's a

6   question for the Court of Appeals -- a good question for the

7   Court of Appeals as to whether that's necessarily the case in

8   a situation like this.

9          Even if FASA and FAR Part 12 don't apply, there's

10  still a very troubling aspect to this case about why the

11  agency would impose this onerous payment term on these

12  contractors increasing the agency's own costs, causing

13  contractors to drop out of the competition, acting contrary

14  to commercial practice.  Very troubling case.  This Court

15  called it one way, but another court could well call it

16  another.

17         Now, in terms of the other three factors, this

18  Court finds that the factor of irreparable harm strongly

19  weighs in favor of the Plaintiff.  If the status quo is

20  altered, CGI will lose the opportunity to compete for these

21  RFQs and it will lose the opportunity for an award that could

22  span three and a half, four and a half years.  Further,

23  according to the declaration of Robert Roth, this would lead

24  to the ████████████████████████████████████.  Mr. Roth

25  states, ████████████████████████████████████████

Protected Material Removed

38

Transcript ████████

CGI Federal, Inc. v. USA                                    9/2/2014

1    ████████████████████████████████████████████████████

2    ██████████████████████████████████

3         CGI will also lose experience working with the

4    Government.  Although the Government argues that CGI has

5    plenty of time to ask the Federal Circuit for a stay, as it

6    does not intend to award the task orders until October 22nd,

7    2014, and that a stay would only benefit CGI as an incumbent

8    under the current contract, this does not address the

9    specific concrete harms raised by CGI.  CGI has demonstrated

10   that if the Government proceeds with awards under the RFQs,

11   it will suffer irreparable harm in terms of a lost

12   opportunity to compete and lost business for a significant

13   amount of time.

14        Granting CGI's motion would not substantially

15   injure the Government.  The agency already has contracts with

16   CGI and the other RACs which have been extended to permit

17   active recovery audit work through December 31st, 2014.

18        Although this required a justification for other

19   than full and open competition, it was completed by the

20   Government and the Government has submitted an affidavit

21   which doesn't say point blank, we can't get another one.

22   This is the affidavit of -- the declaration, excuse me, of

23   Nicole E. Hoey at paragraph 5.  "If CMS is enjoined from

24   awarding task orders pursuant to the RFQs at issue in this

25   case for an indefinite period, we would likely seek to

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Protected Material Removed

CGI Addendum - 064

39

Transcript ███████

CGI Federal, Inc. v. USA                                        9/2/2014

1    negotiate an additional -- additional sole source

2    modifications with the incumbent audit recovery contracts to

3    allow for a longer period of active recovery audit work.   In

4    order to negotiate additional sole source modifications,

5    however, CMS would have to complete another justification for

6    other than full and open competition."

7             No one has suggested that that other justification

8    would not be valid or that these extensions could not occur.

9             The Court agrees with the Plaintiff that it's

10   somewhat speculative for the Government to argue that there

11   would only be a substantial loss in revenue for the Medicare

12   Trust Fund if the situation continues.   That doesn't seem to

13   have been substantiated by the record, in this Court's view.

14            So, on balance, while this Court is not in favor of

15   a delay for the other contractors interested in the RFQs and

16   the health care industry as a whole, it seems on balance that

17   denying CGI's motion would result in greater harm to CGI than

18   to the Government and the agency.

19            Both parties have put forth arguments regarding the

20   public interest.   While it is true that CGI, as an incumbent,

21   would benefit from the extension of its contract, in this

22   Court's view, there would be a greater benefit to the public

23   to have the Federal Circuit resolve this issue on appeal

24   without further disruption in permitting the Circuit to

25   resolve these important issues, to have one procurement with

CGI Addendum - 065

40

Transcript ████████

CGI Federal, Inc. v. USA                                    9/2/2014

1   clarity.

2            For all of the above reasons, the Court grants the

3   Plaintiff's application for a stay.

4            The Court issues the following order:  Plaintiff,

5   CGI Federal, Inc., CGI, has requested a stay and an

6   injunction pending appeal under Rule 62C of the Rules of the

7   United States Court of Federal Claims.  Having considered

8   this request, as well as all of the arguments of counsel

9   today, the written materials and the entire record herein, it

10  is hereby ordered that the Plaintiff's motion is granted, and

11  it is further ordered that Defendant, the United States, its

12  officers, employees and agents, are hereby enjoined from

13  proceeding with the award of a contract, the issuance of

14  orders or performance under existing request for quote

15  numbers, RFQ-CMS-2014-Region 1, RFQ-CMS-2014-Region 2, and

16  RFQ-CMS-2014-Region 4, issued by the Department of Health and

17  Human Services Center for Medicare and Medicaid Services,

18  through the duration of any appeal at the United States Court

19  of Appeals for the Federal Circuit.  Entered this 2nd day of

20  September, 2014.  That ends the Court's ruling.

21           Does anybody have any questions?

22           MR. MCCALEB:  Your Honor, this is Mr. McCaleb, one

23  question.  I know we've obviously got a protective order and

24  this is under seal as of now.  Are we permitted to share with

25  our client that the Court has granted our motion for an

41

Transcript ████

CGI Federal, Inc. v. USA                                          9/2/2014

1    injunction pending appeal?

2            THE COURT:  Certainly.

3            MR. MCCALEB:  Okay, thank you.

4            THE COURT:  Now, you raise a good question, Mr.

5    McCaleb.  I don't know that we need this under seal.  I guess

6    it's really up to your client.  I know that the declaration

7    of Mr. Roth was under seal and perhaps the material about the

8    ████████████████████  needs to be protected.

9            MR. MCCALEB:  Those were the things that we were

10   protecting and we will -- we'll take a more careful look at

11   whether we are -- whether our client's comfortable not

12   protecting that anymore.  But it has been protected

13   throughout the litigation, but we will revisit that.

14           THE COURT:  All right.  Well, the Court wanted to

15   issue this ruling orally because we don't have time to issue

16   a written opinion.

17           MR. MCCALEB:  Right.

18           THE COURT:  And the -- hopefully, the dictation of

19   this order will suffice for your purposes.  We can order the

20   transcript.

21           MR. MCCALEB:  Yeah, we were going to talk to the

22   court reporter and try and make sure we can get it as soon as

23   possible.

24           THE COURT:  Very well.  All right, this matter is

25   concluded.  Thank you.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Protected Material Removed

CGI Addendum - 067

42

Transcript ████████

CGI Federal, Inc. v. USA                                            9/2/2014

1              MR. MCCALEB:  Thank you, Your Honor.

2              THE COURT:  You're welcome.

3              MR. RAYEL:  Your Honor, this is Mr. Rayel.

4              THE COURT:  Okay, we're not concluded, hold on,

5     back on the record.

6              MR. RAYEL:  Sorry about that.

7              THE COURT:  No, no, we pushed the button already so

8     -- are we okay?

9              LAW CLERK:  Yes, we're still on.

10             THE COURT:  Okay, we're good.

11             MR. RAYEL:  Your Honor, we certainly would like a

12    written -- at least the order itself to be written,

13    preferably with the reasons as well, not necessarily

14    published.  I realize it's a very quick time line, but at

15    least we think the order needs to be written.

16             THE COURT:  All right.  Well, since you all are

17    ordering the transcript, once we get that, we will edit it

18    quickly and we won't publish it, but we will issue it as part

19    of the docket in this case.  We will maintain this matter on

20    our docket with sufficient time to do that.  With the Court's

21    travel schedule, I'm not sure when that will be done.  What

22    we can do today is give you a very short form order similar

23    to that appended to the Plaintiff's motion so that your

24    client knows what's going on.  We can issue that publicly

25    today.

43

Transcript ██████████

CGI Federal, Inc. v. USA                                    9/2/2014

```
 1              MR. MCCALEB:  That would be great.
 2              MR. RAYEL:  Yes, Your Honor, thank you.
 3              THE COURT:  You're welcome.  They don't want to
 4      take your word for it, Mr. Rayel.
 5              MR. RAYEL:  I'm sure they'll believe me.
 6              THE COURT:  They should believe you.  Okay, all
 7      right, thank you all.
 8              MR. MCCALEB:  Thank you.
 9              MR. RAYEL:  Thank you, Your Honor.
10              (Whereupon, at 11:57 a.m., the hearing was
11      adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

44

Transcript ████

CGI Federal, Inc. v. USA                                        9/2/2014

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3          I, Elizabeth M. Farrell, court-approved

 4     transcriber, certify that the foregoing is a correct

 5     transcript from the official electronic sound recording of

 6     the proceedings in the above-titled matter.

 7

 8

 9

10     DATE:  9/2/2014            Elizabeth M. Farrell

11                               ELIZABETH M. FARRELL, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# CGI ADDENDUM DOCUMENT NO. 4

# In the United States Court of Federal Claims

### No. 14-355C
### (Bid Protest)
### (Filed: September 2, 2014)

```
* * * * * * * * * * * * * * * * * * * * * * * * *
                                                *
CGI FEDERAL INC.,                               *
                                                *
            Plaintiff,                          *
                                                *
      v.                                         *
                                                *
THE UNITED STATES,                              *
                                                *
            Defendant.                          *
                                                *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

_____

## ORDER

_____

Plaintiff CGI Federal, Inc. ("CGI") filed a "motion to stay judgment and related opinion and order" on August 26, 2014.  Defendant filed a response on August 28, 2014.  Plaintiff's motion requested a stay and an injunction pending appeal under Rule 62(c) of the Rules of the U.S. Court of Federal Claims.  Having considered Plaintiff's motion, as well as all other relevant materials and oral arguments, it is hereby

**ORDERED**, that Plaintiff's motion be and hereby is **GRANTED**, and it is further

**ORDERED**, that Defendant, the United States, its officers, agents, and employees, are hereby enjoined from proceeding with award of a contract, the issuance of orders, or performance under the existing Request for Quote Nos. RFQ-CMS-2014-Region 1, RFQ-CMS-2014-Region 2, and RFQ-CMS-2014-Region 4 ("the RFQs") issued by the Department of Health and Human Services Center for Medicare and Medicaid Services through the duration of the appeal.


 s/Mary Ellen Coster Williams_____
**MARY ELLEN COSTER WILLIAMS**
**Judge**

A707

# CGI ADDENDUM DOCUMENT NO. 5

(i) significantly more important than cost or price;

(ii) approximately equal in importance to cost or price; or

(iii) significantly less important than cost or price.

(2) RESTRICTION ON IMPLEMENTING REGULATIONS.—Regulations implementing paragraph (1)(C) may not define the terms "significantly more important" and "significantly less important" as specific numeric weights that would be applied uniformly to all solicitations or a class of solicitations.

(d) ADDITIONAL INFORMATION IN SOLICITATION.—This section does not prohibit an executive agency from—

(1) providing additional information in a solicitation, including numeric weights for all evaluation factors and subfactors on a case-by-case basis; or

(2) stating in a solicitation that award will be made to the offeror that meets the solicitation's mandatory requirements at the lowest cost or price.

(e) LIMITATION ON EVALUATION OF PURCHASE OPTIONS.—An executive agency, in issuing a solicitation for a contract to be awarded using sealed bid procedures, may not include in the solicitation a clause providing for the evaluation of prices for options to purchase additional property or services under the contract unless the executive agency has determined that there is a reasonable likelihood that the options will be exercised.

(f) AUTHORIZATION OF TELECOMMUTING FOR FEDERAL CONTRACTORS.—

(1) DEFINITION.—In this subsection, the term "executive agency" has the meaning given that term in section 133 of this title.

(2) FEDERAL ACQUISITION REGULATION TO ALLOW TELECOMMUTING.—The Federal Acquisition Regulation issued in accordance with sections 1121(b) and 1303(a)(1) of this title shall permit telecommuting by employees of Federal Government contractors in the performance of contracts entered into with executive agencies.

(3) SCOPE OF ALLOWANCE.—The Federal Acquisition Regulation at a minimum shall provide that a solicitation for the acquisition of property or services may not set forth any requirement or evaluation criteria that would—

(A) render an offeror ineligible to enter into a contract on the basis of the inclusion of a plan of the offeror to allow the offeror's employees to telecommute, unless the contracting officer concerned first determines that the requirements of the agency, including security requirements, cannot be met if telecommuting is allowed and documents in writing the basis for the determination; or

(B) reduce the scoring of an offer on the basis of the inclusion in the offer of a plan of the offeror to allow the offeror's employees to telecommute, unless the contracting officer concerned first determines that the requirements of the agency, including security requirements, would be adversely impacted if telecommuting is allowed and documents in writing the basis for the determination.

(Pub. L. 111-350, §3, Jan. 4, 2011, 124 Stat. 3752.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 3306(a)–(e) .. | 41:253a. | June 30, 1949, ch. 288, title III, §303A, as added Pub. L. 98-369, title VII, §2711(a)(2), July 18, 1984, 98 Stat. 1178; Pub. L. 103-355, title I, §§1061(a), (b), 1062, title IV, §4402(b), Oct. 13, 1994, 108 Stat. 3266, 3267, 3348; Pub. L. 104-106, title XLII, §4202(b)(2), Feb. 10, 1996, 110 Stat. 653. |
| 3306(f) ........ | 41:253a note. | Pub. L. 108-136, title XIV, §1428, Nov. 24, 2003, 117 Stat. 1670. |

In subsection (f)(2), the words "Not later than 180 days after the date of the enactment of this Act, the Federal Acquisition Regulatory Council shall amend" are omitted as obsolete.

## § 3307. Preference for commercial items

(a) RELATIONSHIP OF PROVISIONS OF LAW TO PROCUREMENT OF COMMERCIAL ITEMS.—

(1) THIS DIVISION.—Unless otherwise specifically provided, all other provisions in this division also apply to the procurement of commercial items.

(2) LAWS LISTED IN FEDERAL ACQUISITION REGULATION.—A contract for the procurement of a commercial item entered into by the head of an executive agency is not subject to a law properly listed in the Federal Acquisition Regulation pursuant to section 1906 of this title.

(b) PREFERENCE.—The head of each executive agency shall ensure that, to the maximum extent practicable—

(1) requirements of the executive agency with respect to a procurement of supplies or services are stated in terms of—

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) those requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the executive agency's needs are not available, nondevelopmental items other than commercial items may be procured to fulfill those requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill those requirements.

(c) IMPLEMENTATION.—The head of each executive agency shall ensure that procurement officials in that executive agency, to the maximum extent practicable—

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the executive agency;

(2) require that prime contractors and subcontractors at all levels under contracts of the executive agency incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the executive agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that com-

mercial items suitable to meet the executive agency's needs are not available, nondevelopmental items other than commercial items;

(4) state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the executive agency's needs are not available, nondevelopmental items other than commercial items in response to the executive agency solicitations;

(5) revise the executive agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items; and

(6) require training of appropriate personnel in the acquisition of commercial items.

(d) MARKET RESEARCH.—

(1) WHEN TO BE USED.—The head of an executive agency shall conduct market research appropriate to the circumstances—

(A) before developing new specifications for a procurement by that executive agency; and

(B) before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold.

(2) USE OF RESULTS.—The head of an executive agency shall use the results of market research to determine whether commercial items or, to the extent that commercial items suitable to meet the executive agency's needs are not available, nondevelopmental items other than commercial items are available that—

(A) meet the executive agency's requirements;

(B) could be modified to meet the executive agency's requirements; or

(C) could meet the executive agency's requirements if those requirements were modified to a reasonable extent.

(3) ONLY MINIMUM INFORMATION REQUIRED TO BE SUBMITTED.—In conducting market research, the head of an executive agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

(e) REGULATIONS.—

(1) IN GENERAL.—The Federal Acquisition Regulation shall provide regulations to implement this section, sections 102, 103, 105, and 110 of this title, and chapter 140 of title 10.

(2) CONTRACT CLAUSES.—

(A) DEFINITION.—In this paragraph, the term "subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of a contractor or subcontractor.

(B) LIST OF CLAUSES TO BE INCLUDED.—The regulations prescribed under paragraph (1) shall contain a list of contract clauses to be included in contracts for the acquisition of commercial end items. To the maximum extent practicable, the list shall include only those contract clauses that are—

(i) required to implement provisions of law or executive orders applicable to ac-

quisitions of commercial items or commercial components; or

(ii) determined to be consistent with standard commercial practice.

(C) REQUIREMENTS OF PRIME CONTRACTOR.—The regulations shall provide that the Federal Government shall not require a prime contractor to apply to any of its divisions, subsidiaries, affiliates, subcontractors, or suppliers that are furnishing commercial items any contract clause except those that are—

(i) required to implement provisions of law or executive orders applicable to subcontractors furnishing commercial items or commercial components; or

(ii) determined to be consistent with standard commercial practice.

(D) CLAUSES THAT MAY BE USED IN A CONTRACT.—To the maximum extent practicable, only the contract clauses listed pursuant to subparagraph (B) may be used in a contract, and only the contract clauses referred to in subparagraph (C) may be required to be used in a subcontract, for the acquisition of commercial items or commercial components by or for an executive agency.

(E) WAIVER OF CONTRACT CLAUSES.—The Federal Acquisition Regulation shall provide standards and procedures for waiving the use of contract clauses required pursuant to subparagraph (B), other than those required by law, including standards for determining the cases in which a waiver is appropriate.

(3) MARKET ACCEPTANCE.—

(A) REQUIREMENT OF OFFERORS.—The Federal Acquisition Regulation shall provide that under appropriate conditions the head of an executive agency may require offerors to demonstrate that the items offered—

(i) have achieved commercial market acceptance or been satisfactorily supplied to an executive agency under current or recent contracts for the same or similar requirements; and

(ii) otherwise meet the item description, specifications, or other criteria prescribed in the public notice and solicitation relating to the contract.

(B) REGULATION TO PROVIDE GUIDANCE ON CRITERIA.—The Federal Acquisition Regulation shall provide guidance to ensure that the criteria for determining commercial market acceptance include the consideration of—

(i) the minimum needs of the executive agency concerned; and

(ii) the entire relevant commercial market, including small businesses.

(4) PROVISIONS RELATING TO TYPES OF CONTRACTS.—

(A) TYPES OF CONTRACTS THAT MAY BE USED.—The Federal Acquisition Regulation shall include, for acquisitions of commercial items—

(i) a requirement that firm, fixed price contracts or fixed price with economic price adjustment contracts be used to the maximum extent practicable;

(ii) a prohibition on use of cost type contracts; and

(iii) subject to subparagraph (B), authority for use of a time-and-materials or labor-hour contract for the procurement of commercial services that are commonly sold to the general public through those contracts and are purchased by the procuring agency on a competitive basis.

(B) WHEN TIME-AND-MATERIALS OR LABOR-HOUR CONTRACT MAY BE USED.—A time-and-materials or labor-hour contract may be used pursuant to the authority referred to in subparagraph (A)(iii)—

(i) only for a procurement of commercial services in a category of commercial services described in subparagraph (C); and

(ii) only if the contracting officer for the procurement—

(I) executes a determination and findings that no other contract type is suitable;

(II) includes in the contract a ceiling price that the contractor exceeds at its own risk; and

(III) authorizes a subsequent change in the ceiling price only on a determination, documented in the contract file, that it is in the best interest of the procuring agency to change the ceiling price.

(C) CATEGORIES OF COMMERCIAL SERVICES.— The categories of commercial services referred to in subparagraph (B) are as follows:

(i) Commercial services procured for support of a commercial item, as described in section 103(5) of this title.

(ii) Any other category of commercial services that the Administrator for Federal Procurement Policy designates in the Federal Acquisition Regulation for the purposes of this subparagraph on the basis that—

(I) the commercial services in the category are of a type of commercial services that are commonly sold to the general public through use of time-and-materials or labor-hour contracts; and

(II) it would be in the best interests of the Federal Government to authorize use of time-and-materials or labor-hour contracts for purchases of the commercial services in the category.

(5) CONTRACT QUALITY REQUIREMENTS.—Regulations prescribed under paragraph (1) shall include provisions that—

(A) allow, to the maximum extent practicable, a contractor under a commercial items acquisition to use the existing quality assurance system of the contractor as a substitute for compliance with an otherwise applicable requirement for the Federal Government to inspect or test the commercial items before the contractor's tender of those items for acceptance by the Federal Government;

(B) require that, to the maximum extent practicable, the executive agency take advantage of warranties (including extended warranties) offered by offerors of commercial items and use those warranties for the repair and replacement of commercial items; and

(C) set forth guidance regarding the use of past performance of commercial items and sources as a factor in contract award decisions.

(Pub. L. 111–350, §3, Jan. 4, 2011, 124 Stat. 3754.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 3307(a) ........ | 41:264. | June 30, 1949, ch. 288, title III, §§314, 314B, as added Pub. L. 103–355, title VIII, §§8201, 8203, Oct. 13, 1994, 108 Stat. 3394. |
| 3307(b) ........ | 41:264b(a). | |
| 3307(c) ........ | 41:264b(b). | |
| 3307(d) ........ | 41:264b(c). | |
| 3307(e) ........ | 41:264 note. | Pub. L. 103–355, title VIII, §8002, Oct. 13, 1994, 108 Stat. 3386; Pub. L. 108–136, title XIV, 1432, Nov. 24, 2003, 117 Stat. 1672. |

Subsection (a)(1) is substituted for 41 U.S.C. 264(a) for clarity.

In subsection (e), the text of section 8002(f) of the Federal Acquisition Streamlining Act of 1994 (Public Law 103–355, 41 U.S.C. 264 note) is omitted as obsolete.

In subsection (e)(2)(B)(i) and (C)(i), the words "as the case may be" are omitted as unnecessary.

### § 3308. Planning for future competition in contracts for major systems

(a) DEVELOPMENT CONTRACT.—

(1) DETERMINING WHETHER PROPOSALS ARE NECESSARY.—In preparing a solicitation for the award of a development contract for a major system, the head of an agency shall consider requiring in the solicitation that an offeror include in its offer proposals described in paragraph (2). In determining whether to require the proposals, the head of the agency shall consider the purposes for which the system is being procured and the technology necessary to meet the system's required capabilities. If the proposals are required, the head of the agency shall consider them in evaluating the offeror's price.

(2) CONTENTS OF PROPOSALS.—The proposals that the head of an agency is to consider requiring in a solicitation for the award of a development contract are the following:

(A) Proposals to incorporate in the design of the major system items that are currently available within the supply system of the Federal agency responsible for the major system, available elsewhere in the national supply system, or commercially available from more than one source.

(B) With respect to items that are likely to be required in substantial quantities during the system's service life, proposals to incorporate in the design of the major system items that the Federal Government will be able to acquire competitively in the future.

(b) PRODUCTION CONTRACT.—

(1) DETERMINING WHETHER PROPOSALS ARE NECESSARY.—In preparing a solicitation for the award of a production contract for a major system, the head of an agency shall consider requiring in the solicitation that an offeror include in its offer proposals described in para-

# CGI ADDENDUM DOCUMENT NO. 6

**2.000 Scope of part.**

(a) This part—

(1) Defines words and terms that are frequently used in the FAR;

(2) Provides cross-references to other definitions in the FAR of the same word or term; and

(3) Provides for the incorporation of these definitions in solicitations and contracts by reference.

(b) Other parts, subparts, and sections of this regulation (48 CFR Chapter 1) may define other words or terms and those definitions only apply to the part, subpart, or section where the word or term is defined.

# Subpart 2.1—Definitions

**2.101 Definitions.**

(a) A word or a term, defined in this section, has the same meaning throughout this regulation (48 CFR Chapter 1), unless—

(1) The context in which the word or term is used clearly requires a different meaning; or

(2) Another FAR part, subpart, or section provides a different definition for the particular part or portion of the part.

(b) If a word or term that is defined in this section is defined differently in another part, subpart, or section of this regulation (48 CFR Chapter 1), the definition in—

(1) This section includes a cross-reference to the other definitions; and

(2) That part, subpart, or section applies to the word or term when used in that part, subpart, or section.

"Acquisition" means the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated. Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract.

"Acquisition planning" means the process by which the efforts of all personnel responsible for an acquisition are coordinated and integrated through a comprehensive plan for fulfilling the agency need in a timely manner and at a reasonable cost. It includes developing the overall strategy for managing the acquisition.

"Adequate evidence" means information sufficient to support the reasonable belief that a particular act or omission has occurred.

"Advisory and assistance services" means those services provided under contract by nongovernmental sources to support or improve: organizational policy development; decision-making; management and administration; program and/or project management and administration; or R&D services. It can also mean the furnishing of professional advice or assistance rendered to improve the effectiveness of Federal management processes or procedures (including those of an engineering and technical nature). In rendering the foregoing services, outputs may take the form of information, advice, opinions, alternatives, analyses, evaluations, recommendations, training and the day-to-day aid of support personnel needed for the successful performance of ongoing Federal operations. All advisory and assistance services are classified in one of the following definitional subdivisions:

(1) Management and professional support services, *i.e.,* contractual services that provide assistance, advice or training for the efficient and effective management and operation of organizations, activities (including management and support services for R&D activities), or systems. These services are normally closely related to the basic responsibilities and mission of the agency originating the requirement for the acquisition of services by contract. Included are efforts that support or contribute to improved organization of program management, logistics management, project monitoring and reporting, data collection, budgeting, accounting, performance auditing, and administrative technical support for conferences and training programs.

(2) Studies, analyses and evaluations, *i.e.,* contracted services that provide organized, analytical assessments/evaluations in support of policy development, decision-making, management, or administration. Included are studies in support of R&D activities. Also included are acquisitions of models, methodologies, and related software supporting studies, analyses or evaluations.

(3) Engineering and technical services, *i.e.,* contractual services used to support the program office during the acquisition cycle by providing such services as systems engineering and technical direction (see 9.505-1(b)) to ensure the effective operation and maintenance of a weapon system or major system as defined in OMB Circular No. A-109 or to provide direct support of a weapon system that is essential to research, development, production, operation or maintenance of the system.

"Affiliates" means associated business concerns or individuals if, directly or indirectly—

(1) Either one controls or can control the other; or

(2) A third party controls or can control both.

"Agency head" or "head of the agency" means the Secretary, Attorney General, Administrator, Governor, Chairperson, or other chief official of an executive agency, unless otherwise indicated, including any deputy or assistant chief official of an executive agency.

"Alternate" means a substantive variation of a basic provision or clause prescribed for use in a defined circumstance. It

**FAC 2005–73  MAY 29, 2014**

(ii) An order placed against an indefinite quantity contract under a—

(A) Federal Supply Schedule contract; or

(B) Task-order contract or delivery-order contract awarded by another agency (*i.e.,* Governmentwide acquisition contract or multi-agency contract).

(4) This definition does not apply to a contract that will be awarded and performed entirely outside of the United States.

"Business unit" means any segment of an organization, or an entire business organization that is not divided into segments.

"Certified cost or pricing data" means "cost or pricing data" that were required to be submitted in accordance with FAR 15.403-4 and 15.403-5 and have been certified, or is required to be certified, in accordance with 15.406-2. This certification states that, to the best of the person's knowledge and belief, the cost or pricing data are accurate, complete, and current as of a date certain before contract award. Cost or pricing data are required to be certified in certain procurements (10 U.S.C. 2306a and 41 U.S.C. chapter 35).

"Change-of-name agreement" means a legal instrument executed by the contractor and the Government that recognizes the legal change of name of the contractor without disturbing the original contractual rights and obligations of the parties.

"Change order" means a written order, signed by the contracting officer, directing the contractor to make a change that the Changes clause authorizes the contracting officer to order without the contractor's consent.

"Chief Acquisition Officer" means an executive level acquisition official responsible for agency performance of acquisition activities and acquisition programs created pursuant to 41 U.S.C. 1702.

"Chief of mission" means the principal officer in charge of a diplomatic mission of the United States or of a United States office abroad which is designated by the Secretary of State as diplomatic in nature, including any individual assigned under section 502(c) of the Foreign Service Act of 1980 (Public Law 96-465) to be temporarily in charge of such a mission or office.

"Claim" means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under 41 U.S.C. chapter 71, Contract Disputes, until certified as required by the statute. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

"Classified acquisition" means an acquisition in which offerors must have access to classified information to properly submit an offer or quotation, to understand the performance requirements, or to perform the contract.

"Classified contract" means any contract in which the contractor or its employees must have access to classified information during contract performance. A contract may be a classified contract even though the contract document itself is unclassified.

"Classified information" means any knowledge that can be communicated or any documentary material, regardless of its physical form or characteristics, that—

(1)(i) Is owned by, is produced by or for, or is under the control of the United States Government; or

(ii) Has been classified by the Department of Energy as privately generated restricted data following the procedures in 10 CFR 1045.21; and

(2) Must be protected against unauthorized disclosure according to Executive Order 12958, Classified National Security Information, April 17, 1995, or classified in accordance with the Atomic Energy Act of 1954.

"Cognizant Federal agency" means the Federal agency that, on behalf of all Federal agencies, is responsible for establishing final indirect cost rates and forward pricing rates, if applicable, and administering cost accounting standards for all contracts in a business unit.

"Combatant commander" means the commander of a unified or specified combatant command established in accordance with 10 U.S.C. 161.

"Commercial component" means any component that is a commercial item.

"Commercial computer software" means any computer software that is a commercial item.

"Commercial item" means—

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and—

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for—

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product. Dollar values and percentages may be used as guideposts, but are not conclusive evidence that a modification is minor;

(4) Any combination of items meeting the requirements of paragraphs (1), (2), (3), or (5) of this definition that are of a type customarily combined and sold in combination to the general public;

(5) Installation services, maintenance services, repair services, training services, and other services if—

(i) Such services are procured for support of an item referred to in paragraph (1), (2), (3), or (4) of this definition, regardless of whether such services are provided by the same source or at the same time as the item; and

(ii) The source of such services provides similar services contemporaneously to the general public under terms and conditions similar to those offered to the Federal Government;

(6) Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions. For purposes of these services—

(i) "Catalog price" means a price included in a catalog, price list, schedule, or other form that is regularly maintained by the manufacturer or vendor, is either published or otherwise available for inspection by customers, and states prices at which sales are currently, or were last, made to a significant number of buyers constituting the general public; and

(ii) "Market prices" means current prices that are established in the course of ordinary trade between buyers and sellers free to bargain and that can be substantiated through competition or from sources independent of the offerors.

(7) Any item, combination of items, or service referred to in paragraphs (1) through (6) of this definition, notwithstanding the fact that the item, combination of items, or service is transferred between or among separate divisions, subsidiaries, or affiliates of a contractor; or

(8) A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local governments.

"Commercially available off-the-shelf (COTS) item—"

(1) Means any item of supply (including construction material) that is—

(i) A commercial item (as defined in paragraph (1) of the definition in this section);

(ii) Sold in substantial quantities in the commercial marketplace; and

(iii) Offered to the Government, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace; and

(2) Does not include bulk cargo, as defined in 46 U.S.C. 40102(4), such as agricultural products and petroleum products.

"Common item" means material that is common to the applicable Government contract and the contractor's other work.

"Component" means any item supplied to the Government as part of an end item or of another component, except that for use in—

(1) Part 25, see the definition in 25.003;

(2) 52.225-1 and 52.225-3, see the definition in 52.225-1(a) and 52.225-3(a);

(3) 52.225-9 and 52.225-11, see the definition in 52.225-9(a) and 52.225-11(a); and

(4) 52.225-21 and 52.225-23, see the definition in 52.225-21(a) and 52.225-23(a).

"Computer database" or "database" means a collection of recorded information in a form capable of, and for the purpose of, being stored in, processed, and operated on by a computer. The term does not include computer software.

"Computer software"—(1) Means (i) Computer programs that comprise a series of instructions, rules, routines, or statements, regardless of the media in which recorded, that allow or cause a computer to perform a specific operation or series of operations; and

(ii) Recorded information comprising source code listings, design details, algorithms, processes, flow charts, formulas, and related material that would enable the computer program to be produced, created, or compiled.

(2) Does not include computer databases or computer software documentation.

"Computer software documentation" means owner's manuals, user's manuals, installation instructions, operating instructions, and other similar items, regardless of storage medium, that explain the capabilities of the computer software or provide instructions for using the software.

"Consent to subcontract" means the contracting officer's written consent for the prime contractor to enter into a particular subcontract.

"Construction" means construction, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other real property. For purposes of this definition, the terms "buildings, structures, or other real property" include, but are not limited to, improvements of all

**FAC 2005–73  MAY 29, 2014**

types, such as bridges, dams, plants, highways, parkways, streets, subways, tunnels, sewers, mains, power lines, cemeteries, pumping stations, railways, airport facilities, terminals, docks, piers, wharves, ways, lighthouses, buoys, jetties, breakwaters, levees, canals, and channels. Construction does not include the manufacture, production, furnishing, construction, alteration, repair, processing, or assembling of vessels, aircraft, or other kinds of personal property (except that for use in subpart 22.5, see the definition at 22.502).

"Contiguous United States (CONUS)" means the 48 contiguous States and the District of Columbia.

"Contingency operation" (10 U.S.C. 101(a)(13)) means a military operation that—

(1) Is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or

(2) Results in the call or order to, or retention on, active duty of members of the uniformed services under sections 688, 12301(a), 12302, 12304, 12304(a), 12305, or 12406 of title 10 of the United States Code, Chapter 15 of title 10 of the United States Code, or any other provision of law during a war or during a national emergency declared by the President or Congress.

"Continued portion of the contract" means the portion of a contract that the contractor must continue to perform following a partial termination.

"Contract" means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. In addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and bilateral contract modifications. Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301, *et seq.* For discussion of various types of contracts, see Part 16.

"Contract administration office" means an office that performs—

(1) Assigned postaward functions related to the administration of contracts; and

(2) Assigned preaward functions.

"Contract clause" or "clause" means a term or condition used in contracts or in both solicitations and contracts, and applying after contract award or both before and after award.

"Contract modification" means any written change in the terms of a contract (see 43.103).

"Contracting" means purchasing, renting, leasing, or otherwise obtaining supplies or services from nonfederal sources. Contracting includes description (but not determination) of supplies and services required, selection and solicitation of sources, preparation and award of contracts, and all phases of contract administration. It does not include making grants or cooperative agreements.

"Contracting activity" means an element of an agency designated by the agency head and delegated broad authority regarding acquisition functions.

"Contracting office" means an office that awards or executes a contract for supplies or services and performs postaward functions not assigned to a contract administration office (except for use in Part 48, see also 48.001).

"Contracting officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the contracting officer acting within the limits of their authority as delegated by the contracting officer. "Administrative contracting officer (ACO)" refers to a contracting officer who is administering contracts. "Termination contracting officer (TCO)" refers to a contracting officer who is settling terminated contracts. A single contracting officer may be responsible for duties in any or all of these areas. Reference in this regulation (48 CFR Chapter 1) to administrative contracting officer or termination contracting officer does not—

(1) Require that a duty be performed at a particular office or activity; or

(2) Restrict in any way a contracting officer in the performance of any duty properly assigned.

"Contracting officer's representative (COR)" means an individual, including a contracting officer's technical representative (COTR), designated and authorized in writing by the contracting officer to perform specific technical or administrative functions.

"Conviction" means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere. For use in subpart 23.5, see the definition at 23.503.

"Cost or pricing data" (10 U.S.C. 2306a(h)(1) and 41 U.S.C. chapter 35) means all facts that, as of the date of price agreement, or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to

FAC 2005–77  OCTOBER 14, 2014

(1) $300,000 for any contract to be awarded and performed, or purchase to be made, inside the United States; and

(2) $1 million for any contract to be awarded and performed, or purchase to be made, outside the United States.

"Single, Governmentwide point of entry," means the one point of entry to be designated by the Administrator of OFPP that will allow the private sector to electronically access procurement opportunities Governmentwide.

"Small business concern" means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria and size standards in 13 CFR part 121 (see 19.102). Such a concern is "not dominant in its field of operation" when it does not exercise a controlling or major influence on a national basis in a kind of business activity in which a number of business concerns are primarily engaged. In determining whether dominance exists, consideration must be given to all appropriate factors, including volume of business, number of employees, financial resources, competitive status or position, ownership or control of materials, processes, patents, license agreements, facilities, sales territory, and nature of business activity. (See 15 U.S.C. 632.)

"Small business subcontractor" means a concern, including affiliates, that for subcontracts valued at—

(1) $10,000 or less, does not have more than 500 employees; and

(2) More than $10,000, does not have employees or average annual receipts exceeding the size standard in 13 CFR Part 121 (see 19.102) for the product or service it is providing on the subcontract.

"Small disadvantaged business concern" consistent with 13 CFR 124.1002, means a small business concern under the size standard applicable to the acquisition, that:

(1) Is at least 51 percent unconditionally and directly owned (as defined at 13 CFR 124.105) by—

(i) One or more socially disadvantaged (as defined at 13 CFR 124.103) and economically disadvantaged (as defined at 13 CFR 124.104) individuals who are citizens of the United States; and

(ii) Each individual claiming economic disadvantage has a net worth not exceeding $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

(2) The management and daily business operations of which are controlled (as defined at 13 CFR 124.106) by individuals who meet the criteria in paragraphs (1)(i) and (ii) of this definition.

"Sole source acquisition" means a contract for the purchase of supplies or services that is entered into or proposed to be entered into by an agency after soliciting and negotiating with only one source.

"Solicitation" means any request to submit offers or quotations to the Government. Solicitations under sealed bid procedures are called "invitations for bids." Solicitations under negotiated procedures are called "requests for proposals." Solicitations under simplified acquisition procedures may require submission of either a quotation or an offer.

"Solicitation provision or provision" means a term or condition used only in solicitations and applying only before contract award.

"Source selection information" means any of the following information that is prepared for use by an agency for the purpose of evaluating a bid or proposal to enter into an agency procurement contract, if that information has not been previously made available to the public or disclosed publicly:

(1) Bid prices submitted in response to an agency invitation for bids, or lists of those bid prices before bid opening.

(2) Proposed costs or prices submitted in response to an agency solicitation, or lists of those proposed costs or prices.

(3) Source selection plans.

(4) Technical evaluation plans.

(5) Technical evaluations of proposals.

(6) Cost or price evaluations of proposals.

(7) Competitive range determinations that identify proposals that have a reasonable chance of being selected for award of a contract.

(8) Rankings of bids, proposals, or competitors.

(9) Reports and evaluations of source selection panels, boards, or advisory councils.

(10) Other information marked as "Source Selection Information—See FAR 2.101 and 3.104" based on a case-by-case determination by the head of the agency or the contracting officer, that its disclosure would jeopardize the integrity or successful completion of the Federal agency procurement to which the information relates.

"Special competency" means a special or unique capability, including qualitative aspects, developed incidental to the primary functions of the Federally Funded Research and Development Centers to meet some special need.

"Special test equipment" means either single or multipurpose integrated test units engineered, designed, fabricated, or modified to accomplish special purpose testing in performing a contract. It consists of items or assemblies of equipment including foundations and similar improvements necessary for installing special test equipment, and standard or general purpose items or components that are interconnected and interdependent so as to become a new functional entity for special testing purposes. Special test equipment does not include material, special tooling, real property, and equipment items used for general testing purposes or property that with relatively minor expense can be made suitable for general purpose use.

"Special tooling" means jigs, dies, fixtures, molds, patterns, taps, gauges, and all components of these items including foundations and similar improvements necessary for installing special tooling, and which are of such a specialized nature that without substantial modification or alteration their use is limited to the development or production of particular supplies or parts thereof or to the performance of particular

# CGI ADDENDUM DOCUMENT NO. 7

**FAC 2005–73  MAY 29, 2014**

## Subpart 8.4—Federal Supply Schedules

**8.401  Definitions.**

As used in this subpart—

"Ordering activity" means an activity that is authorized to place orders, or establish blanket purchase agreements (BPA), against the General Services Administration's (GSA) Multiple Award Schedule contracts. A list of eligible ordering activities is available at *http://www.gsa.gov/schedules* (click "For Customers Ordering from Schedules" and then "Eligibility to Use GSA Sources").

"Multiple Award Schedule (MAS)" means contracts awarded by GSA or the Department of Veterans Affairs (VA) for similar or comparable supplies, or services, established with more than one supplier, at varying prices. The primary statutory authorities for the MAS program are 41 U.S.C. 152(3), *Competitive Procedures,* and 40 U.S.C. 501, Services for Executive Agencies.

"Requiring agency" means the agency needing the supplies or services.

"Schedules e-Library" means the on-line source for GSA and VA Federal Supply Schedule contract award information. Schedules e-Library may be accessed at *http://www.gsa.gov/elibrary*.

"Special Item Number (SIN)" means a group of generically similar (but not identical) supplies or services that are intended to serve the same general purpose or function.

**8.402  General.**

(a) The Federal Supply Schedule program is also known as the GSA Schedules Program or the Multiple Award Schedule Program. The Federal Supply Schedule program is directed and managed by GSA and provides Federal agencies (see 8.004) with a simplified process for obtaining commercial supplies and services at prices associated with volume buying. Indefinite delivery contracts are awarded to provide supplies and services at stated prices for given periods of time. GSA may delegate certain responsibilities to other agencies (*e.g.,* GSA has delegated authority to the VA to procure medical supplies under the VA Federal Supply Schedules program). Orders issued under the VA Federal Supply Schedule program are covered by this subpart. Additionally, the Department of Defense (DoD) manages similar systems of schedule-type contracting for military items; however, DoD systems are not covered by this subpart.

(b) GSA schedule contracts require all schedule contractors to publish an "Authorized Federal Supply Schedule Pricelist" (pricelist). The pricelist contains all supplies and services offered by a schedule contractor. In addition, each pricelist contains the pricing and the terms and conditions pertaining to each Special Item Number that is on schedule. The schedule contractor is required to provide one copy of its pricelist to any ordering activity upon request. Also, a copy of the pricelist may be obtained from the Federal Supply Service by submitting a written e-mail request to *schedules.infocenter@gsa.gov* or by telephone at 1-800-488-3111. This subpart, together with the pricelists, contain necessary information for placing delivery or task orders with schedule contractors. In addition, the GSA schedule contracting office issues Federal Supply Schedules publications that contain a general overview of the Federal Supply Schedule (FSS) program and address pertinent topics. Ordering activities may request copies of schedules publications by contacting the Centralized Mailing List Service through the Internet at *http://www.gsa.gov/cmls*, submitting written e-mail requests to *CMLS@gsa.gov*; or by completing GSA Form 457, FSS Publications Mailing List Application, and mailing it to the GSA Centralized Mailing List Service (7SM), P.O. Box 6477, Fort Worth, TX 76115. Copies of GSA Form 457 may also be obtained from the above-referenced points of contact.

(c)(1) GSA offers an on-line shopping service called "GSA Advantage!" through which ordering activities may place orders against Schedules. (Ordering activities may also use GSA Advantage! to place orders through GSA's Global Supply System, a GSA wholesale supply source, formerly known as "GSA Stock" or the "Customer Supply Center." FAR subpart 8.4 is not applicable to orders placed through the GSA Global Supply System.) Ordering activities may access GSA Advantage! through the GSA Federal Supply Service Home Page (*http://www.gsa.gov/fas*) or the GSA Federal Supply Schedule Home Page at *http://www.gsa.gov/schedules*.

(2) GSA Advantage! enables ordering activities to search specific information (*i.e.,* national stock number, part number, common name), review delivery options, place orders directly with Schedule contractors (except see 8.405-6) and pay for orders using the Governmentwide commercial purchase card.

(d)(1) *e-Buy*, GSA's electronic Request for Quotation (RFQ) system, is a part of a suite of on-line tools which complement GSA Advantage!. E-Buy allows ordering activities to post requirements, obtain quotes, and issue orders electronically. Posting an RFQ on e-Buy—

(i) Is one medium for providing fair notice to all schedule contractors offering such supplies and services as required by 8.405-1, 8.405-2, and 8.405-3; and

(ii) Is required when an order contains brand-name specifications (see 8.405-6).

(2) Ordering activities may access e-Buy at *http://www.ebuy.gsa.gov*. For more information or assistance on either GSA Advantage! or e-Buy, contact GSA at Internet e-mail address *gsa.advantage@gsa.gov*.

(e) For more information or assistance regarding the Federal Supply Schedule Program, review the following website: *http://www.gsa.gov/schedules*. Additionally, for on-line

CGI Addendum - 080

training courses regarding the Schedules Program, review the following website: *http://www.gsa.gov/training*.

(f) For administrative convenience, an ordering activity contracting officer may add items not on the Federal Supply Schedule (also referred to as open market items) to a Federal Supply Schedule blanket purchase agreement (BPA) or an individual task or delivery order only if—

(1) All applicable acquisition regulations pertaining to the purchase of the items not on the Federal Supply Schedule have been followed (*e.g.*, publicizing (Part 5), competition requirements (Part 6), acquisition of commercial items (Part 12), contracting methods (Parts 13, 14, and 15), and small business programs (Part 19));

(2) The ordering activity contracting officer has determined the price for the items not on the Federal Supply Schedule is fair and reasonable;

(3) The items are clearly labeled on the order as items not on the Federal Supply Schedule; and

(4) All clauses applicable to items not on the Federal Supply Schedule are included in the order.

(g) When using the Governmentwide commercial purchase card as a method of payment, orders at or below the micro-purchase threshold are exempt from verification in the System for Award Management database as to whether the contractor has a delinquent debt subject to collection under the Treasury Offset Program (TOP).

## 8.403  Applicability.

(a) Procedures in this subpart apply to—

(1) Individual orders for supplies or services placed against Federal Supply Schedules contracts; and

(2) BPAs established against Federal Supply Schedule contracts.

(b) GSA may establish special ordering procedures for a particular schedule. In this case, that schedule will specify those special ordering procedures. Unless otherwise noted, special ordering procedures established for a Federal Supply Schedule take precedence over the procedures in 8.405.

(c) In accordance with section 1427(b) of Public Law 108-136 (40 U.S.C. 1103 note), for requirements that substantially or to a dominant extent specify performance of architect-engineer services (as defined in 2.101), agencies—

(1) Shall use the procedures at subpart 36.6; and

(2) Shall not place orders for such requirements under a Federal Supply Schedule.

## 8.404  Use of Federal Supply Schedules.

(a) *General.* Parts 13 (except 13.303-2(c)(3)), 14, 15, and 19 (except for the requirement at 19.202-1(e)(1)(iii)) do not apply to BPAs or orders placed against Federal Supply Schedules contracts (but see 8.405-5). BPAs and orders placed against a MAS, using the procedures in this subpart, are con-

sidered to be issued using full and open competition (see 6.102(d)(3)). Therefore, when establishing a BPA (as authorized by 13.303-2(c)(3)), or placing orders under Federal Supply Schedule contracts using the procedures of 8.405, ordering activities shall not seek competition outside of the Federal Supply Schedules or synopsize the requirement; but see paragraph (g) of this section.

(b)(1) The contracting officer, when placing an order or establishing a BPA, is responsible for applying the regulatory and statutory requirements applicable to the agency for which the order is placed or the BPA is established. The requiring agency shall provide the information on the applicable regulatory and statutory requirements to the contracting officer responsible for placing the order.

(2) For orders over $500,000, see subpart 17.5 for additional requirements for interagency acquisitions. For example, the requiring agency shall make a determination that use of the Federal Supply Schedule is the best procurement approach, in accordance with 17.502-1(a).

(c) *Acquisition planning.* Orders placed under a Federal Supply Schedule contract—

(1) Are not exempt from the development of acquisition plans (see subpart 7.1), and an information technology acquisition strategy (see Part 39);

(2) Must comply with all FAR requirements for a bundled contract when the order meets the definition of "bundled contract" (see 2.101(b)); and

(3) Must, whether placed by the requiring agency, or on behalf of the requiring agency, be consistent with the requiring agency's statutory and regulatory requirements applicable to the acquisition of the supply or service.

(d) *Pricing.* Supplies offered on the schedule are listed at fixed prices. Services offered on the schedule are priced either at hourly rates, or at a fixed price for performance of a specific task (*e.g.,* installation, maintenance, and repair). GSA has already determined the prices of supplies and fixed-price services, and rates for services offered at hourly rates, under schedule contracts to be fair and reasonable. Therefore, ordering activities are not required to make a separate determination of fair and reasonable pricing, except for a price evaluation as required by 8.405-2(d). By placing an order against a schedule contract using the procedures in 8.405, the ordering activity has concluded that the order represents the best value (as defined in FAR 2.101) and results in the lowest overall cost alternative (considering price, special features, administrative costs, etc.) to meet the Government's needs. Although GSA has already negotiated fair and reasonable pricing, ordering activities may seek additional discounts before placing an order (see 8.405-4).

(e) The procedures under subpart 33.1 are applicable to the issuance of an order or the establishment of a BPA against a schedule contract.

(f) If the ordering activity issues an RFQ, the ordering activity shall provide the RFQ to any schedule contractor that requests a copy of it.

(g)(1) Ordering activities shall publicize contract actions funded in whole or in part by the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5):

(i) Notices of proposed MAS orders (including orders issued under BPAs) that are for "informational purposes only" exceeding $25,000 shall follow the procedures in 5.704 for posting orders.

(ii) Award notices for MAS orders (including orders issued under BPAs) shall follow the procedures in 5.705.

(2) When an order is awarded or a Blanket Purchase Agreement is established with an estimated value greater than the simplified acquisition threshold and supported by a limited-source justification at 8.405-6(a), the ordering officer contracting officer must—

(i) Publicize the action (see 5.301); and

(ii) Post the justification in accordance with 8.405-6(a)(2).

(h) *Type-of-order preference for services.* (1) The ordering activity shall specify the order type (*i.e.*, firm-fixed price, time-and-materials, or labor-hour) for the services offered on the schedule priced at hourly rates.

(2) Agencies shall use fixed-price orders for the acquisition of commercial services to the maximum extent practicable.

(3)(i) A time-and-materials or labor-hour order may be used for the acquisition of commercial services only when it is not possible at the time of placing the order to estimate accurately the extent or duration of the work or to anticipate costs with any reasonable degree of confidence.

(ii) Prior to the issuance of a time-and-materials or labor-hour order, the contracting officer shall—

(A) Execute a determination and findings (D&F) for the order, in accordance with paragraph (h)(3)(iii) of this section that a fixed-price order is not suitable;

(B) Include a ceiling price in the order that the contractor exceeds at its own risk; and

(C) When the total performance period, including options, is more than three years, the D&F prepared in accordance with this paragraph shall be signed by the contracting officer and approved by the head of the contracting activity prior to the execution of the base period.

(iii) The D&F required by paragraph (h)(3)(ii)(A) of this section shall contain sufficient facts and rationale to justify that a fixed-price order is not suitable. At a minimum, the D&F shall—

(A) Include a description of the market research conducted (see 8.404(c) and 10.002(e)); and

(B) Establish that it is not possible at the time of placing the order to accurately estimate the extent or duration of the work or anticipate costs with any reasonable degree of confidence;

(C) Establish that the current requirement has been structured to maximize the use of fixed-price orders (*e.g.*, by limiting the value or length of the time-and-materials/labor-hour order; or, establishing fixed prices for portions of the requirement) on future acquisitions for the same or similar requirements; and

(D) Describe actions to maximize the use of fixed-price orders on future acquisitions for the same requirements.

(iv) Prior to an increase in the ceiling price of a time-and-materials or labor-hour order, the ordering activity shall—

(A) Conduct an analysis of pricing and other relevant factors to determine if the action is in the best interest of the Government and document the order file;

(B) Follow the procedures at 8.405-6 for a change that modifies the general scope of the order; and

(C) Comply with the requirements at 8.402(f) when modifying an order to add open market items.

(i) Ensure that service contractor reporting requirements are met in accordance with subpart 4.17, Service Contracts Inventory.

## 8.405  Ordering procedures for Federal Supply Schedules.

Ordering activities shall use the ordering procedures of this section when placing an order or establishing a BPA for supplies or services. The procedures in this section apply to all schedules. For establishing BPAs and for orders under BPAs see 8.405-3.

## 8.405-1  Ordering procedures for supplies, and services not requiring a statement of work.

(a) Ordering activities shall use the procedures of this subsection when ordering supplies and services that are listed in the schedules contracts at a fixed price for the performance of a specific task, where a statement of work is not required (*e.g.,* installation, maintenance, and repair). For establishing BPAs and for orders under BPAs see 8.405-3.

(b) *Orders at or below the micro-purchase threshold.* Ordering activities may place orders at, or below, the micro-purchase threshold with any Federal Supply Schedule contractor that can meet the agency's needs. Although not required to solicit from a specific number of schedule contractors, ordering activities should attempt to distribute orders among contractors.

(c) *Orders exceeding the micro-purchase threshold but not exceeding the simplified acquisition threshold.* Ordering activities shall place orders with the schedule contractor that can provide the supply or service that represents the best value. Before placing an order, an ordering activity shall:

(1) Consider reasonably available information about the supply or service offered under MAS contracts by surveying at least three schedule contractors through the GSA Advantage! on-line shopping service, by reviewing the catalogs or pricelists of at least three schedule contractors, or by request-

ing quotations from at least three schedule contractors (see 8.405-5); or

(2) Document the circumstances for restricting consideration to fewer than three schedule contractors based on one of the reasons at 8.405-6(a);

(d) *For proposed orders exceeding the simplified acquisition threshold.* (1) Each order shall be placed on a competitive basis in accordance with (d)(2) and (3) of this section, unless this requirement is waived on the basis of a justification that is prepared and approved in accordance with 8.405-6.

(2) The ordering activity contracting officer shall provide an RFQ that includes a description of the supplies to be delivered or the services to be performed and the basis upon which the selection will be made (see 8.405-1(f)).

(3) The ordering activity contracting officer shall —

(i) Post the RFQ on e-Buy to afford all schedule contractors offering the required supplies or services under the appropriate multiple award schedule(s) an opportunity to submit a quote; or

(ii) Provide the RFQ to as many schedule contractors as practicable, consistent with market research appropriate to the circumstances, to reasonably ensure that quotes will be received from at least three contractors that can fulfill the requirements. When fewer than three quotes are received from schedule contractors that can fulfill the requirement, the contracting officer shall prepare a written determination explaining that no additional contractors capable of fulfilling the requirement could be identified despite reasonable efforts to do so. The determination must clearly explain efforts made to obtain quotes from at least three schedule contractors.

(4) The ordering activity contracting officer shall ensure that all quotes received are fairly considered and award is made in accordance with the basis for selection in the RFQ.

(e) When an order contains brand-name specifications, the contracting officer shall post the RFQ on e-Buy along with the justification or documentation, as required by 8.405-6. An RFQ is required when a purchase description specifies a brand-name.

(f) In addition to price (see 8.404(d) and 8.405-4), when determining best value, the ordering activity may consider, among other factors, the following:

(1) Past performance.

(2) Special features of the supply or service required for effective program performance.

(3) Trade-in considerations.

(4) Probable life of the item selected as compared with that of a comparable item.

(5) Warranty considerations.

(6) Maintenance availability.

(7) Environmental and energy efficiency considerations.

(8) Delivery terms.

(g) *Minimum documentation.* The ordering activity shall document—

(1) The schedule contracts considered, noting the contractor from which the supply or service was purchased;

(2) A description of the supply or service purchased;

(3) The amount paid;

(4) When an order exceeds the simplified acquisition threshold, evidence of compliance with the ordering procedures at 8.405-1(d); and

(5) The basis for the award decision.

**8.405-2 Ordering procedures for services requiring a statement of work.**

(a) *General.* Ordering activities shall use the procedures in this subsection when ordering services priced at hourly rates as established by the schedule contracts. The applicable services will be identified in the Federal Supply Schedule publications and the contractor's pricelists. For establishing BPAs and for orders under BPAs see 8.405-3.

(b) *Statements of Work (SOWs).* All Statements of Work shall include a description of work to be performed; location of work; period of performance; deliverable schedule; applicable performance standards; and any special requirements (*e.g.,* security clearances, travel, special knowledge). To the maximum extent practicable, agency requirements shall be performance-based statements (see subpart 37.6).

(c) *Request for Quotation procedures.* The ordering activity must provide the Request for Quotation (RFQ), which includes the statement of work and evaluation criteria (*e.g.,* experience and past performance), to schedule contractors that offer services that will meet the agency's needs. The RFQ may be posted to GSA's electronic RFQ system, e-Buy (see 8.402(d)).

(1) *Orders at, or below, the micro-purchase threshold.* Ordering activities may place orders at, or below, the micro-purchase threshold with any Federal Supply Schedule contractor that can meet the agency's needs. The ordering activity should attempt to distribute orders among contractors.

(2) *For orders exceeding the micro-purchase threshold, but not exceeding the simplified acquisition threshold.* (i) The ordering activity shall develop a statement of work, in accordance with 8.405-2(b).

(ii) The ordering activity shall provide the RFQ (including the statement of work and evaluation criteria) to at least three schedule contractors that offer services that will meet the agency's needs or document the circumstances for restricting consideration to fewer than three schedule contractors based on one of the reasons at 8.405-6(a).

(iii) The ordering activity shall specify the type of order (*i.e.,* firm-fixed-price, labor-hour) for the services identified in the statement of work. The contracting officer should establish firm-fixed-prices, as appropriate.

(3) For proposed orders exceeding the simplified acquisition threshold. In addition to meeting the requirements of 8.405-2(c)(2)(i) and (iii), the following procedures apply:

(i) Each order shall be placed on a competitive basis in accordance with (c)(3)(ii) and (iii) of this section, unless this requirement is waived on the basis of a justification that is prepared and approved in accordance with 8.405-6.

# FAC 2005–55  FEBRUARY 2, 2012

(ii) The ordering activity contracting officer shall provide an RFQ that includes a statement of work and the evaluation criteria.

(iii) The ordering activity contracting officer shall—

(A) Post the RFQ on e-Buy to afford all schedule contractors offering the required services under the appropriate multiple-award schedule(s) an opportunity to submit a quote; or

(B) Provide the RFQ to as many schedule contractors as practicable, consistent with market research appropriate to the circumstances, to reasonably ensure that quotes will be received from at least three contractors that can fulfill the requirements. When fewer than three quotes are received from schedule contractors that can fulfill the requirements, the contracting officer shall prepare a written determination to explain that no additional contractors capable of fulfilling the requirements could be identified despite reasonable efforts to do so. The determination must clearly explain efforts made to obtain quotes from at least three schedule contractors.

(C) Ensure all quotes received are fairly considered and award is made in accordance with the evaluation criteria in the RFQ.

(4) The ordering activity shall provide the RFQ (including the statement of work and the evaluation criteria) to any schedule contractor who requests a copy of it.

(d) *Evaluation*. The ordering activity shall evaluate all responses received using the evaluation criteria provided to the schedule contractors. The ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable. Place the order with the schedule contractor that represents the best value (see 8.404(d) and 8.405-4). After award, ordering activities should provide timely notification to unsuccessful offerors. If an unsuccessful offeror requests information on an award that was based on factors other than price alone, a brief explanation of the basis for the award decision shall be provided.

(e) *Use of time-and-materials and labor-hour orders for services*. When placing a time-and-materials or labor-hour order for services, see 8.404(h).

(f) *Minimum documentation*. The ordering activity shall document—

(1) The schedule contracts considered, noting the contractor from which the service was purchased;

(2) A description of the service purchased;

(3) The amount paid;

(4) The evaluation methodology used in selecting the contractor to receive the order;

(5) The rationale for any tradeoffs in making the selection;

(6) The price reasonableness determination required by paragraph (d) of this subsection;

(7) The rationale for using other than—

(i) A firm-fixed price order; or

(ii) A performance-based order; and

(8) When an order exceeds the simplified acquisition threshold, evidence of compliance with the ordering procedures at 8.405-2(c).

## 8.405-3 Blanket purchase agreements (BPAs).

(a) *Establishment.*(1) Ordering activities may establish BPAs under any schedule contract to fill repetitive needs for supplies or services. Ordering activities shall establish the BPA with the schedule contractor(s) that can provide the supply or service that represents the best value.

(2) In addition to price (see 8.404(d) and 8.405-4), when determining best value, the ordering activity may consider, among other factors, the following:

(i) Past performance.

(ii) Special features of the supply or service required for effective program performance.

(iii) Trade-in considerations.

(iv) Probable life of the item selected as compared with that of a comparable item.

(v) Warranty considerations.

(vi) Maintenance availability.

(vii) Environmental and energy efficiency considerations.

(viii) Delivery terms.

(3)(i) The ordering activity contracting officer shall, to the maximum extent practicable, give preference to establishing multiple-award BPAs, rather than establishing a single-award BPA.

(ii) No single-award BPA with an estimated value exceeding $103 million (including any options), may be awarded unless the head of the agency determines in writing that—

(A) The orders expected under the BPA are so integrally related that only a single source can reasonably perform the work;

(B) The BPA provides only for firm-fixed priced orders for—

*(1)* Products with unit prices established in the BPA; or

*(2)* Services with prices established in the BPA for specific tasks to be performed;

(C) Only one source is qualified and capable of performing the work at a reasonable price to the Government; or

(D) It is necessary in the public interest to award the BPA to a single source for exceptional circumstances.

(iii) The requirement for a determination for a single-award BPA greater than $103 million is in addition to any applicable requirement for a limited-source justification at 8.405-6. However, the two documents may be combined into one document.

CGI Addendum - 084

(iv) In determining how many multiple-award BPAs to establish or that a single-award BPA is appropriate, the contracting officer should consider the following factors and document the decision in the acquisition plan or BPA file:

(A) The scope and complexity of the requirement(s);

(B) The benefits of on-going competition and the need to periodically compare multiple technical approaches or prices;

(C) The administrative costs of BPAs; and

(D) The technical qualifications of the schedule contractor.

(4) BPAs shall address the frequency of ordering, invoicing, discounts, requirements (*e.g.*, estimated quantities, work to be performed), delivery locations, and time.

(5) When establishing multiple-award BPAs, the ordering activity shall specify the procedures for placing orders under the BPAs in accordance with 8.405-3(c)(2).

(6) Establishment of a multi-agency BPA against a Federal Supply Schedule contract is permitted if the multi-agency BPA identifies the participating agencies and their estimated requirements at the time the BPA is established.

(7) *Minimum documentation.* The ordering activity contracting officer shall include in the BPA file documentation the—

(i) Schedule contracts considered, noting the contractor to which the BPA was awarded;

(ii) Description of the supply or service purchased;

(iii) Price;

(iv) Required justification for a limited-source BPA (see 8.405-6), if applicable;

(v) Determination for a single-award BPA exceeding $103 million, if applicable (see (a)(3)(ii));

(vi) Documentation supporting the decision to establish multiple-award BPAs or a single-award BPA (see (a)(3)(iv));

(vii) Evidence of compliance with paragraph (b) of this section, for competitively awarded BPAs, if applicable; and

(viii) *Basis for the award decision.* This should include the evaluation methodology used in selecting the contractor, the rationale for any tradeoffs in making the selection, and a price reasonableness determination for services requiring a statement of work.

(b) *Competitive procedures for establishing a BPA.* This paragraph applies to the establishment of a BPA, in addition to applicable instructions in paragraph (a).

(1) *For supplies, and for services not requiring a statement of work.* The procedures of this paragraph apply when establishing a BPA for supplies and services that are listed in the schedule contract at a fixed price for the performance of a specific task, where a statement of work is not required (*e.g.*, installation, maintenance, and repair).

(i) *If the estimated value of the BPA does not exceed the simplified acquisition threshold.* (A) The ordering activity shall:

(1) Consider reasonably available information about the supply or service offered under MAS contracts by surveying at least three schedule contractors through the GSA Advantage! on-line shopping service, by reviewing the catalogs or pricelists of at least three schedule contractors, or by requesting quotations from at least three schedule contractors (see 8.405-5); or

(2) Document the circumstances for restricting consideration to fewer than three schedule contractors based on one of the reasons at 8.405-6(a).

(B) The ordering activity shall establish the BPA with the schedule contractor(s) that can provide the best value.

(ii) *If the estimated value of the BPA exceeds the simplified acquisition threshold.* The ordering activity contracting officer:

(A) Shall provide an RFQ that includes a description of the supplies to be delivered or the services to be performed and the basis upon which the selection will be made.

(B) (1) Shall post the RFQ on e-Buy to afford all schedule contractors offering the required supplies or services under the appropriate multiple award schedule(s) an opportunity to submit a quote; or

(2) Shall provide the RFQ to as many schedule contractors as practicable, consistent with market research appropriate to the circumstances, to reasonably ensure that quotes will be received from at least three contractors that can fulfill the requirements. When fewer than three quotes are received from schedule contractors that can fulfill the requirements, the contracting officer shall prepare a written determination explaining that no additional contractors capable of fulfilling the requirements could be identified despite reasonable efforts to do so. The determination must clearly explain efforts made to obtain quotes from at least three schedule contractors.

(C) Shall ensure all quotes received are fairly considered and award is made in accordance with the basis for selection in the RFQ. After seeking price reductions (see 8.405-4), establish the BPA with the schedule contractor(s) that provides the best value.

(D) The BPA must be established in accordance with paragraphs (b)(1)(ii)(B) and (C) of this section, unless the requirement is waived on the basis of a justification that is prepared and approved in accordance with 8.405-6.

(2) *For services requiring a statement of work.* This applies when establishing a BPA that requires services priced at hourly rates, as provided by the schedule contract. The applicable services will be identified in the Federal Supply Schedule publications and the contractor's pricelists.

(i) *Statements of Work (SOWs).* The ordering activity shall develop a statement of work. All Statements of Work

shall include a description of work to be performed; location of work; period of performance; deliverable schedule; applicable performance standards; and any special requirements (*e.g.*, security clearances, travel, and special knowledge). To the maximum extent practicable, agency requirements shall be performance-based statements (see subpart 37.6).

(ii) *Type-of-order preference*. The ordering activity shall specify the order type (*i.e.*, firm-fixed price, time-and-materials, or labor-hour) for the services identified in the statement of work. The contracting officer should establish firm-fixed priced orders to the maximum extent practicable. For time-and-materials and labor-hour orders, the contracting officer shall follow the procedures at 8.404(h).

(iii) *Request for Quotation procedures*. The ordering activity must provide a RFQ, which includes the statement of work and evaluation criteria (*e.g.*, experience and past performance), to schedule contractors that offer services that will meet the agency's needs. The RFQ may be posted to GSA's electronic RFQ system, e-Buy (see 8.402(d)).

(iv) *If the estimated value of the BPA does not exceed the simplified acquisition threshold*. The ordering activity shall provide the RFQ (including the statement of work and evaluation criteria) to at least three schedule contractors that offer services that will meet the agency's needs.

(v) *If estimated value of the BPA exceeds the simplified acquisition threshold*. The ordering activity contracting officer—

(A) Shall post the RFQ on e-Buy to afford all schedule contractors offering the required supplies or services under the appropriate multiple-award schedule an opportunity to submit a quote; or

(B) Shall provide the RFQ, which includes the statement of work and evaluation criteria, to as many schedule contractors as practicable, consistent with market research appropriate to the circumstances, to reasonably ensure that quotes will be received from at least three contractors that can fulfill the requirements. When fewer than three quotes are received from schedule contractors that can fulfill the requirements, the contracting officer shall document the file. The contracting officer shall prepare a written determination explaining that no additional contractors capable of fulfilling the requirements could be identified despite reasonable efforts to do so. The determination must clearly explain efforts made to obtain quotes from at least three schedule contractors.

(vi) The ordering activity contracting officer shall ensure all quotes received are fairly considered and award is made in accordance with the basis for selection in the RFQ. The ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform, and for determining that the proposed price is reasonable.

(vii) The BPA must be established in accordance with paragraph (b)(2)(iv) or (v), and with paragraph (b)(2)(vi) of this section, unless the requirement is waived on the basis

of a justification that is prepared and approved in accordance with 8.405-6.

(viii) The ordering activity contracting officer shall establish the BPA with the schedule contractor(s) that represents the best value (see 8.404(d) and 8.405-4).

(3) After award, ordering activities should provide timely notification to unsuccessful offerors. If an unsuccessful offeror requests information on an award that was based on factors other than price alone, a brief explanation of the basis for the award decision shall be provided.

(c) *Ordering from BPAs*. The procedures in this paragraph (c) are not required for BPAs established on or before May 16, 2011. However, ordering activities are encouraged to use the procedures for such BPAs.

(1) *Single-award BPA*. If the ordering activity establishes a single-award BPA, authorized users may place the order directly under the established BPA when the need for the supply or service arises.

(2) *Multiple-award BPAs*.(i) Orders at or below the micro-purchase threshold. The ordering activity may place orders at or below the micro-purchase threshold with any BPA holder that can meet the agency needs. The ordering activity should attempt to distribute any such orders among the BPA holders.

(ii) *Orders exceeding the micro-purchase threshold but not exceeding the simplified acquisition threshold.* (A) The ordering activity must provide each multiple-award BPA holder a fair opportunity to be considered for each order exceeding the micro-purchase threshold, but not exceeding the simplified acquisition threshold unless one of the exceptions at 8.405-6(a)(1)(i) applies.

(B) The ordering activity need not contact each of the multiple-award BPA holders before placing an order if information is available to ensure that each BPA holder is provided a fair opportunity to be considered for each order.

(C) The ordering activity contracting officer shall document the circumstances when restricting consideration to less than all multiple-award BPA holders offering the required supplies and services.

(iii) *Orders exceeding the simplified acquisition threshold.* (A) The ordering activity shall place an order in accordance with paragraphs (c)(2)(iii)(A)(*1*), (*2*) and (*3*) of this paragraph, unless the requirement is waived on the basis of a justification that is prepared and approved in accordance with 8.405-6. The ordering activity shall—

(*1*) Provide an RFQ to all BPA holders offering the required supplies or services under the multiple-award BPAs, to include a description of the supplies to be delivered or the services to be performed and the basis upon which the selection will be made;

(*2*) Afford all BPA holders responding to the RFQ an opportunity to submit a quote; and

CGI Addendum - 086

*(3)* Fairly consider all responses received and make award in accordance with the selection procedures.

(B) The ordering activity shall document evidence of compliance with these procedures and the basis for the award decision.

(3) *BPAs for hourly-rate services.* If the BPA is for hourly-rate services, the ordering activity shall develop a statement of work for each order covered by the BPA. Ordering activities should place these orders on a firm-fixed-price basis to the maximum extent practicable. For time-and-materials and labor-hour orders, the contracting officer shall follow the procedures at 8.404(h). All orders under the BPA shall specify a price for the performance of the tasks identified in the statement of work. The ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable through appropriate analysis techniques, and documenting the file accordingly.

(d) *Duration of BPAs.* (1) Multiple-award BPAs generally should not exceed five years in length, but may do so to meet program requirements.

(2) A single-award BPA shall not exceed one year. It may have up to four one-year options. See paragraph (e) of this section for requirements associated with option exercise.

(3) Contractors may be awarded BPAs that extend beyond the current term of their GSA Schedule contract, so long as there are option periods in their GSA Schedule contract that, if exercised, will cover the BPA's period of performance.

(e) *Review of BPAs.* (1) The ordering activity contracting officer shall review the BPA and determine in writing, at least once a year (*e.g.,* at option exercise), whether—

(i) The schedule contract, upon which the BPA was established, is still in effect;

(ii) The BPA still represents the best value (see 8.404(d)); and

(iii) Estimated quantities/amounts have been exceeded and additional price reductions can be obtained.

(2) The determination shall be included in the BPA file documentation.

**8.405-4  Price reductions.**

Ordering activities may request a price reduction at any time before placing an order, establishing a BPA, or in conjunction with the annual BPA review. However, the ordering activity shall seek a price reduction when the order or BPA exceeds the simplified acquisition threshold. Schedule contractors are not required to pass on to all schedule users a price reduction extended only to an individual ordering activity for a specific order or BPA.

**8.405-5  Small business.**

(a) Although the preference programs of part 19 are not mandatory in this subpart, in accordance with section 1331 of Public Law 111-240 (15 U.S.C. 644(r))—

(1) Ordering activity contracting officers may, at their discretion—

(i) Set aside orders for any of the small business concerns identified in 19.000(a)(3); and

(ii) Set aside BPAs for any of the small business concerns identified in 19.000(a)(3).

(2) When setting aside orders and BPAs—

(i) Follow the ordering procedures for Federal Supply Schedules at 8.405-1, 8.405-2, and 8.405-3; and

(ii) The specific small business program eligibility requirements identified in part 19 apply.

(b) Orders placed against schedule contracts may be credited toward the ordering activity's small business goals. For purposes of reporting an order placed with a small business schedule contractor, an ordering agency may only take credit if the awardee meets a size standard that corresponds to the work performed. Ordering activities should rely on the small business representations made by schedule contractors at the contract level.

(c) Ordering activities may consider socio-economic status when identifying contractor(s) for consideration or competition for award of an order or BPA. At a minimum, ordering activities should consider, if available, at least one small business, veteran-owned small business, service disabled veteran-owned small business, HUBZone small business, women-owned small business, or small disadvantaged business schedule contractor(s). GSA Advantage! and Schedules e-Library at *http://www.gsa.gov/fas* contain information on the small business representations of Schedule contractors.

(d) For orders exceeding the micro-purchase threshold, ordering activities should give preference to the items of small business concerns when two or more items at the same delivered price will satisfy the requirement.

**8.405-6  Limiting sources.**

Orders placed or BPAs established under Federal Supply Schedules are exempt from the requirements in part 6. However, an ordering activity must justify its action when restricting consideration in accordance with paragraphs (a) or (b) of this section—

(a) *Orders or BPAs exceeding the micro-purchase threshold based on a limited sources justification.* (1) *Circumstances justifying limiting the source.* (i) For a proposed order or BPA with an estimated value exceeding the micro-purchase threshold not placed or established in accordance with the procedures in 8.405-1, 8.405-2, or 8.405-3, the only circumstances that may justify the action are—

(A) An urgent and compelling need exists, and following the procedures would result in unacceptable delays;

(B) Only one source is capable of providing the supplies or services required at the level of quality required because the supplies or services are unique or highly specialized; or

(C) In the interest of economy and efficiency, the new work is a logical follow-on to an original Federal Supply Schedule order provided that the original order was placed in accordance with the applicable Federal Supply Schedule ordering procedures. The original order or BPA must not have been previously issued under sole-source or limited-sources procedures.

(ii) See 8.405-6(c) for the content of the justification for an order or BPA exceeding the simplified acquisition threshold.

(2) *Posting.*(i) Within 14 days after placing an order or establishing a BPA exceeding the simplified acquisition threshold that is supported by a limited-sources justification permitted under any of the circumstances under paragraph (a)(1) of this section, the ordering activity shall—

(A) Publish a notice in accordance with 5.301; and

(B) Post the justification—

*(1)* At the GPE www.fedbizopps.gov;

*(2)* On the Web site of the ordering activity agency, which may provide access to the justification by linking to the GPE; and

*(3)* For a minimum of 30 days.

(ii) In the case of an order or BPA permitted under paragraph (a)(1)(i)(A) of this section, the justification shall be posted within 30 days after award.

(iii) Contracting officers shall carefully screen all justifications for contractor proprietary data and remove all such data, and such references and citations as are necessary to protect the proprietary data, before making the justifications available for public inspection. Contracting officers shall also be guided by the exemptions to disclosure of information contained in the Freedom of Information Act (5 U.S.C. 552) and the prohibitions against disclosure in 24.202 in determining whether other data should be removed. Although the submitter notice process set out in Executive Order 12600 "Predisclosure Notification Procedures for Confidential Commercial Information" does not apply, if the justification appears to contain proprietary data, the contracting officer should provide the contractor that submitted the information an opportunity to review the justification for proprietary data before making the justification available for public inspection, redacted as necessary. This process must not prevent or delay the posting of the justification in accordance with the timeframes required in paragraphs (a)(2)(i) and (ii) of this section.

(iv) This posting requirement does not apply when disclosure would compromise the national security (*e.g.*,

would result in disclosure of classified information) or create other security risks.

(b) *Items peculiar to one manufacturer.* An item peculiar to one manufacturer can be a particular brand name, product, or a feature of a product, peculiar to one manufacturer). A brand name item, whether available on one or more schedule contracts, is an item peculiar to one manufacturer.

(1) Brand name specifications shall not be used unless the particular brand name, product, or feature is essential to the Government's requirements, and market research indicates other companies' similar products, or products lacking the particular feature, do not meet, or cannot be modified to meet, the agency's needs.

(2) *Documentation.*(i) For proposed orders or BPAs with an estimated value exceeding the micro-purchase threshold, but not exceeding the simplified acquisition threshold, the ordering activity contracting officer shall document the basis for restricting consideration to an item peculiar to one manufacturer.

(ii) For proposed orders or BPAs with an estimated value exceeding the simplified acquisition threshold, see paragraph (c) of this section.

(iii) The documentation or justification must be completed and approved at the time the requirement for a brand-name item is determined. In addition, the justification for a brand-name item is required at the order level when a justification for the brand-name item was not completed for the BPA or does not adequately cover the requirements in the order.

(3) *Posting.*(i) The ordering activity shall post the following information along with the Request for Quotation (RFQ) to e-buy (http://www.ebuy.gsa.gov):

(A) For proposed orders or BPAs with an estimated value exceeding $25,000, but not exceeding the simplified acquisition threshold, the documentation required by paragraph (b)(2)(i) of this section.

(B) For proposed orders or BPAs with an estimated value exceeding the simplified acquisition threshold, the justification required by paragraph (c) of this section.

(C) The documentation in paragraph (b)(2)(i) and the justification in paragraph (c) of this subsection is subject to the screening requirement in paragraph (a)(2)(iii) of this section.

(ii) The posting requirement of paragraph (b)(3)(i) of this section does not apply when—

(A) Disclosure would compromise the national security (*e.g.*, would result in disclosure of classified information) or create other security risks. The fact that access to classified matter may be necessary to submit a proposal or perform the contract does not, in itself, justify use of this exception;

(B) The nature of the file (*e.g.*, size, format) does not make it cost-effective or practicable for contracting officers to provide access through e-Buy; or

(C) The agency's senior procurement executive makes a written determination that access through e-Buy is not in the Government's interest.

(4) When applicable, the documentation and posting requirements in paragraphs (b)(2) and (3) of this subsection apply only to the portion of the order or BPA that requires a brand-name item. If the justification and approval is to cover only the portion of the acquisition which is brand-name, then it should so state; the approval level requirements will then only apply to that portion.

(c) *An order or BPA with an estimated value exceeding the simplified acquisition threshold.*(1) For a proposed order or BPA exceeding the simplified acquisition threshold, the requiring activity shall assist the ordering activity contracting officer in the preparation of the justification. The justification shall cite that the acquisition is conducted under the authority of the Multiple-Award Schedule Program (see 8.401).

(2) At a minimum, each justification shall include the following information:

(i) Identification of the agency and the contracting activity, and specific identification of the document as a "Limited-Sources Justification."

(ii) Nature and/or description of the action being approved.

(iii) A description of the supplies or services required to meet the agency's needs (including the estimated value).

(iv) The authority and supporting rationale (see 8.405-6(a)(1)(i) and (b)(1)) and, if applicable, a demonstration of the proposed contractor's unique qualifications to provide the required supply or service.

(v) A determination by the ordering activity contracting officer that the order represents the best value consistent with 8.404(d).

(vi) A description of the market research conducted among schedule holders and the results or a statement of the reason market research was not conducted.

(vii) Any other facts supporting the justification.

(viii) A statement of the actions, if any, the agency may take to remove or overcome any barriers that led to the restricted consideration before any subsequent acquisition for the supplies or services is made.

(ix) The ordering activity contracting officer's certification that the justification is accurate and complete to the best of the contracting officer's knowledge and belief.

(x) Evidence that any supporting data that is the responsibility of technical or requirements personnel (*e.g.*, verifying the Government's minimum needs or requirements or other rationale for limited sources) and which form a basis for the justification have been certified as complete and accurate by the technical or requirements personnel.

(xi) For justifications under 8.405-6(a)(1), a written determination by the approving official identifying the circumstance that applies.

(d) *Justification approvals.*(1) For a proposed order or BPA with an estimated value exceeding the simplified acquisition threshold, but not exceeding $650,000, the ordering activity contracting officer's certification that the justification is accurate and complete to the best of the ordering activity contracting officer's knowledge and belief will serve as approval, unless a higher approval level is established in accordance with agency procedures.

(2) For a proposed order or BPA with an estimated value exceeding $650,000, but not exceeding $12.5 million, the justification must be approved by the advocate for competition of the activity placing the order, or by an official named in paragraph (d)(3) or (d)(4) of this section. This authority is not delegable.

(3) For a proposed order or BPA with an estimated value exceeding $12.5 million, but not exceeding $62.5 million (or, for DoD, NASA, and the Coast Guard, not exceeding $85.5 million), the justification must be approved by—

(i) The head of the procuring activity placing the order;

(ii) A designee who—

(A) If a member of the armed forces, is a general or flag officer;

(B) If a civilian, is serving in a position in a grade above GS-15 under the General Schedule (or in a comparable or higher position under another schedule); or

(iii) An official named in paragraph (d)(4) of this section.

(4) For a proposed order or BPA with an estimated value exceeding $62.5 million (or, for DoD, NASA, and the Coast Guard, over $85.5 million), the justification must be approved by the senior procurement executive of the agency placing the order. This authority is not delegable, except in the case of the Under Secretary of Defense for Acquisition, Technology, and Logistics, acting as the senior procurement executive for the Department of Defense.

**8.405-7 Payment.**

Agencies may make payments for oral or written orders by any authorized means, including the Governmentwide commercial purchase card (but see 32.1108(b)(2)).

**8.406 Ordering activity responsibilities.**

**8.406-1 Order placement.**

(a) Ordering activities may place orders orally, except for—

(1) Supplies and services not requiring a statement of work exceeding the simplified acquisition threshold;

(2) Services requiring a statement of work (SOW); and

(3) Orders containing brand-name specifications that exceed $25,000.

(b) Ordering activities may use Optional Form 347, an agency-prescribed form, or an established electronic communications format to order supplies or services from schedule contracts.

(c) The ordering activity shall place an order directly with the contractor in accordance with the terms and conditions of the pricelists (see 8.402(b)). Prior to placement of the order, the ordering activity shall ensure that the regulatory and statutory requirements of the requiring agency have been applied.

(d) Orders shall include the following information in addition to any information required by the schedule contract:

(1) Complete shipping and billing addresses.

(2) Contract number and date.

(3) Agency order number.

(4) F.o.b. delivery point; *i.e.*, origin or destination.

(5) Discount terms.

(6) Delivery time or period of performance.

(7) Special item number or national stock number.

(8) A statement of work for services, when required, or a brief, complete description of each item (when ordering by model number, features and options such as color, finish, and electrical characteristics, if available, must be specified).

(9) Quantity and any variation in quantity.

(10) Number of units.

(11) Unit price.

(12) Total price of order.

(13) Points of inspection and acceptance.

(14) Other pertinent data; *e.g.*, delivery instructions or receiving hours and size-of-truck limitation.

(15) Marking requirements.

(16) Level of preservation, packaging, and packing.

**8.406-2  Inspection and acceptance.**

(a) *Supplies*.(1) Consignees shall inspect supplies at destination except when—

(i) The schedule contract indicates that mandatory source inspection is required by the schedule contracting agency; or

(ii) A schedule item is covered by a product description, and the ordering activity determines that the schedule contracting agency's inspection assistance is needed (based on the ordering volume, the complexity of the supplies, or the past performance of the supplier).

(2) When the schedule contracting agency performs the inspection, the ordering activity will provide two copies of the order specifying source inspection to the schedule contracting agency. The schedule contracting agency will notify the ordering activity of acceptance or rejection of the supplies.

(3) Material inspected at source by the schedule contracting agency, and determined to conform with the product description of the schedule, shall not be reinspected for the same purpose. The consignee shall limit inspection to kind, count, and condition on receipt.

(4) Unless otherwise provided in the schedule contract, acceptance is conclusive, except as regards latent defects, fraud, or such gross mistakes as amount to fraud.

(b) *Services*. The ordering activity has the right to inspect all services in accordance with the contract requirements and as called for by the order. The ordering activity shall perform inspections and tests as specified in the order's quality assurance surveillance plan in a manner that will not unduly delay the work.

**8.406-3  Remedies for nonconformance.**

(a) If a contractor delivers a supply or service, but it does not conform to the order requirements, the ordering activity shall take appropriate action in accordance with the inspection and acceptance clause of the contract, as supplemented by the order.

(b) If the contractor fails to perform an order, or take appropriate corrective action, the ordering activity may terminate the order for cause or modify the order to establish a new delivery date (after obtaining consideration, as appropriate). Ordering activities shall follow the procedures at 8.406-4 when terminating an order for cause.

**8.406-4  Termination for cause.**

(a)(1) An ordering activity contracting officer may terminate individual orders for cause. Termination for cause shall comply with FAR 12.403, and may include charging the contractor with excess costs resulting from repurchase.

(2) The schedule contracting office shall be notified of all instances where an ordering activity contracting officer has terminated for cause an individual order to a Federal Supply Schedule contractor, or if fraud is suspected.

(b) If the contractor asserts that the failure was excusable, the ordering activity contracting officer shall follow the procedures at 8.406-6, as appropriate.

(c) If the contractor is charged excess costs, the following apply:

(1) Any repurchase shall be made at as low a price as reasonable, considering the quality required by the Government, delivery requirement, and administrative expenses. Copies of all repurchase orders, except the copy furnished to the contractor or any other commercial concern, shall include the notation:

Repurchase against the account of _____ [*insert contractor's name*] under Order _____ [*insert number*] under Contract _____ [*insert number*].

(2) When excess costs are anticipated, the ordering activity may withhold funds due the contractor as offset security. Ordering activities shall minimize excess costs to be charged against the contractor and collect or set-off any excess costs owed.

# FAC 2005–69  SEPTEMBER 3, 2013

(3) If an ordering activity is unable to collect excess repurchase costs, it shall notify the schedule contracting office after final payment to the contractor.

(i) The notice shall include the following information about the terminated order:

(A) Name and address of the contractor.

(B) Schedule, contract, and order number.

(C) National stock or special item number(s), and a brief description of the item(s).

(D) Cost of schedule items involved.

(E) Excess costs to be collected.

(F) Other pertinent data.

(ii) The notice shall also include the following information about the purchase contract:

(A) Name and address of the contractor.

(B) Item repurchase cost.

(C) Repurchase order number and date of payment.

(D) Contract number, if any.

(E) Other pertinent data.

(d) Only the schedule contracting officer may modify the contract to terminate for cause any, or all, supplies or services covered by the schedule contract. If the schedule contracting officer has terminated any supplies or services covered by the schedule contract, no further orders may be placed for those items. Orders placed prior to termination for cause shall be fulfilled by the contractor, unless terminated for the convenience of the Government by the ordering activity contracting officer.

(e) *Reporting*. An ordering activity contracting officer, in accordance with agency procedures, shall ensure that information related to termination for cause notices and any amendments are reported. In the event the termination for cause is subsequently converted to a termination for convenience, or is otherwise withdrawn, the contracting officer shall ensure that a notice of the conversion or withdrawal is reported. All reporting shall be in accordance with 42.1503(h).

## 8.406-5  Termination for the Government's convenience.

(a) An ordering activity contracting officer may terminate individual orders for the Government's convenience. Termi-

nations for the Government's convenience shall comply with FAR 12.403.

(b) Before terminating orders for the Government's convenience, the ordering activity contracting officer shall endeavor to enter into a "no cost" settlement agreement with the contractor.

(c) Only the schedule contracting officer may modify the schedule contract to terminate any, or all, supplies or services covered by the schedule contract for the Government's convenience.

## 8.406-6  Disputes.

(a) *Disputes pertaining to the performance of orders under a schedule contract.*(1) Under the Disputes clause of the schedule contract, the ordering activity contracting officer may—

(i) Issue final decisions on disputes arising from performance of the order (but see paragraph (b) of this section); or

(ii) Refer the dispute to the schedule contracting officer.

(2) The ordering activity contracting officer shall notify the schedule contracting officer promptly of any final decision.

(b) *Disputes pertaining to the terms and conditions of schedule contracts.* The ordering activity contracting officer shall refer all disputes that relate to the contract terms and conditions to the schedule contracting officer for resolution under the Disputes clause of the contract and notify the schedule contractor of the referral.

(c) *Appeals.* Contractors may appeal final decisions to either the Board of Contract Appeals servicing the agency that issued the final decision or the U.S. Court of Federal Claims.

(d) *Alternative dispute resolution.* The contracting officer should use the alternative dispute resolution (ADR) procedures, to the maximum extent practicable (see 33.204 and 33.214).

## 8.406-7  Contractor Performance Evaluation.

Ordering activities must prepare at least annually and at the time the work under the order is completed, an evaluation of contractor performance for each order that exceeds the simplified acquisition threshold in accordance with 42.1502(c).

# CGI ADDENDUM DOCUMENT NO. 8

# FAC 2005–73 MAY 29, 2014

**10.000 Scope of part.**

This part prescribes policies and procedures for conducting market research to arrive at the most suitable approach to acquiring, distributing, and supporting supplies and services. This part implements the requirements of 41 U.S.C. 3306(a)(1), 41 U.S.C. 3307, 10 U.S.C. 2377, and 6 U.S.C. 796.

**10.001 Policy.**

(a) Agencies must—

(1) Ensure that legitimate needs are identified and trade-offs evaluated to acquire items that meet those needs;

(2) Conduct market research appropriate to the circumstances—

(i) Before developing new requirements documents for an acquisition by that agency;

(ii) Before soliciting offers for acquisitions with an estimated value in excess of the simplified acquisition threshold;

(iii) Before soliciting offers for acquisitions with an estimated value less than the simplified acquisition threshold when adequate information is not available and the circumstances justify its cost;

(iv) Before soliciting offers for acquisitions that could lead to a bundled contract (15 U.S.C. 644(e)(2)(A));

(v) Before awarding a task or delivery order under an indefinite-delivery/indefinite-quantity (ID/IQ) contract (*e.g.*, GWACs, MACs) for a noncommercial item in excess of the simplified acquisition threshold (10 U.S.C. 2377(c)); and

(vi) On an ongoing basis, take advantage (to the maximum extent practicable) of commercially available market research methods in order to effectively identify the capabilities of small businesses and new entrants into Federal contracting that are available in the marketplace for meeting the requirements of the agency in furtherance of—

(A) A contingency operation or defense against or recovery from nuclear, biological, chemical, or radiological attack; and

(B) Disaster relief to include debris removal, distribution of supplies, reconstruction, and other disaster or emergency relief activities. (See 26.205).

(3) Use the results of market research to—

(i) Determine if sources capable of satisfying the agency's requirements exist;

(ii) Determine if commercial items or, to the extent commercial items suitable to meet the agency's needs are not available, nondevelopmental items are available that—

(A) Meet the agency's requirements;

(B) Could be modified to meet the agency's requirements; or

(C) Could meet the agency's requirements if those requirements were modified to a reasonable extent;

(iii) Determine the extent to which commercial items or nondevelopmental items could be incorporated at the component level;

(iv) Determine the practices of firms engaged in producing, distributing, and supporting commercial items, such as type of contract, terms for warranties, buyer financing, maintenance and packaging, and marking;

(v) Ensure maximum practicable use of recovered materials (see Subpart 23.4) and promote energy conservation and efficiency; and

(vi) Determine whether bundling is necessary and justified (see 7.107) (15 U.S.C. 644(e)(2)(A)).

(vii) Assess the availability of electronic and information technology that meets all or part of the applicable accessibility standards issued by the Architectural and Transportation Barriers Compliance Board at 36 CFR Part 1194 (see Subpart 39.2).

(b) When conducting market research, agencies should not request potential sources to submit more than the minimum information necessary.

(c) If an agency contemplates awarding a bundled contract, the agency—

(1) When performing market research, should consult with the local Small Business Administration procurement center representative (PCR). If a PCR is not assigned, see 19.402(a); and

(2) At least 30 days before release of the solicitation or 30 days prior to placing an order without a solicitation—

(i) Must notify any affected incumbent small business concerns of the Government's intention to bundle the requirement; and

(ii) Should notify any affected incumbent small business concerns of how the concerns may contact the appropriate Small Business Administration representative.

(d) See 10.003 for the requirement for a prime contractor to perform market research in contracts in excess of $5 million for the procurement of items other than commercial items in accordance with section 826 of Public Law 110-181.

**10.002 Procedures.**

(a) Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research.

(b) Market research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs.

(1) The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience. The contracting officer may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant. Market research involves obtaining

information specific to the item being acquired and should include—

(i) Whether the Government's needs can be met by—

(A) Items of a type customarily available in the commercial marketplace;

(B) Items of a type customarily available in the commercial marketplace with modifications; or

(C) Items used exclusively for governmental purposes;

(ii) Customary practices regarding customizing, modifying or tailoring of items to meet customer needs and associated costs;

(iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made;

(iv) The requirements of any laws and regulations unique to the item being acquired;

(v) The availability of items that contain recovered materials and items that are energy efficient;

(vi) The distribution and support capabilities of potential suppliers, including alternative arrangements and cost estimates; and

(vii) Size and status of potential sources (see Part 19).

(2) Techniques for conducting market research may include any or all of the following:

(i) Contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements.

(ii) Reviewing the results of recent market research undertaken to meet similar or identical requirements.

(iii) Publishing formal requests for information in appropriate technical or scientific journals or business publications.

(iv) Querying the Governmentwide database of contracts and other procurement instruments intended for use by multiple agencies available at *https://www.contractdirectory.gov/contractdirectory/* and other

Government and commercial databases that provide information relevant to agency acquisitions.

(v) Participating in interactive, on-line communication among industry, acquisition personnel, and customers.

(vi) Obtaining source lists of similar items from other contracting activities or agencies, trade associations or other sources.

(vii) Reviewing catalogs and other generally available product literature published by manufacturers, distributors, and dealers or available on-line.

(viii) Conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

(c) If market research indicates commercial or nondevelopmental items might not be available to satisfy agency needs, agencies shall reevaluate the need in accordance with 10.001(a)(3)(ii) and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs.

(d)(1) If market research establishes that the Government's need may be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at Subpart 2.1, the contracting officer shall solicit and award any resultant contract using the policies and procedures in Part 12.

(2) If market research establishes that the Government's need cannot be met by a type of item or service customarily available in the commercial marketplace, Part 12 shall not be used. When publication of the notice at 5.201 is required, the contracting officer shall include a notice to prospective offerors that the Government does not intend to use Part 12 for the acquisition.

(e) Agencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition.

**10.003 Contract clause.**

The contracting officer shall insert the clause at 52.210-1, Market Research, in solicitations and contracts over $5 million for the procurement of items other than commercial items.

# CGI ADDENDUM DOCUMENT NO. 9

**11.000  Scope of part.**

This part prescribes policies and procedures for describing agency needs.

**11.001  Definitions.**

As used in this part—

"Reconditioned" means restored to the original normal operating condition by readjustments and material replacement.

"Remanufactured" means factory rebuilt to original specifications.

**11.002  Policy.**

(a) In fulfilling requirements of 10 U.S.C. 2305(a)(1), 10 U.S.C. 2377, 41 U.S.C. 3306(a), and 41 U.S.C. 3307, agencies shall—

(1) Specify needs using market research in a manner designed to—

(i) Promote full and open competition (see Part 6), or maximum practicable competition when using simplified acquisition procedures, with due regard to the nature of the supplies or services to be acquired; and

(ii) Only include restrictive provisions or conditions to the extent necessary to satisfy the needs of the agency or as authorized by law.

(2) To the maximum extent practicable, ensure that acquisition officials—

(i) State requirements with respect to an acquisition of supplies or services in terms of—

(A) Functions to be performed;

(B) Performance required; or

(C) Essential physical characteristics;

(ii) Define requirements in terms that enable and encourage offerors to supply commercial items, or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items, in response to the agency solicitations;

(iii) Provide offerors of commercial items and nondevelopmental items an opportunity to compete in any acquisition to fill such requirements;

(iv) Require prime contractors and subcontractors at all tiers under the agency contracts to incorporate commercial items or nondevelopmental items as components of items supplied to the agency; and

(v) Modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items.

(b) The Metric Conversion Act of 1975, as amended by the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 205a, et seq.), designates the metric system of measurement as the preferred system of weights and measures for United States trade and commerce, and it requires that each agency use the metric system of measurement in its acquisitions, except to the extent that such use is impracticable or is likely to cause significant inefficiencies or loss of markets to United States firms. Requiring activities are responsible for establishing guidance implementing this policy in formulating their requirements for acquisitions.

(c) To the extent practicable and consistent with Subpart 9.5, potential offerors should be given an opportunity to comment on agency requirements or to recommend application and tailoring of requirements documents and alternative approaches. Requiring agencies should apply specifications, standards, and related documents initially for guidance only, making final decisions on the application and tailoring of these documents as a product of the design and development process. Requiring agencies should not dictate detailed design solutions prematurely (see 7.101 and 7.105(a)(8)).

(d)(1) When agencies acquire products and services, various statutes and executive orders (identified in part 23) require consideration of sustainable acquisition (see subpart 23.1) including—

(i) Energy-efficient and water-efficient services and products (including products containing energy-efficient standby power devices) (subpart 23.2);

(ii) Products and services that utilize renewable energy technologies (subpart 23.2);

(iii) Products containing recovered materials (subpart 23.4);

(iv) Biobased products (subpart 23.4);

(v) Environmentally preferable products and services, including EPEAT®-registered electronic products and non-toxic or low-toxic alternatives (subpart 23.7); and

(vi) Non-ozone depleting substances (subpart 23.8).

(2) Unless an exception applies and is documented by the requiring activity, Executive agencies shall, to the maximum practicable, require the use of products and services listed in paragraph (d)(1) of this section when—

(i) Developing, reviewing, or revising Federal and military specifications, product descriptions (including commercial item descriptions) and standards;

(ii) Describing Government requirements for products and services; and

(iii) Developing source-selection factors.

(e) Some or all of the performance levels or performance specifications in a solicitation may be identified as targets rather than as fixed or minimum requirements.

(f) In accordance with Section 508 of the Rehabilitation Act of 1973 (29 U.S.C. 794d), requiring activities must prepare requirements documents for electronic and information technology that comply with the applicable accessibility standards issued by the Architectural and Transportation Barriers Compliance Board at 36 CFR Part 1194 (see Subpart 39.2).

CGI Addendum - 094

(g) Unless the agency Chief Information Officer waives the requirement, when acquiring information technology using Internet Protocol, the requirements documents must include reference to the appropriate technical capabilities defined in the USGv6 Profile (NIST Special Publication 500-267) and the corresponding declarations of conformance defined in the USGv6 Test Program. The applicability of IPv6 to agency networks, infrastructure, and applications specific to individual acquisitions will be in accordance with the agency's Enterprise Architecture (see OMB Memorandum M-05-22 dated August 2, 2005).

(h) Agencies shall not include in a solicitation a requirement that prohibits an offeror from permitting its employees to telecommute unless the contracting officer executes a written determination in accordance with FAR 7.108(a).

## Subpart 11.1—Selecting and Developing Requirements Documents

### 11.101  Order of precedence for requirements documents.

(a) Agencies may select from existing requirements documents, modify or combine existing requirements documents, or create new requirements documents to meet agency needs, consistent with the following order of precedence:

(1) Documents mandated for use by law.

(2) Performance-oriented documents (*e.g.,* a PWS or SOO). (See 2.101.)

(3) Detailed design-oriented documents.

(4) Standards, specifications and related publications issued by the Government outside the Defense or Federal series for the non-repetitive acquisition of items.

(b) In accordance with OMB Circular A-119, "Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities," and Section 12(d) of the National Technology Transfer and Advancement Act of 1995, Pub. L. 104-113 (15 U.S.C. 272 note), agencies must use voluntary consensus standards, when they exist, in lieu of Government-unique standards, except where inconsistent with law or otherwise impractical. The private sector manages and administers voluntary consensus standards. Such standards are not mandated by law (*e.g.*, industry standards such as ISO 9000, and IEEE 1680).

### 11.102  Standardization program.

Agencies shall select existing requirements documents or develop new requirements documents that meet the needs of the agency in accordance with the guidance contained in the Federal Standardization Manual, FSPM-0001; for DoD components, DoD 4120.24-M, Defense Standardization Program Policies and Procedures; and for IT standards and guidance, the Federal Information Processing Standards Publications (FIPS PUBS). The Federal Standardization Manual may be obtained from the General Services Administration (see

address in 11.201(d)(1)). DoD 4120.24-M may be obtained from DoD (see 11.201(d)(2) or 11.201(d)(3)). FIPS PUBS may be obtained from the Government Printing Office (GPO), or the Department of Commerce's National Technical Information Service (NTIS) (see address in 11.201(d)(4)).

### 11.103  Market acceptance.

(a) 41 U.S.C. 3307(e) provides that, in accordance with agency procedures, the head of an agency may, under appropriate circumstances, require offerors to demonstrate that the items offered—

(1) Have either—

(i) Achieved commercial market acceptance; or

(ii) Been satisfactorily supplied to an agency under current or recent contracts for the same or similar requirements; and

(2) Otherwise meet the item description, specifications, or other criteria prescribed in the public notice and solicitation.

(b) Appropriate circumstances may, for example, include situations where the agency's minimum need is for an item that has a demonstrated reliability, performance or product support record in a specified environment. Use of market acceptance is inappropriate when new or evolving items may meet the agency's needs.

(c) In developing criteria for demonstrating that an item has achieved commercial market acceptance, the contracting officer shall ensure the criteria in the solicitation—

(1) Reflect the minimum need of the agency and are reasonably related to the demonstration of an item's acceptability to meet the agency's minimum need;

(2) Relate to an item's performance and intended use, not an offeror's capability;

(3) Are supported by market research;

(4) Include consideration of items supplied satisfactorily under recent or current Government contracts, for the same or similar items; and

(5) Consider the entire relevant commercial market, including small business concerns.

(d) Commercial market acceptance shall not be used as a sole criterion to evaluate whether an item meets the Government's requirements.

(e) When commercial market acceptance is used, the contracting officer shall document the file to—

(1) Describe the circumstances justifying the use of commercial market acceptance criteria; and

(2) Support the specific criteria being used.

### 11.104  Use of brand name or equal purchase descriptions.

(a) While the use of performance specifications is preferred to encourage offerors to propose innovative solutions, the use of brand name or equal purchase descriptions may be advantageous under certain circumstances.

# CGI ADDENDUM DOCUMENT NO. 10

# FAC 2005–73  MAY 29, 2014

**12.000  Scope of part.**

This part prescribes policies and procedures unique to the acquisition of commercial items. It implements the Federal Government's preference for the acquisition of commercial items contained in 41 U.S.C. 1906, 1907, and 3307 and 10 U.S.C. 2375-2377 by establishing acquisition policies more closely resembling those of the commercial marketplace and encouraging the acquisition of commercial items and components.

**12.001  Definition.**

"Subcontract," as used in this part, includes, but is not limited to, a transfer of commercial items between divisions, subsidiaries, or affiliates of a contractor or subcontractor.

## Subpart 12.1—Acquisition of Commercial Items—General

**12.101  Policy.**

Agencies shall—

(a) Conduct market research to determine whether commercial items or nondevelopmental items are available that could meet the agency's requirements;

(b) Acquire commercial items or nondevelopmental items when they are available to meet the needs of the agency; and

(c) Require prime contractors and subcontractors at all tiers to incorporate, to the maximum extent practicable, commercial items or nondevelopmental items as components of items supplied to the agency.

**12.102  Applicability.**

(a) This part shall be used for the acquisition of supplies or services that meet the definition of commercial items at 2.101.

(b) Contracting officers shall use the policies in this part in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in Part 13, Simplified Acquisition Procedures; Part 14, Sealed Bidding; or Part 15, Contracting by Negotiation, as appropriate for the particular acquisition.

(c) Contracts for the acquisition of commercial items are subject to the policies in other parts of the FAR. When a policy in another part of the FAR is inconsistent with a policy in this part, this part 12 shall take precedence for the acquisition of commercial items.

(d) The definition of commercial item in section 2.101 uses the phrase "purposes other than governmental purposes." These purposes are those that are not unique to a government.

(e) This part shall not apply to the acquisition of commercial items—

(1) At or below the micro-purchase threshold;

(2) Using the Standard Form 44 (see 13.306);

(3) Using the imprest fund (see 13.305);

(4) Using the Governmentwide commercial purchase card as a method of purchase rather than only as a method of payment; or

(5) Directly from another Federal agency.

(f)(1) Contracting officers may treat any acquisition of supplies or services that, as determined by the head of the agency, are to be used to facilitate defense against or recovery from nuclear, biological, chemical, or radiological attack, as an acquisition of commercial items.

(2) A contract in an amount greater than $17.5 million that is awarded on a sole source basis for an item or service treated as a commercial item under paragraph (f)(1) of this section but does not meet the definition of a commercial item as defined at FAR 2.101 shall not be exempt from—

(i) Cost accounting standards (see subpart 30.2); or

(ii) Certified cost or pricing data requirements (see 15.403).

(g)(1) In accordance with 41 U.S.C. 2310, the contracting officer also may use Part 12 for any acquisition for services that does not meet the definition of commercial item in FAR 2.101, if the contract or task order—

(i) Is entered into on or before November 24, 2013;

(ii) Has a value of $29.5 million or less;

(iii) Meets the definition of performance-based acquisition at FAR 2.101;

(iv) Uses a quality assurance surveillance plan;

(v) Includes performance incentives where appropriate;

(vi) Specifies a firm-fixed price for specific tasks to be performed or outcomes to be achieved; and

(vii) Is awarded to an entity that provides similar services to the general public under terms and conditions similar to those in the contract or task order.

(2) In exercising the authority specified in paragraph (g)(1) of this section, the contracting officer may tailor paragraph (a) of the clause at FAR 52.212-4 as may be necessary to ensure the contract's remedies adequately protect the Government's interests.

**12.103  Commercially available off-the-shelf (COTS) items.**

Commercially available off-the-shelf (COTS) items are defined in 2.101. Unless indicated otherwise, all of the policies that apply to commercial items also apply to COTS items. Section 12.505 lists the laws that are not applicable to COTS (in addition to 12.503 and 12.504); the components test of the Buy American statute, and the two recovered materials certifications in subpart 23.4, do not apply to COTS.

CGI Addendum - 096

This page intentionally left blank.

12.1-2

# Subpart 12.2—Special Requirements for the Acquisition of Commercial Items

## 12.201  General.

This subpart identifies special requirements for the acquisition of commercial items intended to more closely resemble those customarily used in the commercial marketplace, as well as other considerations necessary for proper planning, solicitation, evaluation, and award of contracts for commercial items.

## 12.202  Market research and description of agency need.

(a) Market research (see 10.001) is an essential element of building an effective strategy for the acquisition of commercial items and establishes the foundation for the agency description of need (see Part 11), the solicitation, and resulting contract.

(b) The description of agency need must contain sufficient detail for potential offerors of commercial items to know which commercial products or services may be suitable. Generally, for acquisitions in excess of the simplified acquisition threshold, an agency's statement of need for a commercial item will describe the type of product or service to be acquired and explain how the agency intends to use the product or service in terms of function to be performed, performance requirement or essential physical characteristics. Describing the agency's needs in these terms allows offerors to propose methods that will best meet the needs of the Government.

(c) Follow the procedures in Subpart 11.2 regarding the identification and availability of specifications, standards and commercial item descriptions.

(d) Requirements documents for electronic and information technology must comply with the applicable accessibility standards issued by the Architectural and Transportation Barriers Compliance Board at 36 CFR Part 1194 (see Subpart 39.2).

(e) When acquiring information technology using Internet Protocol, agencies must include the appropriate Internet Protocol compliance requirements in accordance with 11.002(g).

## 12.203  Procedures for solicitation, evaluation, and award.

Contracting officers shall use the policies unique to the acquisition of commercial items prescribed in this part in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in Part 13, Simplified Acquisition Procedures; Part 14, Sealed Bidding; or Part 15, Contracting by Negotiation, as appropriate for the particular acquisition. The contracting officer may use the streamlined procedure for soliciting offers for commercial items prescribed in 12.603. For acquisitions of commercial items exceeding the simplified acquisition threshold but not exceed-

ing $6.5 million ($12 million for acquisitions as described in 13.500(e)), including options, contracting activities shall employ the simplified procedures authorized by Subpart 13.5 to the maximum extent practicable.

## 12.204  Solicitation/contract form.

(a) The contracting officer shall use the Standard Form 1449, Solicitation/Contract/Order for Commercial Items, if (1) the acquisition is expected to exceed the simplified acquisition threshold; (2) a paper solicitation or contract is being issued; and (3) procedures at 12.603 are not being used. Use of the SF 1449 is nonmandatory but encouraged for commercial acquisitions not exceeding the simplified acquisition threshold.

(b) Consistent with the requirements at 5.203(a) and (h), the contracting officer may allow fewer than 15 days before issuance of the solicitation.

## 12.205  Offers.

(a) Where technical information is necessary for evaluation of offers, agencies should, as part of market research, review existing product literature generally available in the industry to determine its adequacy for purposes of evaluation. If adequate, contracting officers shall request existing product literature from offerors of commercial items in lieu of unique technical proposals.

(b) Contracting officers should allow offerors to propose more than one product that will meet a Government need in response to solicitations for commercial items. The contracting officer shall evaluate each product as a separate offer.

(c) Consistent with the requirements at 5.203(b), the contracting officer may allow fewer than 30 days response time for receipt of offers for commercial items, unless the acquisition is covered by the World Trade Organization Government Procurement Agreement or a Free Trade Agreement (see 5.203(h)).

## 12.206  Use of past performance.

Past performance should be an important element of every evaluation and contract award for commercial items. Contracting officers should consider past performance data from a wide variety of sources both inside and outside the Federal Government in accordance with the policies and procedures contained in Subpart 9.1, 13.106, or Subpart 15.3, as applicable.

## 12.207  Contract type.

(a) Except as provided in paragraph (b) of this section, agencies shall use firm-fixed-price contracts or fixed-price contracts with economic price adjustment for the acquisition of commercial items.

CGI Addendum - 098

(b) (1) A time-and-materials contract or labor-hour contract (see Subpart 16.6) may be used for the acquisition of commercial services when—

(i) The service is acquired under a contract awarded using—

(A) Competitive procedures (*e.g.*, the procedures in 6.102, the set-aside procedures in Subpart 19.5, or competition conducted in accordance with Part 13);

(B) The procedures for other than full and open competition in 6.3 provided the agency receives offers that satisfy the Government's expressed requirement from two or more responsible offerors; or

(C) The fair opportunity procedures in 16.505 (including discretionary small business set-asides under 16.505(b)(2)(i)(F)), if placing an order under a multiple-award delivery-order contract; and

(ii) The contracting officer—

(A) Executes a determination and findings (D&F) for the contract, in accordance with paragraph (b)(2) of this section (but see paragraph (c) of this section for indefinite-delivery contracts), that no other contract type authorized by this subpart is suitable;

(B) Includes a ceiling price in the contract or order that the contractor exceeds at its own risk; and

(C) Prior to increasing the ceiling price of a time-and-materials or labor-hour contract or order, shall—

(*1*) Conduct an analysis of pricing and other relevant factors to determine if the action is in the best interest of the Government;

(*2*) Document the decision in the contract or order file; and

(*3*) When making a change that modifies the general scope of—

(*i*) A contract, follow the procedures at 6.303;

(*ii*) An order issued under the Federal Supply Schedules, follow the procedures at 8.405-6; or

(*iii*) An order issued under multiple award task and delivery order contracts, follow the procedures at 16.505(b)(2).

(2) Each D&F required by paragraph (b)(1)(ii)(A) of this section shall contain sufficient facts and rationale to justify that no other contract type authorized by this subpart is suitable. At a minimum, the D&F shall—

(i) Include a description of the market research conducted (see 10.002(e));

(ii) Establish that it is not possible at the time of placing the contract or order to accurately estimate the extent or duration of the work or to anticipate costs with any reasonable degree of confidence;

(iii) Establish that the requirement has been structured to maximize the use of firm-fixed-price or fixed-price with economic price adjustment contracts (*e.g.*, by limiting the value or length of the time-and-material/labor-hour contract or order; establishing fixed prices for portions of the requirement) on future acquisitions for the same or similar requirements; and

(iv) Describe actions planned to maximize the use of firm-fixed-price or fixed-price with economic price adjustment contracts on future acquisitions for the same requirements.

(3) See 16.601(d)(1) for additional approval required for contracts expected to extend beyond three years.

(4) See 8.404(h) for the requirement for determination and findings when using Federal Supply Schedules.

(c)(1) Indefinite-delivery contracts (see Subpart 16.5) may be used when—

(i) The prices are established based on a firm-fixed-price or fixed-price with economic price adjustment; or

(ii) Rates are established for commercial services acquired on a time-and-materials or labor-hour basis.

(2) When an indefinite-delivery contract is awarded with services priced on a time-and-materials or labor-hour basis, contracting officers shall, to the maximum extent practicable, also structure the contract to allow issuance of orders on a firm-fixed-price or fixed-price with economic price adjustment basis. For such contracts, the contracting officer shall execute the D&F required by paragraph (b)(2) of this section, for each order placed on a time-and-materials or labor-hour basis. Placement of orders shall be in accordance with Subpart 8.4 or 16.5, as applicable.

(3) If an indefinite-delivery contract only allows for the issuance of orders on a time-and-materials or labor-hour basis, the D&F required by paragraph (b)(2) of this section shall be executed to support the basic contract and shall also explain why providing for an alternative firm-fixed-price or fixed-price with economic price adjustment pricing structure is not practicable. The D&F for this contract shall be approved one level above the contracting officer. Placement of orders shall be in accordance with Subpart 16.5.

(d) The contract types authorized by this subpart may be used in conjunction with an award fee and performance or delivery incentives when the award fee or incentive is based solely on factors other than cost (see 16.202-1 and 16.203-1).

(e) Use of any contract type other than those authorized by this subpart to acquire commercial items is prohibited.

## 12.208  Contract quality assurance.

Contracts for commercial items shall rely on contractors' existing quality assurance systems as a substitute for Government inspection and testing before tender for acceptance unless customary market practices for the commercial item being acquired include in-process inspection. Any in-process inspection by the Government shall be conducted in a manner consistent with commercial practice.

**12.209  Determination of price reasonableness.**

While the contracting officer must establish price reasonableness in accordance with 13.106-3, 14.408-2, or Subpart 15.4, as applicable, the contracting officer should be aware of customary commercial terms and conditions when pricing commercial items. Commercial item prices are affected by factors that include, but are not limited to, speed of delivery, length and extent of warranty, limitations of seller's liability, quantities ordered, length of the performance period, and specific performance requirements. The contracting officer must ensure that contract terms, conditions, and prices are commensurate with the Government's need.

**12.210  Contract financing.**

Customary market practice for some commercial items may include buyer contract financing. The contracting officer may offer Government financing in accordance with the policies and procedures in Part 32.

**12.211  Technical data.**

Except as provided by agency-specific statutes, the Government shall acquire only the technical data and the rights in that data customarily provided to the public with a commercial item or process. The contracting officer shall presume that data delivered under a contract for commercial items was developed exclusively at private expense. When a contract for commercial items requires the delivery of technical data, the contracting officer shall include appropriate provisions and clauses delineating the rights in the technical data in addenda to the solicitation and contract (see Part 27 or agency FAR supplements).

**12.212  Computer software.**

(a) Commercial computer software or commercial computer software documentation shall be acquired under licenses customarily provided to the public to the extent such licenses are consistent with Federal law and otherwise satisfy the Government's needs. Generally, offerors and contractors shall not be required to—

(1) Furnish technical information related to commercial computer software or commercial computer software documentation that is not customarily provided to the public; or

(2) Relinquish to, or otherwise provide, the Government rights to use, modify, reproduce, release, perform, display, or disclose commercial computer software or commercial computer software documentation except as mutually agreed to by the parties.

(b) With regard to commercial computer software and commercial computer software documentation, the Government shall have only those rights specified in the license contained in any addendum to the contract. For additional guidance regarding the use and negotiation of license agreements for commercial computer software, see 27.405-3.

**12.213  Other commercial practices.**

It is a common practice in the commercial marketplace for both the buyer and seller to propose terms and conditions written from their particular perspectives. The terms and conditions prescribed in this part seek to balance the interests of both the buyer and seller. These terms and conditions are generally appropriate for use in a wide range of acquisitions. However, market research may indicate other commercial practices that are appropriate for the acquisition of the particular item. These practices should be considered for incorporation into the solicitation and contract if the contracting officer determines them appropriate in concluding a business arrangement satisfactory to both parties and not otherwise precluded by law or Executive order.

**12.214  Cost Accounting Standards.**

Cost Accounting Standards (CAS) do not apply to contracts and subcontracts for the acquisition of commercial items when these contracts and subcontracts are firm-fixed-price or fixed-price with economic price adjustment (provided that the price adjustment is not based on actual costs incurred). See 30.201-1 for CAS applicability to fixed-price with economic price adjustment contracts and subcontracts for commercial items when the price adjustment is based on actual costs incurred. When CAS applies, the contracting officer shall insert the appropriate provisions and clauses as prescribed in 30.201.

**12.215  Notification of overpayment.**

If the contractor notifies the contracting officer of a duplicate payment or that the Government has otherwise overpaid, the contracting officer shall follow the procedures at 32.604.

**12.216  Unenforceability of unauthorized obligations.**

Many supplies or services are acquired subject to supplier license agreements. These are particularly common in information technology acquisitions, but they may apply to any supply or service. For example, computer software and services delivered through the internet (web services) are often subject to license agreements, referred to as End User License Agreements (EULA), Terms of Service (TOS), or other similar legal instruments or agreements. Many of these agreements contain indemnification clauses that are inconsistent with Federal law and unenforceable, but which could create a violation of the Anti-Deficiency Act (31 U.S.C. 1341) if agreed to by the Government. Paragraph (u) of the clause at 52.212-4 prevents any such violations.

This page intentionally left blank.

12.2-4

## Subpart 12.3—Solicitation Provisions and Contract Clauses for the Acquisition of Commercial Items

**12.300  Scope of subpart.**

This subpart establishes provisions and clauses to be used when acquiring commercial items.

**12.301  Solicitation provisions and contract clauses for the acquisition of commercial items.**

(a) In accordance with 41 U.S.C. 3307, contracts for the acquisition of commercial items shall, to the maximum extent practicable, include only those clauses—

(1) Required to implement provisions of law or executive orders applicable to the acquisition of commercial items; or

(2) Determined to be consistent with customary commercial practice.

(b) Insert the following provisions in solicitations for the acquisition of commercial items, and clauses in solicitations and contracts for the acquisition of commercial items:

(1) *The provision at 52.212-1, Instructions to Offerors—Commercial Items.* This provision provides a single, streamlined set of instructions to be used when soliciting offers for commercial items and is incorporated in the solicitation by reference (see Block 27a, SF 1449). The contracting officer may tailor these instructions or provide additional instructions tailored to the specific acquisition in accordance with 12.302.

(2) *The provision at 52.212-3, Offeror Representations and Certifications—Commercial Items.* This provision provides a single, consolidated list of representations and certifications for the acquisition of commercial items and is attached to the solicitation for offerors to complete. This provision may not be tailored except in accordance with subpart 1.4. Use the provision with its Alternate I in solicitations issued by DoD, NASA, or the Coast Guard.

(3) *The clause at 52.212-4, Contract Terms and Conditions—Commercial Items.* This clause includes terms and conditions which are, to the maximum extent practicable, consistent with customary commercial practices and is incorporated in the solicitation and contract by reference (see Block 27, SF 1449). Use this clause with its Alternate I when a time-and-materials or labor-hour contract will be awarded. The contracting officer may tailor this clause in accordance with 12.302.

(4) *The clause at 52.212-5, Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items.* This clause incorporates by reference only those clauses required to implement provisions of law or Executive orders applicable to the acquisition of commercial items. The contracting officer shall attach this clause to the solicitation and contract and, using the appropriate clause prescriptions, indicate which, if any, of the additional clauses cited in 52.212-5(b) or (c) are applicable to the specific acquisition. Some of the clauses require fill-in; the fill-in language should be inserted as directed by 52.104(d). When cost information is obtained pursuant to Part 15 to establish the reasonableness of prices for commercial items, the contracting officer shall insert the clauses prescribed for this purpose in an addendum to the solicitation and contract. This clause may not be tailored.

(i) Use the clause with its Alternate I when the head of the agency has waived the examination of records by the Comptroller General in accordance with 25.1001.

(ii)(A) If the acquisition will use funds appropriated or otherwise made available by the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), the contracting officer shall use the clause with its Alternate II.

(B) *(1)* In the case of a bilateral contract modification that will use funds appropriated or otherwise made available by the American Recovery and Reinvestment Act of 2009, the contracting officer shall specify applicability of Alternate II to that modification.

*(2)* In the case of a task- or delivery-order contract in which not all orders will use funds appropriated or otherwise made available by the American Recovery and Reinvestment Act of 2009, the contracting officer shall specify the task or delivery orders to which Alternate II applies.

(C) The contracting officer may not use Alternate I when Alternate II applies.

(c) When the use of evaluation factors is appropriate, the contracting officer may—

(1) Insert the provision at 52.212-2, Evaluation—Commercial Items, in solicitations for commercial items (see 12.602); or

(2) Include a similar provision containing all evaluation factors required by 13.106, subpart 14.2 or subpart 15.3, as an addendum (see 12.302(d)).

(d) *Other required provisions and clauses.* (1)   Notwithstanding prescriptions contained elsewhere in the FAR, when acquiring commercial items, contracting officers shall be required to use only those provisions and clauses prescribed in this part.  The provisions and clauses prescribed in this part shall be revised, as necessary, to reflect the applicability of statutes and executive orders to the acquisition of commercial items.

(2) Insert the clause at 52.225-19, Contractor Personnel in a Designated Operational Area or Supporting a Diplomatic or Consular Mission outside the United States, as prescribed in 25.301-4.

(3)  Insert the provision at 52.209-7, Information Regarding Responsibility Matters, as prescribed in 9.104-7(b).

(4) Insert the clause at 52.232-40, Providing Accelerated Payments to Small Business Subcontractors, as prescribed in 32.009-2.

(e) *Discretionary use of FAR provisions and clauses.* The contracting officer may include in solicitations and contracts by addendum other FAR provisions and clauses when their use is consistent with the limitations contained in 12.302. For example:

(1) The contracting officer may include appropriate clauses when an indefinite-delivery type of contract will be used. The clauses prescribed at 16.506 may be used for this purpose.

(2) The contracting officer may include appropriate provisions and clauses when the use of options is in the Government's interest. The provisions and clauses prescribed in 17.208 may be used for this purpose. If the provision at 52.212-2 is used, paragraph (b) provides for the evaluation of options.

(3) The contracting officer may use the provisions and clauses contained in Part 23 regarding the use of products containing recovered materials and biobased products when appropriate for the item being acquired.

(4) When setting aside under the Stafford Act (subpart 26.2), include the provision at 52.226-3, Disaster or Emergency Area Representation, in the solicitation. The representation in this provision is not in the System for Award Management database.

(f) Agencies may supplement the provisions and clauses prescribed in this part (to require use of additional provisions and clauses) only as necessary to reflect agency unique statutes applicable to the acquisition of commercial items or as may be approved by the agency senior procurement executive, or the individual responsible for representing the agency on the FAR Council, without power of delegation.

**12.302  Tailoring of provisions and clauses for the acquisition of commercial items.**

(a) *General.* The provisions and clauses established in this subpart are intended to address, to the maximum extent practicable, commercial market practices for a wide range of potential Government acquisitions of commercial items. However, because of the broad range of commercial items acquired by the Government, variations in commercial practices, and the relative volume of the Government's acquisitions in the specific market, contracting officers may, within the limitations of this subpart, and after conducting appropriate market research, tailor the provision at 52.212-1, Instructions to Offerors—Commercial Items, and the clause at 52.212-4, Contract Terms and Conditions—Commercial Items, to adapt to the market conditions for each acquisition.

(b) *Tailoring 52.212-4, Contract Terms and Conditions—Commercial Items.* The following paragraphs of the clause at 52.212-4, Contract Terms and Conditions—Commercial

Items, implement statutory requirements and shall not be tailored—

(1) Assignments;

(2) Disputes;

(3) Payment (except as provided in subpart 32.11);

(4) Invoice;

(5) Other compliances;

(6) Compliance with laws unique to Government contracts; and

(7) Unauthorized obligations.

(c) *Tailoring inconsistent with customary commercial practice.* The contracting officer shall not tailor any clause or otherwise include any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice for the item being acquired unless a waiver is approved in accordance with agency procedures. The request for waiver must describe the customary commercial practice found in the marketplace, support the need to include a term or condition that is inconsistent with that practice and include a determination that use of the customary commercial practice is inconsistent with the needs of the Government. A waiver may be requested for an individual or class of contracts for that specific item.

(d) Tailoring shall be by addenda to the solicitation and contract. The contracting officer shall indicate in Block 27a of the SF 1449 if addenda are attached. These addenda may include, for example, a continuation of the schedule of supplies/services to be acquired from blocks 18 through 21 of the SF 1449; a continuation of the description of the supplies/services being acquired; further elaboration of any other item(s) on the SF 1449; any other terms or conditions necessary for the performance of the proposed contract (such as options, ordering procedures for indefinite-delivery type contracts, warranties, contract financing arrangements, etc.).

**12.303  Contract format.**

Solicitations and contracts for the acquisition of commercial items prepared using this Part 12 shall be assembled, to the maximum extent practicable, using the following format:

(a) Standard Form (SF) 1449;

(b) Continuation of any block from SF 1449, such as—

(1) Block 10 if an incentive subcontracting clause is used (the contracting officer shall indicate the applicable percentage);

(2) Block 18B for remittance address;

(3) Block 19 for contract line item numbers;

(4) Block 20 for schedule of supplies/services; or

(5) Block 25 for accounting data;

(c) Contract clauses—

(1) 52.212-4, Contract Terms and Conditions—Commercial Items, by reference (see SF 1449 block 27a);

(2) Any addendum to 52.212-4; and

(3) 52.212-5, Contract Terms and Conditions Required to Implement Statutes and Executive orders;

(d) Any contract documents, exhibits or attachments; and

(e) Solicitation provisions—

(1) 52.212-1, Instructions to Offerors—Commercial Items, by reference (see SF 1449, Block 27a);

(2) Any addendum to 52.212-1;

(3) 52.212-2, Evaluation—Commercial Items, or other description of evaluation factors for award, if used; and

(4) 52.212-3, Offeror Representations and Certifications—Commercial Items.

CGI Addendum - 104

This page intentionally left blank.

12.3-4

## Subpart 12.4—Unique Requirements Regarding Terms and Conditions for Commercial Items

**12.401 General.**

This subpart provides—

(a) Guidance regarding tailoring of the paragraphs in the clause at 52.212-4, Contract Terms and Conditions—Commercial Items, when the paragraphs do not reflect the customary practice for a particular market; and

(b) Guidance on the administration of contracts for commercial items in those areas where the terms and conditions in 52.212-4 differ substantially from those contained elsewhere in the FAR.

**12.402 Acceptance.**

(a) The acceptance paragraph in 52.212-4 is based upon the assumption that the Government will rely on the contractor's assurances that the commercial item tendered for acceptance conforms to the contract requirements. The Government inspection of commercial items will not prejudice its other rights under the acceptance paragraph. Additionally, although the paragraph does not address the issue of rejection, the Government always has the right to refuse acceptance of nonconforming items. This paragraph is generally appropriate when the Government is acquiring noncomplex commercial items.

(b) Other acceptance procedures may be more appropriate for the acquisition of complex commercial items or commercial items used in critical applications. In such cases, the contracting officer shall include alternative inspection procedure(s) in an addendum and ensure these procedures and the postaward remedies adequately protect the interests of the Government. The contracting officer must carefully examine the terms and conditions of any express warranty with regard to the effect it may have on the Government's available postaward remedies (see 12.404).

(c) The acquisition of commercial items under other circumstances such as on an "as is" basis may also require acceptance procedures different from those contained in 52.212-4. The contracting officer should consider the effect the specific circumstances will have on the acceptance paragraph as well as other paragraphs of the clause.

**12.403 Termination.**

(a) *General*. The clause at 52.212-4 permits the Government to terminate a contract for commercial items either for the convenience of the Government or for cause. However, the paragraphs in 52.212-4 entitled "Termination for the Government's Convenience" and "Termination for Cause" contain concepts which differ from those contained in the termination clauses prescribed in Part 49. Consequently, the requirements of Part 49 do not apply when terminating contracts for commercial items and contracting officers shall follow the procedures in this section. Contracting officers may continue to use Part 49 as guidance to the extent that Part 49 does not conflict with this section and the language of the termination paragraphs in 52.212-4.

(b) *Policy*. The contracting officer should exercise the Government's right to terminate a contract for commercial items either for convenience or for cause only when such a termination would be in the best interests of the Government. The contracting officer should consult with counsel prior to terminating for cause.

(c) *Termination for cause*. (1) The paragraph in 52.212-4 entitled "Excusable Delay" requires contractors notify the contracting officer as soon as possible after commencement of any excusable delay. In most situations, this requirement should eliminate the need for a show cause notice prior to terminating a contract. The contracting officer shall send a cure notice prior to terminating a contract for a reason other than late delivery.

(2) The Government's rights after a termination for cause shall include all the remedies available to any buyer in the marketplace. The Government's preferred remedy will be to acquire similar items from another contractor and to charge the defaulted contractor with any excess reprocurement costs together with any incidental or consequential damages incurred because of the termination.

(3) When a termination for cause is appropriate, the contracting officer shall send the contractor a written notification regarding the termination. At a minimum, this notification shall—

(i) Indicate the contract is terminated for cause;

(ii) Specify the reasons for the termination;

(iii) Indicate which remedies the Government intends to seek or provide a date by which the Government will inform the contractor of the remedy; and

(iv) State that the notice constitutes a final decision of the contracting officer and that the contractor has the right to appeal under the Disputes clause (see 33.211).

(4) The contracting officer, in accordance with agency procedures, shall ensure that information related to termination for cause notices and any amendments are reported. In the event the termination for cause is subsequently converted to a termination for convenience, or is otherwise withdrawn, the contracting officer shall ensure that a notice of the conversion or withdrawal is reported. All reporting shall be in accordance with 42.1503(h).

(d) *Termination for the Government's convenience.* (1) When the contracting officer terminates a contract for commercial items for the Government's convenience, the contractor shall be paid—

(i) (A) The percentage of the contract price reflecting the percentage of the work performed prior to the notice of the termination for fixed-price or fixed-price with economic price adjustment contracts; or

**FAC 2005–73  MAY 29, 2014**

(B) An amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the Schedule; and

(ii) Any charges the contractor can demonstrate directly resulted from the termination. The contractor may demonstrate such charges using its standard record keeping system and is not required to comply with the cost accounting standards or the contract cost principles in Part 31. The Government does not have any right to audit the contractor's records solely because of the termination for convenience.

(2) Generally, the parties should mutually agree upon the requirements of the termination proposal. The parties must balance the Government's need to obtain sufficient documentation to support payment to the contractor against the goal of having a simple and expeditious settlement.

**12.404  Warranties.**

(a) *Implied warranties*. The Government's post award rights contained in 52.212-4 are the implied warranty of merchantability, the implied warranty of fitness for particular purpose and the remedies contained in the acceptance paragraph.

(1) The implied warranty of merchantability provides that an item is reasonably fit for the ordinary purposes for which such items are used. The items must be of at least average, fair or medium-grade quality and must be comparable in quality to those that will pass without objection in the trade or market for items of the same description.

(2) The implied warranty of fitness for a particular purpose provides that an item is fit for use for the particular purpose for which the Government will use the items. The Government can rely upon an implied warranty of fitness for particular purpose when—

(i) The seller knows the particular purpose for which the Government intends to use the item; and

(ii) The Government relied upon the contractor's skill and judgment that the item would be appropriate for that particular purpose.

(3) Contracting officers should consult with legal counsel prior to asserting any claim for a breach of an implied warranty.

(b) *Express warranties*. 41 U.S.C. 3307(e)(5)(B) requires contracting officers to take advantage of commercial warranties. To the maximum extent practicable, solicitations for commercial items shall require offerors to offer the Government at least the same warranty terms, including offers of extended warranties, offered to the general public in customary commercial practice. Solicitations may specify minimum warranty terms, such as minimum duration, appropriate for the Government's intended use of the item.

(1) Any express warranty the Government intends to rely upon must meet the needs of the Government. The contracting officer should analyze any commercial warranty to determine if—

(i) The warranty is adequate to protect the needs of the Government, *e.g.,* items covered by the warranty and length of warranty;

(ii) The terms allow the Government effective post-award administration of the warranty to include the identification of warranted items, procedures for the return of warranted items to the contractor for repair or replacement, and collection of product performance information; and

(iii) The warranty is cost-effective.

(2) In some markets, it may be customary commercial practice for contractors to exclude or limit the implied warranties contained in 52.212-4 in the provisions of an express warranty. In such cases, the contracting officer shall ensure that the express warranty provides for the repair or replacement of defective items discovered within a reasonable period of time after acceptance.

(3) Express warranties shall be included in the contract by addendum (see 12.302).

Case: 14-5143   Document: 16   Page: 167   Filed: 10/20/2014   (167 of 176)

Subpart 12.5—Applicability of Certain Laws to the Acquisition of Commercial Items and
Commercially Available Off-The-Shelf Items                                              12.504

## Subpart 12.5—Applicability of Certain Laws to the Acquisition of Commercial Items and Commercially Available Off-The-Shelf Items

### 12.500  Scope of subpart.

(a) As required by 41 U.S.C. 1906 and 1907, this subpart lists provisions of law that are not applicable to—

(1) Contracts for the acquisition of commercial items;

(2) Subcontracts, at any tier, for the acquisition of commercial items; and

(3) Contracts and subcontracts, at any tier, for the acquisition of COTS items.

(b) This subpart also lists provisions of law that have been amended to eliminate or modify their applicability to either contracts or subcontracts for the acquisition of commercial items.

### 12.501  Applicability.

(a) This subpart applies to any contract or subcontract at any tier for the acquisition of commercial items.

(b) Nothing in this subpart shall be construed to authorize the waiver of any provision of law with respect to any subcontract if the prime contractor is reselling or distributing commercial items of another contractor without adding value. This limitation is intended to preclude establishment of unusual contractual arrangements solely for the purpose of Government sales.

(c) For purposes of this subpart, contractors awarded subcontracts under subpart 19.8, Contracting with the Small Business Administration (the 8(a) Program), shall be considered prime contractors.

### 12.502  Procedures.

(a) The FAR prescription for the provision or clause for each of the laws listed in 12.503 has been revised in the appropriate part to reflect its proper application to prime contracts for the acquisition of commercial items.

(b) For subcontracts for the acquisition of commercial items or commercial components, the clauses at 52.212-5, Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items, and 52.244-6, Subcontracts for Commercial Items, reflect the applicability of the laws listed in 12.504 by identifying the only provisions and clauses that are required to be included in a subcontract at any tier for the acquisition of commercial items or commercial components.

(c) The FAR prescription for the provision or clause for each of the laws listed in 12.505 has been revised in the appropriate part to reflect its proper application to contracts and subcontracts for the acquisition of COTS items.

### 12.503  Applicability of certain laws to Executive agency contracts for the acquisition of commercial items.

(a) The following laws are not applicable to Executive agency contracts for the acquisition of commercial items:

(1) 41 U.S.C. chapter 65, Contracts for Materials, Supplies, Articles, and Equipment Exceeding $15,000 (see subpart 22.6).

(2) 41 U.S.C. 3901(b) and 10 U.S.C. 2306(b), Contingent Fees (see 3.404).

(3) 41 U.S.C. 1708(e)(3), Minimum Response Time for Offers (see 5.203).

(4) 41 U.S.C. chapter 81, Drug-Free Workplace (see 23.501).

(5) 31 U.S.C. 1354(a), Limitation on use of appropriated funds for contracts with entities not meeting veterans' employment reporting requirements (see 22.1302).

(6) [Reserved]

(7) Section 806(a)(3) of Pub. L. 102-190, as amended by Sections 2091 and 8105 of Pub. L. 103-355, (10 U.S.C. 2302 note), Payment Protections for Subcontractors and Suppliers (see 28.106-6).

(8) 41 U.S.C. 4706(d)(1) and 10 U.S.C. 2313(c)(1), GAO Access to Contractor Employees, Section 871 of Pub. L. 110-417 (see 52.214-26 and 52.215-2).

(9) 41 U.S.C. 2303, Policy on Personal Conflicts of Interest by Contractor Employees (see subpart 3.11).

(b) Certain requirements of the following laws are not applicable to executive agency contracts for the acquisition of commercial items:

(1) 40 U.S.C. chapter 37, Requirement for a certificate and clause under the Contract Work Hours and Safety Standards statute (see 22.305).

(2) 41 U.S.C. 8703 and 8703, Requirement for a clause and certain other requirements related to kickbacks (see 3.602).

(3) 49 U.S.C. 40118, Requirement for a clause under the Fly American provisions (see 47.405).

(c) The applicability of the following laws have been modified in regards to Executive agency contracts for the acquisition of commercial items:

(1) 41 U.S.C. 4704 and 10 U.S.C. 2402, Prohibition on Limiting Subcontractor Direct Sales to the United States (see 3.603).

(2) 41 U.S.C. chapter 35, Truthful Cost or Pricing Data, and 10 U.S.C. 2306a, Truth in Negotiations Act (see 15.403).

(3) 41 U.S.C. chapter 15, Cost Accounting Standards (48 CFR Chapter 99) (see 12.214).

### 12.504  Applicability of certain laws to subcontracts for the acquisition of commercial items.

(a) The following laws are not applicable to subcontracts at any tier for the acquisition of commercial items or commercial components at any tier:

# FAC 2005–77  OCTOBER 14, 2014

(1) 10 U.S.C. 2631, Transportation of Supplies by Sea (except for the types of subcontracts listed at 47.504(d)).

(2) 15 U.S.C. 644(d), Requirements relative to labor surplus areas under the Small Business Act (see subpart 19.2).

(3) [Reserved]

(4) 41 U.S.C. 6505, Contracts for Materials, Supplies, Articles, and Equipment Exceeding $15,000 (see subpart 22.6).

(5) 41 U.S.C. 4703, Validation of Proprietary Data restrictions (see subpart 27.4).

(6) 41 U.S.C. 3901(b) and 10 U.S.C. 2306(b), Contingent Fees (see subpart 3.4).

(7) 41 U.S.C. 4706(d) and 10 U.S.C. 2313(c), Examination of Records of Contractor, when a subcontractor is not required to provide certified cost or pricing data (see15.209(b)), unless using funds appropriated or otherwise made available by the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5).

(8) 41 U.S.C. 1708(e)(3), Minimum Response Time for Offers (see subpart 5.2).

(9) 41 U.S.C. 2302, Rights in Technical Data (see subpart 27.4).

(10) 41 U.S.C. chapter 81, Drug-Free Workplace Act (see subpart 23.5).

(11) 46 U.S.C. App. 1241(b), Transportation in American Vessels of Government Personnel and Certain Cargo (see subpart 47.5) (except for the types of subcontracts listed at 47.504(d)).

(12) 49 U.S.C. 40118, Fly American provisions (see subpart 47.4).

(13) Section 806(a)(3) of Pub. L. 102-190, as amended by Sections 2091 and 8105 of Pub. L. 103-355 (10 U.S.C. 2302 note), Payment Protections for Subcontractors and Suppliers (see 28.106-6).

(b) The requirements for a certificate and clause under the Contract Work Hours and Safety Standards statute, 40 U.S.C. 37, (see subpart 22.3) are not applicable to subcontracts at any tier for the acquisition of commercial items or commercial components.

(c) The applicability of the following laws has been modified in regards to subcontracts at any tier for the acquisition of commercial items or commercial components:

(1) 41 U.S.C. 4704 and 10 U.S.C. 2402, Prohibition on Limiting Subcontractor Direct Sales to the United States (see subpart 3.6).

(2) 41 U.S.C. chapter 35, Truthful Cost or Pricing Data, and 10 U.S.C. 2306a, Truth in Negotiations (see subpart 15.4).

(3) 41 U.S.C. chapter 15, Cost Accounting Standards (48 CFR Chapter 99) (see 12.214).

## 12.505  Applicability of certain laws to contracts for the acquisition of COTS items.

COTS items are a subset of commercial items. Therefore, any laws listed in sections 12.503 and 12.504 are also inapplicable or modified in their applicability to contracts or subcontracts for the acquisition of COTS items. In addition, the following laws are not applicable to contracts for the acquisition of COTS items:

(a)(1) The portion of 41 U.S.C. 8302(a)(1), that reads "substantially all from articles, materials, or supplies mined, produced, or manufactured, in the United States," Buy American-Supplies, component test (see 52.225-1 and 52.225-3).

(2) The portion of 41 U.S.C. 8303(a)(2), that reads "substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States," Buy American-Construction Materials, component test (see 52.225-9 and 52.225-11).

(b) 42 U.S.C. 6962(c)(3)(A), Certification and Estimate of Percentage of Recovered Material.

# FAC 2005–48  JANUARY 31, 2011

## Subpart 12.6—Streamlined Procedures for Evaluation and Solicitation for Commercial Items

### 12.601  General.

This subpart provides optional procedures for (a) streamlined evaluation of offers for commercial items; and (b) streamlined solicitation of offers for commercial items for use where appropriate. These procedures are intended to simplify the process of preparing and issuing solicitations, and evaluating offers for commercial items consistent with customary commercial practices.

### 12.602  Streamlined evaluation of offers.

(a) When evaluation factors are used, the contracting officer may insert a provision substantially the same as the provision at 52.212-2, Evaluation—Commercial Items, in solicitations for commercial items or comply with the procedures in 13.106 if the acquisition is being made using simplified acquisition procedures. When the provision at 52.212-2 is used, paragraph (a) of the provision shall be tailored to the specific acquisition to describe the evaluation factors and relative importance of those factors. However, when using the simplified acquisition procedures in Part 13, contracting officers are not required to describe the relative importance of evaluation factors.

(b) Offers shall be evaluated in accordance with the criteria contained in the solicitation. For many commercial items, the criteria need not be more detailed than technical (capability of the item offered to meet the agency need), price and past performance. Technical capability may be evaluated by how well the proposed products meet the Government requirement instead of predetermined subfactors. Solicitations for commercial items do not have to contain subfactors for technical capability when the solicitation adequately describes the item's intended use. A technical evaluation would normally include examination of such things as product literature, product samples (if requested), technical features and warranty provisions. Past performance shall be evaluated in accordance with the procedures in 13.106 or Subpart 15.3, as applicable. The contracting officer shall ensure the instructions provided in the provision at 52.212-1, Instructions to Offerors—Commercial Items, and the evaluation criteria provided in the provision at 52.212-2, Evaluation—Commercial Items, are in agreement.

(c) Select the offer that is most advantageous to the Government based on the factors contained in the solicitation. Fully document the rationale for selection of the successful offeror including discussion of any trade-offs considered.

### 12.603  Streamlined solicitation for commercial items.

(a) When a written solicitation will be issued, the contracting officer may use the following procedure to reduce the time required to solicit and award contracts for the acquisition of commercial items. This procedure combines the synopsis required by 5.203 and the issuance of the solicitation into a single document.

(b) When using the combined synopsis/solicitation procedure, the SF 1449 is not used for issuing the solicitation.

(c) To use these procedures, the contracting officer shall—

(1) Prepare the synopsis as described at 5.207.

(2) In the Description, include the following additional information:

(i) The following statement:

This is a combined synopsis/solicitation for commercial items prepared in accordance with the format in Subpart 12.6, as supplemented with additional information included in this notice. This announcement constitutes the only solicitation; proposals are being requested and a written solicitation will not be issued.

(ii) The solicitation number and a statement that the solicitation is issued as an invitation to bid (IFB), request for quotation (RFQ) or request for proposal (RFP).

(iii) A statement that the solicitation document and incorporated provisions and clauses are those in effect through Federal Acquisition Circular _____.

(iv) A notice regarding any set-aside and the associated NAICS code and small business size standard.

(v) A list of contract line item number(s) and items, quantities and units of measure, (including option(s), if applicable).

(vi) Description of requirements for the items to be acquired.

(vii) Date(s) and place(s) of delivery and acceptance and FOB point.

(viii) A statement that the provision at 52.212-1, Instructions to Offerors—Commercial, applies to this acquisition and a statement regarding any addenda to the provision.

(ix) A statement regarding the applicability of the provision at 52.212-2, Evaluation—Commercial Items, if used, and the specific evaluation criteria to be included in paragraph (a) of that provision. If this provision is not used, describe the evaluation procedures to be used.

(x) A statement advising offerors to include a completed copy of the provision at 52.212-3, Offeror Representations and Certifications—Commercial Items, with its offer.

(xi) A statement that the clause at 52.212-4, Contract Terms and Conditions—Commercial Items, applies to this acquisition and a statement regarding any addenda to the clause.

(xii) A statement that the clause at 52.212-5, Contract Terms and Conditions Required To Implement Statutes or Executive Orders—Commercial Items, applies to this acquisition and a statement regarding which, if any, of the

additional FAR clauses cited in the clause are applicable to the acquisition.

(xiii) A statement regarding any additional contract requirement(s) or terms and conditions (such as contract financing arrangements or warranty requirements) determined by the contracting officer to be necessary for this acquisition and consistent with customary commercial practices.

(xiv) A statement regarding the Defense Priorities and Allocations System (DPAS) and assigned rating, if applicable.

(xv) The date, time and place offers are due.

(xvi) The name and telephone number of the individual to contact for information regarding the solicitation.

(3) Allow response time for receipt of offers as follows:

(i) Because the synopsis and solicitation are contained in a single document, it is not necessary to publicize a separate synopsis 15 days before the issuance of the solicitation.

(ii) When using the combined synopsis and solicitation, contracting officers must establish a response time in accordance with 5.203(b) (but see 5.203(h)).

(4) Publicize amendments to solicitations in the same manner as the initial synopsis and solicitation.

*    *    *    *    *    *

# CGI ADDENDUM DOCUMENT NO. 11

## FAC 2005-73  MAY 29, 2014

**38.000  Scope of part.**

This part prescribes policies and procedures for contracting for supplies and services under the Federal Supply Schedule program, which is directed and managed by the General Services Administration (see Subpart 8.4, Federal Supply Schedules, for additional information). GSA may delegate certain responsibilities to other agencies (*e.g.,* GSA has delegated authority to the Department of Veterans Affairs (VA) to procure medical supplies under the VA Federal Supply Schedules Program). The VA Federal Supply Schedules Program is covered by this subpart. Additionally, the Department of Defense manages a similar system of schedule contracting for military items; however, the Department of Defense systems are not a part of the Federal Supply Schedule program.

## Subpart 38.1—Federal Supply Schedule Program

**38.101  General.**

(a) The Federal Supply Schedule program, pursuant to 41 U.S.C. 152(3), provides Federal agencies with a simplified process of acquiring commercial supplies and services in varying quantities while obtaining volume discounts. Indefinite-delivery contracts are awarded using competitive procedures to firms. The firms provide supplies and services at stated prices for given periods of time, for delivery within a stated geographic area such as the 48 contiguous states, the District of Columbia, Alaska, Hawaii, and overseas. The schedule contracting office issues Federal Supply Schedule publications that contain a general overview of the Federal Supply Schedule (FSS) program and address pertinent topics.

(b) Each schedule identifies agencies that are required to use the contracts as primary sources of supply.

(c) Federal agencies not identified in the schedules as mandatory users may issue orders under the schedules. Contractors are encouraged to accept the orders.

(d) Although GSA awards most Federal Supply Schedule contracts, it may authorize other agencies to award schedule contracts and publish schedules. For example, the Department of Veterans Affairs awards schedule contracts for certain medical and nonperishable subsistence items.

(e) When establishing Federal Supply Schedules, GSA, or an agency delegated that authority, is responsible for complying with all applicable statutory and regulatory requirements (*e.g.,* Parts 5, 6, and 19). The requirements of parts 5, 6, and 19 apply at the acquisition planning stage prior to issuing the schedule solicitation and, generally, do not apply to orders and BPAs placed under resulting schedule contracts (except see 8.404 and 8.405-5).

# CGI ADDENDUM DOCUMENT NO. 12

## PART 512—ACQUISITION OF COMMERCIAL ITEMS

### Subpart 512.2—Special Requirements for the Acquisition of Commercial Items

**512.203  Procedures for solicitation, evaluation, and award.**

(a) *Federal Supply Schedule contracts.* For Federal Supply Schedule contracts, the contracting officer shall use the policies in FAR Part 12 and this Part 512 in conjunction with the policies and procedures in FAR Part 38 and Part 538. See Subpart 515.70, Use of Bid Samples, if applicable.

(b) *Deregulated/Competitive Acquisitions for Natural Gas and Electricity.* For deregulated/competitive acquisitions, the contracting officer shall use policies and procedures in FAR Part 12 and this Part 512 in conjunction with the policies and procedures in FAR 41.202 (a) and (b), the review requirements of FAR Part 41, and GSAM Part 541, as applicable.

(c) *Construction as a commercial item.* The provisions and clauses in FAR Part 36 and GSAM Part 536 address the fundamental aspects of construction contracting. FAR Part 36 and GSAM Part 536 apply well-established commercial principles that are designed to result in an equitable distribution of risk between the Government and its contractors. The contracting officer should consider the following when contemplating a construction acquisition as a commercial item—

(1) FAR Part 12, as currently promulgated, should rarely be used for new construction acquisitions or non-routine alteration and repair services.

(2) FAR Part 12 and GSAM Part 512 may be used in limited circumstances involving construction contracting, primarily for routine alteration and repair services as well as for the acquisition of commercial construction materials and associated ancillary services.  It may be appropriate to use FAR Part 12 and GSAM Part 512 for routine projects such as painting or carpeting, simple hanging of drywall, everyday electrical or plumbing work, and similar noncomplex services, as well as for purchases of commercial construction material and associated ancillary services.

(3) Whether a construction acquisition is conducted under FAR Part 36 or FAR Part 12, the contracting officer must adhere to the policies of FAR Subpart 22.4.  This subpart addresses labor standards for contracts involving construction.  Prior to making the determination that a construction acquisition can be conducted as a commercial item, the contracting officer should conduct appropriate market research in accordance with FAR Part 10 and GSAM Part 510.

(4) Construction contracts in excess of $2,000 must include an applicable Davis-Bacon wage determination found at *http://www.access.gpo.gov/davisbacon/*.  If the construction contract is greater than $30,000, then the SF 1442 should be used in lieu of the SF 1449 and the bonds or alternate pay-

ment protection provisions of FAR 28.102-1, 28.102-2 and 28.102-3 apply.

(5) Construction contracts awarded as commercial item acquisitions should not exceed the prospectus threshold.  The prospectus threshold as referenced in section 102-73.35 of the Federal Management Regulation (FMR) is posted at *http://www.gsa.gov/annualprospectusthreshold*.

### Subpart 512.3—Solicitation Provisions and Contract Clauses for the Acquisition of Commercial Items

**512.301  Solicitation provisions and contract clauses for the acquisition of commercial items.**

(a) *Solicitation provisions and clauses.* Insert these provisions or clauses in solicitations or solicitations and contracts, respectively, in accordance with the instructions provided:

(1) 552.212-71, Contract Terms and Conditions Applicable to GSA Acquisition of Commercial Items, when listed clauses apply.  The clause provides for incorporation by reference of terms and conditions which are, to the maximum extent practicable, consistent with customary commercial practice.  If necessary, tailor this clause.

(2) 552.212-72, Contract Terms and Conditions Required to Implement Statutes or Executive Orders Applicable to GSA Acquisitions of Commercial Items, when listed clauses apply.  The clause provides for the incorporation by reference of terms and conditions required to implement provisions of law or executive orders that apply to commercial item acquisitions.

(b) *Discretionary use of GSAR provisions and clauses.* Consistent with the limitations contained in FAR 12.302(c), include in solicitations and contracts by addendum other GSAR provisions and clauses.

(c) *Use of additional provisions and clauses.* The Senior Procurement Executive must approve the use of a provision or clause that is either not:

(1) Prescribed in the FAR or GSAR for use in contracts for commercial items.

(2) Consistent with customary commercial practice.

# CGI ADDENDUM DOCUMENT NO. 13

## PART 538—FEDERAL SUPPLY SCHEDULE CONTRACTING

### Subpart 538.2—Establishing and Administering Federal Supply Schedules

**538.270  Evaluation of multiple award schedule (MAS) offers.**

(a) The Government will seek to obtain the offeror's best price (the best price given to the most favored customer). However, the Government recognizes that the terms and conditions of commercial sales vary and there may be legitimate reasons why the best price is not achieved.

(b) Establish negotiation objectives based on a review of relevant data and determine price reasonableness.

(c) When establishing negotiation objectives and determining price reasonableness, compare the terms and conditions of the MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers. When determining the Government's price negotiation objectives, consider the following factors:

(1) Aggregate volume of anticipated purchases.

(2) The purchase of a minimum quantity or a pattern of historic purchases.

(3) Prices taking into consideration any combination of discounts and concessions offered to commercial customers.

(4) Length of the contract period.

(5) Warranties, training, and/or maintenance included in the purchase price or provided at additional cost to the product prices.

(6) Ordering and delivery practices.

(7) Any other relevant information, including differences between the MAS solicitation and commercial terms and conditions that may warrant differentials between the offer and the discounts offered to the most favored commercial customer(s). For example, an offeror may incur more expense selling to the Government than to the customer who receives the offeror's best price, or the customer (*e.g.*, dealer, distributor, original equipment manufacturer, other reseller) who receives the best price may perform certain value-added functions for the offeror that the Government does not perform. In such cases, some reduction in the discount given to the Government may be appropriate. If the best price is not offered to the Government, you should ask the offeror to identify and explain the reason for any differences. Do not require offerors to provide detailed cost breakdowns.

(d) You may award a contract containing pricing which is less favorable than the best price the offeror extends to any commercial customer for similar purchases if you make a determination that both of the following conditions exist:

(1) The prices offered to the Government are fair and reasonable, even though comparable discounts were not negotiated.

(2) Award is otherwise in the best interest of the Government.

**538.271  MAS contract awards.**

(a) MAS awards will be for commercial items as defined in FAR 2.101. Negotiate contracts as a discount from established catalog prices.

(b) Before awarding any MAS contract, determine that the offered prices are fair and reasonable (see FAR Subpart 15.4 and 538.270). Document the negotiation and your determination using FAR 15.406-3 as guidance.

(c) State clearly in the award document the price/discount relationship between the Government and the identified commercial customer (or category of customers) on which the award is predicated.

**538.272  MAS price reductions.**

(a) Section 552.238-75, Price Reductions, requires the contractor to maintain during the contract period the negotiated price/discount relationship (and/or term and condition relationship) between the eligible ordering activities and the offeror's customer or category of customers on which the contract award was predicated (see 538.271(c)). If a change occurs in the contractor's commercial pricing or discount arrangement applicable to the identified commercial customer (or category of customers) that results in a less advantageous relationship between the eligible ordering activities and this customer or category of customers, the change constitutes a "price reduction."

(b) Make sure that the contractor understands the requirements of section 552.238-75 and agrees to report to you all price reductions as provided for in the clause.